# SUPREME COURT

OF THE

## STATE OF MISSOURI

AT THE

### OCTOBER TERM, 1909.

---

## CHARLES A. BOYLES et al. v. J. L. ROBERTS et al., Appellants.

### In Banc, October 22, 1909.*

1. **POWERS OF CIVIL COURTS: Church Matters: Confessions of Faith.** The civil courts have the authority, and it is their constitutional duty, to investigate ecclesiastical matters, including confessions of faith, in cases involving rights to property. If no civil or property rights are involved, the courts accept the decrees of ecclesiastical judicatories, not because they are bound by such decrees, but because a civil court has nothing to do with the subject-matter of such decrees; but where property rights are involved, civil courts do not register as their own the church decrees, even on matters of doctrine and of faith, but investigate them for themselves. And if, in determining the civil or property rights of the parties, it becomes necessary to investigate the articles of faith of a church and the written documents of its judicatories, that will be done, even, to the extent of determining whether or not those judicatories have put the right meaning upon those articles.

2. ———: ———: ———: **Church Judicatory: Validity of Acts.** In the investigation of property rights the civil courts will investigate to see whether the church judicatory has acted, and if so, whether it has acted within the terms of its own constitutional grant of power.

3. ———: ———: ———: **Adherence to Original Faith: Majority or Minority.** In an investigation of property rights, the courts will compare the creeds of the two church organizations attempting to unite and will award the property to those parties, whether in the majority or minority, who have adhered to the doctrines and faith existing prior to the schism or division, where the trust relationship to the property was then fixed.

4. ———: ———: ———: **Full Faith and Credit to Foreign Courts: Jurisdiction.** Under the clause of the Federal Consti-

---

NOTE—Decided June 8, 1909. Motion for rehearing filed. Motion overruled October 22, 1909.

(613)

tution requiring each State to give full faith and credit to the records and judicial proceedings of every other State, the adjudications of any foreign court, whether civil or ecclesiastical, are of no binding force upon the courts of a State, unless the foreign court had jurisdiction over the subject-matter it attempted to adjudge.

5. ————: ————: ————: Union: Identity of Doctrine. There must be identity of doctrine and faith before a majority ·of a church organization can take the church property into another church.

6. ————: ————: ————: Division: Right to Property. In case of a division in a church organization, that portion thereof, whether the majority or the minority, which adheres to the existing creed, is entitled to the property.

7. ————: ————: ————: Union: No Church Adjudication. There has been no decree from either the Presbyterian Church of the United States of America or the Cumberland Presbyterian Church, declaring that each possessed and confessed an identity of faith, doctrine, discipline or church polity. A recital in a resolution for a union of the two churches, "It is mutually recognized such agreement now exists between the systems of doctrine contained in the Confession of Faith in the two Churches as to warrant this union," is no such an adjudication by the church judicatory that there is an identity in the two confessions of faith as is required to pass trust property, even if civil courts recognized such adjudication as binding upon them.

8. ————: ————: ————: Union: No Identity of Faith. In the attempted union between the Presbyterian Church U. S. A. and the Cumberland Presbyterian Church, not only was there no identity of faith, but the resolutions and reports admit there was not; and the former fully recognized that the latter was to "adopt our standards as an entirety" as interpreted by the revision of 1903, and "its other doctrinal and ecclesiastical standards," and the former declared that it was made plain to the latter's committee that "the revision of the Confession of Faith had effected no material change in the attitude of our church."

9. ————: ————: ————: ————: ————: The Language Itself, of the two confessions of faith, shows they are not substantially identical in doctrine, either before or since the Declaratory Statement or "explanation" of 1903.

10. ————:. ————: ————: Identity of Faith As Affecting Property. The proceedings for union between the two Presbyterian churches being invalid, those persons who left the Cumberland Presbyterian Church and went into the Presbyterian Church U. S. A., were dissenters from the Cumberland Presbyterian doctrines and faith, and are not, whether they be in the majority or the minority, in a position to claim property conveyed and held in trust by the Cumberland Presbyterian Church.

11. **CHURCH: Constitution: Supreme Law.** Whenever a church has a written constitution, such constitution is a contract between its members, and all are bound by it; it is its supreme law, and is binding upon all portions and all judicatories thereof.

12. ————: ————: **Change of Name.** The Cumberland Presbyterian Church could change its name only when its General Assembly had, by a two-thirds vote, asked the Presbyteries, by way of a proposed amendment, to do so, and a majority of them had approved of such a change.

13. ————: ————: ————: **Question Not Submitted.** No such proposition was submitted to the Presbyteries in the attempt at organic union with the Presbyterian Church U. S. A. A submission to the Presbyteries of the question, "Do you approve of the reunion and union of the Presbyterian Church in the United States of America and the Cumberland Presbyterian Church on the following basis: The union shall be effected on the doctrinal basis of the Confession of Faith of the Presbyterian Church in the United States of America, as revised in 1903, and of the other doctrinal and ecclesiastical standards; and the Scriptures of the Old and New Testaments shall be acknowledged as the inspired word of God, the only infallible rule of faith and practice?" submitted a proposition for union to be based on a declaration of faith, but not the proposition looking to the change in name of the Cumberland Presbyterian Church, and there was no such submission as authorized the latter church to change its name, dissolve its organization and surrender its properties to the other.

14. ————: ————: **Power of Assembly: To Surrender Organization.** The General Assembly of the Presbyterian Church, under its constitution authorizing it "to concert measures for promoting the prosperity and enlargement of the church," had no power to surrender the name, organization and creed of the church. And the clause authorizing it "to receive under its jurisdiction other ecclesiastical bodies whose organization is conformed to the doctrines and order of this church," does not supply that lack of power, but rather emphasizes it.

15. ————: ————: ————: **To Receive Other Bodies: Expressio Unius, Etc.: Without Amendment.** The Constitutional power of the Cumberland Presbyterian Church "to receive under its jurisdiction other ecclesiastical bodies whose organization is conformed to the doctrines and order of this church," does not indicate a power in the church to surrender its name, organization and properties, but excludes such power. The church's constitution prescribes a method by which its creed and doctrines may be amended, so as to provide for union with another church, but until so amended, in the way prescribed therein, neither the General Assembly nor its Presbyteries, nor both, have any constitutional power to unite with another church, but only to

receive under its own jurisdiction other churches conforming with its doctrines and order.

16. ————: **Attempted Union With Another: Unwarranted Merger: Forfeiture of Property.** The attempted union of the Cumberland Presbyterian Church with the Presbyterian Church U. S. A., implied a surrender of name, organization, judicatories, properties and creed by the former to the latter, and was an unwarranted merger of the one into the other. One church cannot· be merged into another having a different creed and doctrines, without forfeiting the property held in trust to such members of the body as remain faithful to the original creed and doctrines. Those who dissent from that church's faith and cast their lot with another of different faith and creed, are not entitled to the beneficial use of the property deeded to trustees of the church, but it belongs to the other members of the congregation who have remained faithful to its doctrines and organization.

17. ————: **Power of Self-Destruction: Implied.** As a rule, an executive body appointed to administer the affairs of an association, is created to effectuate the purposes of the association; to preserve it, not to destroy or extinguish it; and there can be no difference in this regard between a church organization and an organization of any other kind, unless it be that the presumption is stronger in favor of the church organization, since a church organization always looks to perpetuity. It is almost impossible to conceive of an organization delegating to its executive board, or its administrative body, by whatever name it may be called, the power to take its own life, to destroy the organization, including the administrative body itself. No such power can be implied; if it is conferred, it must be by express terms. No such power was conferred by the written constitution of the Cumberland Presbyterian Church upon its General Assembly; on the contrary, all the powers conferred were to aid in carrying into effect the purposes for which the church was organized, which have remained the same since its organization.

18. ————: ————: **Derived from Divine Founder.** Whether or not the powers of the General Assembly were derived, not from the people composing the church, but from its Divine Founder, cannot be determined in a lawsuit involving the title to property. The only knowledge a civil court can have of the powers of an administrative body is such as may be derived from its written constitution and laws, written by men, and those laws, in determining property rights, are to be interpreted as the work of men, and those rights are to be decided according to human law.

19. ————: **Interpretation of Confession of Faith: Effect on Outsiders.** The fact that the Presbyterian Church U. S. A. in 1903

put an interpretation on its Confession of Faith and thereby declared it did not mean what the founders of the Cumberland Presbyterian Church thought it did, may be final and conclusive· as to all members of that church, and in a dispute among them over property it would be held to be such; but such interpretation is not binding on those who are not members and who refuse voluntarily to become members; and where the former members of the Cumberland Church, who have accepted that interpretation of the creed of the Presbyterian Church U. S. A. and have accepted the provisions of union which make them members of the latter church, seek to reach out and take property which was deeded to trustees of the Cumberland Church, from those who have refused to accept the attempted union but have remained faithful to their own organization, the courts must take the Confession of Faith and interpret it for themselves as they would any other written instrument.

Per WOODSON, J., dissenting, with whom LAMM, J., concurs.

1. **CHURCH: Powers: Limited by Constitution.** The powers of both Presbyterian Churches are not limited and restricted to the matters and things enumerated in their written constitutions. Except where there is an expressed limitation, the General Assembly of each has inherent and absolute powers in legislative, executive and judicial matters.

2. ————: ————: ————: **Provisions Inapplicable: Inherent Powers.** The powers of the General Assembly expressed in section 43 of the written constitution of the Cumberland Presbyterian Church, namely, "to concert measures for promoting the prosperity and enlargement of the Church," and "to receive under its jurisdiction other ecclesiastical bodies whose organization is conformed to the doctrines and order of this Church," are foreign to the question of the power of that church and the Presbyterian Church U. S. A. to form a union with each other, and neither is a delegation of power to the General Assembly, but is at most only a limitation of power in respect to the matters embraced therein. But having no reference to union, neither is a limitation upon the inherent power of the various constitutional judicatories of the church, namely, the General Assembly, upon the approval of their action by the Presbyteries, to unite with the other church.

3. ————: **Powers of Court: Ecclesiastical Matters: Property Rights Incidental.** Where questions of faith, discipline, ecclesiastical rule, custom or law have been decided by church judicatories which, according to its government and organization, had jurisdiction over the matter, their decisions on those questions are final, and are binding, in their application, upon the civil courts in cases pending before them; and this rule is not changed by the fact that, in the determination of such purely

ecclesiastical question, the right to property may be incidentally involved, since every church must have property as an incident to the propagation of its faith and the religion it professes, and the property right dependent thereon is a mere incident to the larger question of faith and practice. The courts should not, in a suit over the rightful ownership of a church house, undertake to determine that one faction has departed from the church's confession of faith and the other has not, when the church's highest judicatory to which the question is committed by its own constitution has decided that there has been no such departure.

4. ———: ———: ———: ———: **Failure to Differentiate: Union of Church and State: English Cases.** The vice underlying those cases which hold that civil courts may determine for themselves that there has been a substantial departure from the confession of faith by a portion of a church in the face of the fact that its highest judicatory has decided to the contrary, consists in their failure to differentiate, on the one hand, between the principles of law governing in the courts of those countries in which there is a union of Church and State, and in which ecclesiastical law forms a part of their jurisprudence;

5. ———: ———: ———: ———: ———: **Property Deeded for Specific Purpose.** Or, it consists in a failure, on the other hand, to differentiate between those cases which hold that the determination of questions of faith and creed made by the constituted judicatories of the church is binding upon the civil courts, and those cases in which the property which was the subject of the litigation was by the will or deed of the donor in express terms devoted to the teaching, support or spread of some particular form of religious doctrine or practice, and toward which the ecclesiastical body occupies the relation of an ordinary trustee of an express trust, and must administer the property according to the instrument' creating the trust, and not according to the doctrines and beliefs of such church as interpreted by its judicatories.

6. ———: ———: ———: ———: ———: ———: **Deeded to Local Trustees for Congregation.** But property deeded to trustees of the Cumberland Presbyterian Church of Warrensburg, Missouri, is not restricted by an express trust to the purpose of teaching and propagating any specific form of religious doctrine or belief; but the local congregation is a subordinate part of the general organization known as the Cumberland Presbyterian Church, in which there are superior ecclesiastial tribunals possessing general and ultimate power of control over the entire membership of the general organization, which of itself gives to such tribunals jurisdiction over all church property as an incident to their control over all church matters.

7. ————: **Union: Change of Name: Surrender of Organization.** When the General Assembly of the Cumberland Presbyterian Church submitted to its Presbyteries the two propositions, namely, the question of union, and the acceptance of the Confession of Faith of the Presbyterian Church U. S. A., and those two propositions were adopted by a majority of those Presbyteries, the change of name and the surrender of the organization of the Cumberland Presbyterian Church necessarily followed, in the absence of an agreement to the contrary, as a result of and as an incident to the adoption of the plan of union—just as would, as a matter of law, the consolidation of two business co-partnerships, and the adoption by them of the name of one of the firms as the name of the consolidated organization.

8. ————: **Creeds: Power of Civil Courts.** Civil courts have no jurisdiction to construe and compare confessions of faith and other religious questions, because they constitute no part of the law of the land, but are simply doctrinal statements, expressing the religious beliefs entertained and taught by the church which promulgated them; and both the Federal and State constitutions prevent the civil courts from infringing upon man's religious liberty in matters of faith, but permit churches to investigate and interpret their own confessions of faith. For courts to undertake to construe them, and to make property rights dependent upon that construction, is to violate that part of the State Constitution which says that "no human authority can control or interfere with the rights of conscience" and that no person can be molested "in his person or estate on account of his religious persuasion or profession."

9. ————: **Union: Right to Property.** Since the General Assembly of the Cumberland Presbyterian Church adopted the Confession of Faith of the Presbyterian Church, U. S. A., as interpreted by the revision of 1903, and a majority of the Presbyteries approved of that action, the property of the Cumberland Presbyterian Church should belong to those former members thereof who accept and adhere to the plan of union, and the other members who refuse to abide by that interpretation of doctrine should be considered as having withdrawn from the Cumberland Presbyterian Church. Otherwise, there can never be any union between churches carrying with it the right to church property, unless unanimous assent were obtained, which implies an impossibility. A majority of the Presbyteries of the Cumberland Presbyterian Church having voted to adopt the Confession of Faith of the other church as revised, the courts should not undertake to say that interpretation was wrong, and give the property to the minority who maintain it was wrong and dissent therefrom. The church constitution provided for an amendment of its confession of faith, but did not restrict the church to any particular kind of amendment, nor require

that it should conform to the religious beliefs and convictions of all its members before it should become valid; and those members who were dissatisfied with the amendment should withdraw from the united church, which of course implies a forfeiture of any claim by them to the church property, which of necessity went with the union as an incident thereof.

10. ———: ———: **Confessions of Faith: Identity.** The courts have no right to determine that the Confessions of Faith of the Cumberland Presbyterian Church and the Presbyterian Church U. S. A. are not identical in substance, since the General Assemblies of each solemnly declared that they were in substantial agreement, and their declaration was approved by the majority of the Presbyteries of each, and thereby the difference in doctrine which originally caused their separation was removed; but, even if the courts could investigate the matter, that investigation would lead to the conclusion that there was no inconsistency and irreconcilable conflict at the time the union was attempted.

**Per LAMM, J., dissenting.**

**Effect of Decision: Legal Church Unions an Impossibility: True Attitude of Courts.** The majority opinions do not in so many words, but do in effect hold that legal church unions in America are impossible. The courts should not lend support to such a doctrine. The road to church unity, on the basis of the essentials of Christian faith, allowing flexibility and liberty of belief in non-essentials, is not laid with legal pitfalls, nor bristles with obstacles well nigh insurmountable. The bounden duty of the courts is to lend all the art and reason of the law to smooth the way to unity in church relations.

Appeal from Cooper Circuit Court.—*Hon. Wm. H. Martin*, Judge.

Reversed and remanded (*with directions*).

*Robt. M. Reynolds* and *Jas. A. Kemper* for appellants; *W. C. Caldwell* of counsel.

(1)    From the year 1810 the "Cumberland Presbyterian Church" has been an independent ecclesiastical body or society whose spiritual and temporal existence was presumed and intended to continue on and on throughout time, and its organizations and government were formed and established with that aim and

to that end, as best its founders could devise. (2) It began by the association of a few members into an organization or society, which formed what was denominated, a "church." These and other members of like faith formed and established other churches, which were later united into a presbytery. Other churches were organized and presbyteries formed, till the presbyteries created what was called a synod, the membership was extended into different states, presbyteries were established therein and synods formed, till, in 1829, all the presbyteries were organized into a general body, called a general assembly. The first law or discipline of said church was adopted in 1814. (3) The confession of faith, constitution and other ecclesiastical standards assumed their present form in 1883, and said church or society has been subject to the provisions of said laws since said time. (4) The Presbyterian Church in the United States of America, with its Westminster Confession of Faith and other ecclesiastical standards, has existed since 1789, and has been governed by fixed and established laws, and is now subject thereto. (5) The courts or judicatories of the Cumberland Presbyterian Church, as well as of the Presbyterian Church in the United States of America, are creatures of the constitutions of their respective churches, and their authority is limited to the powers expressly granted therein, and where no power or authority to do a thing exists in the law, it will be prohibited, and the only way to accomplish said end will be by amendments to the constitution so as to authorize the same, in the way and manner prescribed by the constitutions themselves. (6) The so-called scheme or plan of "union" or "reunion" was without any constitutional authority—either in the laws of the Cumberland Presbyterian Church or in the laws of the Presbyterian Church in the United States of America, was, and is therefore null and void. Watson v. Avery, 2 Bush 332; Bear v. Heasley, 98 Mich. 279,

24 L. B. A. 623; Bunn v. Gorgas, 41 Pa. St. 446; Krecker v. Shirley, 163 Pa. St. 634, 29 L. R. A. 481; Gartin v. Penick, 5 Bush 110; Kerr's Appeal, 89 Pa. St. 97; Deaderick v. Lampson, 11 Heisk. 523; Watson v. Garvin, 54 Mo. 379. (7) The sovereignty of the Cumberland Presbyterian Church is in the organization as a whole, and not in any of its parts. It is in the people, that is, the membership at large—official and non-official and ministerial—and not in the church courts, singly or collectively. Moore's Digest, Presbyterian Assembly, 465; Baird's Digest, 722; Discussions by Dabney, vol. 2, Evangelical, pp. 261-297, Constitution Presbyterian Church in the United States, sec. 62-IV, Form of Government, Alexander's Digest and Supplement, 1897, pp. 412-432, 454-458; Davis v. Congregation, 40 N. Y. App. Div. 424. (8) The constitutional authority to consummate and effectuate the alleged union or merger by the Cumberland Presbyterian Church and the Presbyterian Church in the United States of America, must be shown by those asserting it. The constitutionality of said movement has been challenged from its inception and no such authority has ever been cited, but on the contrary, the illegality and unconstitutionality of said movement have been openly declared, and no contrary contemporaneous construction of said constitution ever offered in justification of said movement. Kerr's Appeal, 89 Pa. St. 97; Schnorr's Appeal, 67 Pa. St. 138, 5 Am. Rep. 415; Watson v. Avery, 2 Bush 332; Gartin v. Penick, 5 Bush 110; also, Mr. Redfield's note to this case, 9 Am. L. Reg. N. S. 210, 221; Chase v. Cheney, 10 Am. L. Reg. N. S., and Mr. Fuller's note to latter case, page 308; Bear v. Heasley, *supra;* Free Church of Scotland Case, L. R. App. Cases (1904) 312, in which several of the judges expressed views on this point. (9) The action of the majority of the commissioners of the General Assembly in May, 1906, at Decatur, Illinois, in passing the final resolutions on

union and merger and declaring the general assembly adjourned *sine die,* and without naming a place for the next meeting, was in violation of their authority and in violation of section 41 of the constitution of the church, and their action was, therefore, inoperative and void. General Assembly of the Free Church of Scotland v. Lord Overton, L. R. App. Cas. (1904) 687; Schweiker v. Husser (Ill.), 34 N. E. 1022; Kreuher v. Shirley, 163 Pa. St. 534, 29 L. R. A. 470; Auracher v. Yerger, 90 Iowa 558.    (10)  The minority, in self-defense and in their effort to protect their rights and to perpetuate the existence of the Cumberland Presbyterian Church, acted in accordance with their commissions at Decatur in 1906, and preserved the church organization.    (11)  The culmination of the so-called union movement is not a union or reunion of the Cumberland Presbyterian Church and the Presbyterian Church in the United States of America, but is a merger and absorption of the Cumberland Presbyterian Church into and by the Presbyterian Church in the United States of America, and completely exterminates the same.  C. P. Min. 1904, p. 62a; P. Min. 1904, p. 136; P. Min. 1906, pp. 139, 140, 145-150, 152, 840-900; Successive Steps, 15, 70-78, 83, 89, 90, 91, 94, 102-106, 107, 108, 110, 112-114; C. P. Min. 1906, 67-71, 81; P. Min. 1907, 140, 245, 247, 280; C. P. Min. 1907, 18-22, 57b-59b; Associate Ref. Church v. Seminary, 4 N. J. Eq. 77.    (12)  The steps taken by the general assembly, culminating in the submission of the proposed basis of union to the presbyteries and the action of the presbyteries thereon, did not effect an amendment to the constitution of the Cumberland Presbyterian church, and thereby authorize the merger of that church into the Presbyterian Church in the United States of America.  Bear v. Heasley, 98 Mich. 279; White v. Brownell, 2 Daily 329; Venable v. Baptist Church, 25 Kan. 177; Hydes v. Woods, 2 Sawy. 655; State v. Williams, 75 N. C. 134; Protchett v.

Schaefer, 11 Phila. 166; Lamb v. Cain, 14 L. R. A. 528; State v. Foraker, 6 L. R. A. 422; Rottman v. Borthing, 22 Neb. 375; Schlichter v. Keiter, 156 P. A. 119; Hochreter's App., 93 P. A. 479; State v. Swift, 69 Ind. 505; Phillomoth v. Wyatt, 26 L. R. A. 78; Clask v. Brown, 108 S. W. 431; Russie v. Brazzill, 128 Mo. 107; sec. 60, Const. C. P. Church; Prohibitory Amendment Cases, 24 Kan. 709; In re Constitutional Convention, 14 R. I. 651; Smith v. Stephens, 10 Wall. 326; Bunn v. Gorgas, 41 Pa. St. 446. (13) The action of the general assembly throughout all of the proceedings leading up to and consummating in the alleged union or merger were not judicial in their character, and had not the effect of a judicial determination of any of the matters by it considered or sought to be determined. (14) The civil courts treat the constitutions of ecclesiastical bodies or societies as a civil contract between the membership thereof, and in passing upon questions of property rights, arising out of the violation of its terms, apply those established rules that govern in other civil controversies. Hyde v. Woods, 2 Sawy. 655, 94 U. S. 523, 24 L. Ed. 264; White v. Brownell, 2 Daly 239; Ebbinghousen v. Worth Club, 4 Abb. N. C. 300; Leech v. Harris, 2 Brewst. (Pa.) 571; Venable v. Ebenezer Baptist Church of Atchison, 25 Kan. 177; State v. Williams, 75 N. C. 134; Innes v. Wylie, 1 Car. & K. 262; Protchett v. Schaffer, 11 Phila. 166; Brine v. Board of Trade, 2 Am. L. R. 268; Bear v. Heasley, *supra;* White v. Brownell, *supra.* (15) The real estate and other property involved in this controversy belonged to the members of the Warrensburg congregation of the Cumberland Presbyterian Church, and the Presbyteries, synod or general assembly of said church, nor the members of the Presbyterian Church in the United States of America, had any interest whatever therein, nor right to the use or the control thereof, nor any authority or power to deprive said members of their said interest,

so long as they continue members of said church.   Gibson v. Armstrong, 7 B. Mon. 489; Deaderick v. Lampson, 11 Heisk. 529; Bridges v. Wilson, 11 Heisk. 458; Rodgers v. Burnett, 108 Tenn. 173; Newman v. Proctor, 10 Bush 318; Brown v. Monroe, 80 Ky. 443; Gartin v. Penick, 5 Bush 112; Harper v. Straws, 14 B. Mon. 39; Watson v. Garvin, 54 Mo. 343; Mount Helm Baptist Church v. Jones, 79 Miss. 488; Finley v. Brent, 87 Va. 103, 11 L. R. A. 214; McBride v. Porter, 17 Iowa 207; Godfrey v. Walker, 42 Ga. 562.   (16)   The real estate or property involved herein belonged to the membership of the Warrensburg congregation of the Cumberland Presbyterian Church, and each member has a substantial interest therein, and cannot be deprived thereof so long as he continues a member of said church, except by due process of law.   The effect of the so-called union and re-union would be to transfer the property of the said congregation to the Warrensburg congregation of the Presbyterian Church in the United States of America without ''due process of law,'' and is in violation of the provisions of the Constitution of the State of Missouri and void. Sec. 30, art. 2, Const. Mo.; Watson v. Garvin, 54 Mo. 366; Schnorr's Appeal, 67 Pa. St. 138; Wayman v. Southard, 10 Wheat. 50; Dabney's Discussions, 275, 291; Gartin v. Penick, 5 Bush 123; Ferravia v. Vasconcellos, 31 Ill. 25.   (17)   The property belonging to the members of a particular church or congregation professing a particular or distinct faith, doctrine or creed, will be protected by a court of equity as trust property, and where there is a division of the membership and a controversy as to the local property, the courts will give the property to those adhering to the faith, government, etc., held at the time the property was acquired, however small said number may be. Rodgers v. Burnett, 168 Tenn. 183; App. v. Lutheran Congregation, 6 Pa. St. 210; Roshi's Appeal, 69 Pa. St. 462; Harper v. Straws, 14 B. Mon. 48; General As-

222 Sup— 40

sembly of Free Church of Scotland v. Lord Overton, *supra;* Gartin v. Penick, *supra;* McGinnis v. Watson, 41 Pa. St. 13; Schnorr's Appeal, *supra;* Church v. Whitmore (Iowa), 13 L. R. A. 205; Smith v. Pedigo, 145 Ind. 361; Hendrickson v. Shotwell, 1 N. J. Eq. 577; Church v. Iserman, 64 N. J. L. 506; Rose v. Isaac Christ, 193 Pa. St. 13. (18) In order to determine whether or not church property belonging to the membership of a particular congregation, is trust property, civil courts will inquire into and consider the doctrine, polity, usages and practices of the contending parties, or in case of a divided congregation, of the two factions, in order to ascertain the true identity. L. R. App. Cas. (1904), 611. (19) Civil courts will take jurisdiction and investigate and determine the legality and regularity of the acts and decisions of ecclesiastical tribunals, when civil or property rights are involved, and such decisions or acts are not conclusive and binding upon said courts. Krecker v. Shirley (163 Pa. St. 534), 29 L. R. A. 476; Prickett v. Wells (Mo.), 24 S. W. 53; Pounder v. Ash, 36 Neb. 564; Langs v. Roven, 113 Mich. 375; Bird v. St. Mark's Ch., 62 Iowa 567; Kerr's Appeal, 89 Pa. St. 97; Jennings v. Scarbrough, 56 N. J. Law 401; Smith v. Nelson, 18 Vt. 511; Mount Helm Baptist Church v. Jones, 79 Miss. 582; Bear v. Heasley (98 Mich. 279), 24 L. R. A. 615; Bridges v. Wilson, 11 Heisk. 488; Deaderick v. Lampson, 11 Heisk. 523; Nance v. Busby, 91 Tenn. 304; Travers v. Abbey, 104 Tenn. 665; Rodgers v. Burnett, 108 Tenn. 173; Watson v. Garvin, 54 Mo. 377; Ferravia v. Vasconcellos, 31 Ill. 35; Watson v. Avery, 2 Bush 332; Associate Reform Church v. Trustees of Theological Seminary, 4 N. J. Eq. (3 Green), 77; Gartin v. Penick, 5 Bush 110. (20) Civil courts take jurisdiction of and decide all matters of civil or property rights for themselves and ecclesiastical judicatories have no authority over, or jurisdiction to consider and determine the same, and such courts will pro-

tect the rights of citizens, whether they be members
of a religious society, or other organizations, under
the constitutions of the State and of the federal gov-
ernment; and property belonging to the members of
a particular church or congregation professing a par-
ticular or distinct faith, doctrine or creed, will be pro-
tected by courts of equity as trust property.  Smith v.
Pedigo, 145 Ind. 361; Mount Zion Baptist Church v.
Whitmore, 83 Iowa 147; Park v. Champlin, 96 Iowa
55; Hale v. Everett, 63 N. H. 9; Schnorr's Appeal,
67 Pa. St. 138; Finley v. Brent, 87 Va. 103; Nance v.
Busby, 91 Tenn. 305; Bridges v. Wilson, 11 Heisk. 458;
Mount Helm Baptist Church v. Jones, 79 Miss. 488;
Dr. Dabney's Discussions, vol. 2, p. 288.  A change
from one denomination to another, though different in
name only, is a change, or a breach, that results in
the loss of property held in the former denomination.
Godfrey v. Walker, 42 Ga. 562; Deaderick v. Lampson,
11 Heisk. 523; Bridges v. Wilson, 11 Heisk. 459;
McKinney v. Griggs, 5 Bush. 401; Newman v.
Proctor, 10 Bush. 318; Brown v. Mason, 80 Ky.
443; Finley v. Brent, 87 Va. 103; Hale v. Everett (N.
H.), 16 Am. Rep. 114.  The rule is universal that go-
ing into another organization is, in law and necessarily,
an abandonment of all previous property rights by
those who go, and that those who maintain the original
organization thereby become the sole beneficiaries, as
the only persons then answering the description of the
deed.  Finley v. Brent, 87 Va. 103; Mount Helm Bap-
tist Church v. Jones, 79 Miss. 488; Godfrey v. Walker,
42 Ga. 562; McKinney v. Griggs, 5 Bush 401; Bridges
v. Wilson, 11 Heisk. 459; Harper v. Straws, 14 B. Mon.
48; Free Church of Scotland Case, L. Rep. App. Cas.
1904, 611.  Also, numerous other cases collated in note
in 4 Am. & Eng. Dec. in Equity, 509-10.  (21)  To hold
that the actions of the general assembly of the Cum-
berland Presbyterian Church in its various proceed-
ings leading up to and culminating in the so-called

union or re-union with the Presbyterian Church in the United States of America, is judicial, and therefore final, conclusive and binding upon the civil courts, would be to hold that said body possesses the power to surrender the Cumberland Presbyterian Church, with all of its judicatories, agencies, membership and property to the Presbyterian Church in the United States of America, either legally or illegally, and then, preclude an investigation thereinto. Church v. Harris, 73 Conn. 216, 50 L. R., A. 636; Central Univ. of Ky. v. Walters, 90 S. W. 1066; Schnorr's Appeal, 67 Pa. St. 138. (22) The doctrines as taught and represented by the Cumberland Presbyterian Church and by the Presbyterian Church in the United States of America, have never been declared identical by the two churches, but have ever been recognized and regarded as fundamentally and essentially different. P. Min. 1904, pp. 119, 137; C. P. Min. 1904, p. 63a; Successive Steps, 16, 20, 96; L. R. App. Cas. (1904) 669; C. P. Min. 1906, p. 117; P. Min. 1907, p. 211. (23) The medium system of theology occupies what is known as the "middle ground" between Calvinism and Arminianism, and opposes the extreme view taught by each of said systems, and is the doctrine of the Cumberland Presbyterian Church. The Old Log House, pp. 267-270; Min. 1905, p. 85. (24) Calvinism is a complete and compact system of doctrine, each part of which is inseparably connected with, and dependent upon each and every other part, and to alter or eliminate any of its parts would be to destroy the force of the whole system. Davidson's History of the Presbyterian Church, p. 256, quoted in Blake's Old Log House, at p. 76. (25) The Presbyterian Church in the United States of America is Calvinistic in its doctrine, having for its creed the Westminster Confession of Faith, while the Cumberland Presbyterian Church, in its doctrines, occupies the middle ground between Calvinism and Arminianism, having for its creed the con-

fession of faith, adopted in 1883. The doctrines of the two churches are, therefore, essentially different and irreconcilably antagonistic in many substantial and essential features thereof, and for this reason, even if the constitution authorized such a union or merger, the same could not be effected under the laws of the land, except by unanimous consent of all parties interested therein. Blake's Old Log House, 75. (26) The so-called "declaratory statement" found and contained in the "added chapters" of the Presbyterian confession of faith, constituting what is called the "revision of 1903," has not made any change or alteration in the original meaning of the objectionable parts of the Westminster Confession of Faith, nor has such "declaratory statement" or the added chapters rendered said confession of faith any less Calvinistic, than it was in 1810, when the Cumberland Presbyterian Church was organized, nor was it intended by the authors of said so-called revision that any change should be made or the meaning thereof in any degree affected thereby. (27) It has ever been the policy of the law, as is clearly expressed both in the Federal Constitution and in the Constitutions of the several States, to maintain a complete separation of Church and State, and to maintain exclusive jurisdiction, on the part of each of them, of all matters particularly within its own proper domain. In the domain of the church are all religious rights, while in the domain of the State are to be found all civil rights, and neither can, upon any pretext or for any purpose, lawfully invade the domain of the other. Hence it follows that all acts of ecclesiastical courts or tribunals which relate to and effect matters purely ecclesiastical, are within the exclusive jurisdiction of the church courts; but all ecclesiastical acts, though ecclesiastical in their character, if they affect the civil or property rights of those interested therein, it becomes the duty of the civil

courts to review said acts, not for the purpose of disturbing or annulling the same or their ecclesiastical effect; but for the purpose of determining the legality and regularity of such proceedings, and to see whether or not they are in violation of the rules and practices of the church, and the laws of the land, merely in order to ascertain and determine the legal status or property rights of the persons interested in and affected thereby. Watson v. Garvin, 54 Mo. 377; Watson v. Avery, 2 Bush 332; Fulbright v. Higginbotham, 133 Mo. 677; Clark v. Brown, 108 S. W. 431; Watson v. Avery, 2 Bush 332; Bridges v. Wilson, 11 Heisk. 470; Gartin v. Penick, 5 Bush 117; Smith v. Pedigo, 145 Ind. 361; Mt. Zion Baptist Church v. Whitmore, 83 Iowa 147; Hale v. Everett, 63 N. H. 9; Nance v. Busby, 91 Tenn. 305; Bear v. Heasley, 98 Mich. 279. (28) The effect of the so-called union and reunion of the two churches would be to deprive the defendants of membership in the Cumberland Presbyterian Church, and to transfer them into the Presbyterian Church in the United States of America, contrary to their will and wish. Such would be in violation of the provisions of the Constitution of the State of Missouri, and is therefore null and void. (29) The "basis of union" referred, by the general assembly at Dallas, in 1904, to the various presbyteries of the Cumberland Presbyterian Church, for their approval or disapproval was not intended to serve the purpose of an amendment to the constitution of the church, but was merely referred, for the purpose of obtaining the sense of the various presbyteries, upon the thing submitted as a "basis," or foundation, so to speak, upon which to proceed to build or erect the superstructure denominated a "union or reunion of the churches," and the plan and details of the proposed union or reunion, were to be worked out in the future. C. P. Min. 1904, pp. 62a, 63a; Successive Steps, 15; Joint Report on Union. (30) The transactions and proceedings had by the various church judicatories

of the Cumberland Presbyterian Church and of the Presbyterian Church in The United States of America, including the sessions, presbyteries and general assemblies of the respective denominations or churches touching or affecting the civil or temporal rights of the membership of the Cumberland Presbyterian Church, in and to the property held by the various congregations thereof, and more particularly the Warrensburg congregation of the said Cumberland Presbyterian Church, in and to the property herein involved, are without authority, *ultra vires,* and void; said judicatories, or courts being ecclesiastical in their origin and jurisdictional powers, cannot adjudicate or determine property rights between the members of contending factions of a congregation, or of churches of the same or different denominations.

*John M. Gault* for respondents; *J. W. Suddath, O. L. Houts* and *W. M. Williams* of counsel.

(1) The General Assembly of the Cumberland Presbyterian Church, being "invested with legislative, judicial and executive authority" (Conf. of Faith, sec. 110, D. E. 67) and being "the highest court of this church and representing in one body all the particular churches thereof" (Con., sec. 40, D. E. 71), and having power to decide all questions of doctrine and ecclesiastical law (Con., sec. 43, D. E. 64; Rules of Dis., sec. 1; D. E. 67; Con., sec. 25, D. E. 65), and having decided that "such agreement now exists between the systems of doctrine contained in the Confessions of Faith of the two churches as to warrant this union—a union honoring alike to both." (Concurrent Declarations, par. 1, D. E. 31), and "that said reunion and union has been constitutionally agreed to" and the basis of the union "constitutionally adopted" (Res. of 1905, D. E. 43), such decision is binding upon every member of the church and hence is conclusive of this controversy. Watson v. Jones, 13 Wall. 675; State v. Farris, 45 Mo.

183; Brundage v. Deardorf, 92 Fed. 214; Nance v. Busby, 91 Tenn. 303 (15 L. R. A. 801); Trustees v. Harris, 73 Conn. 217; Marbury v. Madison, 1 Cranch 137; Luther v. Borden, 7 How. 1; Georgia v. Stanton, 6 Wall. 50; Miller v. Johnson, 92 Ky. 597. (2) If the questions of ecclesiastical law and of doctrine are open for the decision of this court, then the law presumes that every act of a church government, or department thereof, like every act of the government of a State or of the United States, is valid, and such presumption continues until the invalidity of the act is clearly shown. Knox v. Lee, 12 Wall. 531; Gibson v. Armstrong, 7 B. Mon. 515; McGinnis v. Watson, 41 Pa. St. 29. (3) The Cumberland Presbyterian Church had the inherent, inalienable and inextinguishable right and power, independent of the constitution, to form a union with the Presbyterian Church in the United States of America. McBride v. Porter, 17 Iowa 204; McGinnis v. Watson, 41 Pa. St. 9; The Scotch Kirk Case, Authorized Report, Macniven & Wallace; Gibson v. Armstrong, 7 B. Mon. 500; Oliver Lee & Co.'s Bank, 21 N. Y. 9; Miller v. Johnson, 92 Ky. 594; Smith v. Swormstedt, 16 How. 288; Brundage v. Deardorf, 92 Fed. 223; Lamb v. Cain, 129 Ind. 486, 14 L. R. A. 518. (4) This inherent, sovereign power, under the Presbyterian form of government, resided in the general assembly and presbyteries, the judicatories which made the constitution and the creed and have the power to amend or change both. Brundage v. Deardorf, 92 Fed. 223; Gibson v. Armstrong, 7 B. Mon. 510; Smith v. Swormstedt, 16 How. 308. (5) The general assembly and presbyteries of the church, acting conjointly, had the power, expressly conferred by the constitution, to take every step involved in the formation of the union, and hence had the express power to form the union. Com. of the C. P. Church, secs. 43-60; McBride v. Porter, 17 Iowa 204. (6) In view of the express power above referred to, it is immaterial

whether we or our adversaries are correct in the construction of section 25 of the constitution. (7) The clause of section 25 upon which the opposing counsel rely, did not change the church government from one of general powers into one of limited powers. It simply declared, what was already the law, that the powers of the church court were unlimited unless restricted by expressed provisions of the constitution. Moreover, it has no application to the general assembly and all of the presbyteries when acting conjointly in the exercise of the sovereign power of the church,. but only to each one of the judicatories when acting by itself. (8) The Presbyterian Constitution, prior to its adoption by the Cumberland Church in 1810, had been construed by the Presbyterian Churches as authorizing union with other denominations. The Cumberland Presbyterian Church adopted this construction of the constitution along with the constitution itself. Brown v. Walker, 161 U. S. 591; Blaylock v. Muskogee, 117 Fed. 125; Cooley's Con. Lim., p. 81; State Board v. Holliday, 150 Ind. 216; Requa v. Graham, 187 Ill. 65. This construction has been held to be conclusive. Stuart v. Laird, 1 Cranch 299; McPherson v. Blacker, 146 U. S. 37. The civil courts will follow that construction which the Cumberland Presbyterian Church has practically and contemporaneously given its own constitution throughout its entire history. McGinnis v. Watson, 41 Pa. St. 9; Smith v. Swormstedt, 16 How. 288; Gibson v. Armstrong, 7 B. Mon. 481. Just as a civil court will adopt, as the construction of a contract, that construction which has been given it by the parties to it, so the civil courts will adopt the construction given by the judicatories and members of a church to their constitution, such constitution being a contract between the members. Such construction will be given whether correct or incorrect in the opinion of the civil court. First Pres. Ch. v. Wilson, 14 Bush 256. (9) The union having been legally formed, those ministers, officers

and members who recognize it constitute the ministers, judicators, and congregations of the church, whether they be in the majority or minority, and are entitled to the church property, while those who repudiate the authority of the general assembly and presbyteries exercised in the formation of the union, and repudiate the union itself, are seceders from the church and have abandoned all their rights and privileges as to all of the church property. Sutter v. First Ref. Dutch Ch., 42 Pa. St. 503; Godfrey v. Walker, 42 Ga. 592; Gaff v. Greer, 88 Ind. 122; McGinnis v. Watson, 41 Pa. St. 9; McBride v. Porter, 17 Iowa 204; Feraria v. Vasconcellos, 23 Ill. 403; First Pres. Ch. v. Wilson, 14 Bush 273. (10) A special trust for the continued separate existence of the church, or for the propagation of any particular doctrines, could not be created by implication (Baptist Ch. v. Fort, 93 Tex. 224), and none was created by any express provision in any deed, will or other muniment of title. On the contrary, as the constitution authorizes change of creed, any implied trust would be for a changeable, instead of a changeless creed. The church, therefore, violated no trust in entering the union, and carrying into it the property of the church, even if there were difference in doctrine, which we deny. (11) The fundamental purpose of a Christian church is not to maintain a separate organic existence, but to christianize men. The organism is only a means for accomplishing this purpose. A change from separate existence to existence in union with another church is not a change in the fundamental purpose, but only a change in the means employed for the accomplishment of that purpose. Such a change is not death but enlarged and invigorated life. McBride v. Porter, 17 Iowa 204; Gibson v. Armstrong, 7 B. Mon. 500; McGinnis v. Watson, 41 Pa. St. 9.

GRAVES, J.—This is one of the numerous cases in the different States which resulted from what is called a union between the Presbyterian Church in the United States of America and the Cumberland Presbyterian Church, alleged to have been consummated in the year 1906. Both were voluntary unincorporated religious societies. The Presbyterian Church in the United States of America has for its foundation the Westminster Confession of Faith, known alike to profane and ecclesiastical history. In what was known as the great revival of 1800, which spread over Kentucky, Tennessee and other portions of the South, and in which Dr. McGready was one of the leading spirits, so great was the demand for the Gospel, that the more educated and intelligent laymen, of devout character, were called and did preach. This revival, as we gather from the early history of the Cumberland Presbyterian Church, was opposed by many of the straighter-laced Presbyterians, and the same opposed the uneducated ministers who in the course of this great revival had buckled on their armor and hied to the field of action. In Cumberland Presbytery the "Revival Party," as it was called, was strongly in the ascendency and this Presbytery had dared to send forth some of their educated laity to preach. In 1805, the Synod of Kentucky, under whose jurisdiction was the Cumberland Presbytery, appointed a commission of ten ministers and six elders to meet at Gasper River Meeting House and investigate the proceedings of Cumberland Presbytery. The "Anti-Revival Party" was largely in the majority in the Synod, and from this majority the investigators and triers of fact were selected. The charges against Cumberland Presbytery were, (1) that such Presbytery had licensed men to preach and ordained others to preach and administer the church ordinances contrary to the rules of the church, and (2) that such Presbytery did not require such men so licensed and ordained to adopt the Presbyterian Con-

fession of Faith further than they believed it to be the
Word of God. As a result of this commission many
preachers and licentiates were silenced from preach-
ing. Shortly thereafter, in 1810, three ministers of
the Presbyterian Church, who were not in accord with
the Westminster Confession of Faith, organized the
new church. They pointed out the doctrinal differences
which led to their action, which differences it may be-
come necessary to note in detail later. From an hum-
ble beginning the Cumberland Presbyterian Church
grew and continued to grow, until in 1906 it had to its
credit 114 Presbyteries, 17 Synods, a General Assem-
bly, 1,514 ordained ministers, 9,614 ordained elders,
3,914 ordained deacons, 2,869 congregations, and a total
membership of 185,212. One of these congregations
was located at Warrensburg, Missouri, and a schism
therein has occasioned the case now before us. The
petition in the case, which is one for injunction, sets
out the steps of the alleged union of the two churches.
Plaintiffs, who sue for themselves and in behalf of all
the members of the Presbyterian Church in the United
States of America, and especially for those members
who were formerly members of the Cumberland Pres-
byterian Church at Warrensburg, Missouri, ask that
the defendants be enjoined and restrained from certain
things, which are better stated in their prayer for re-
lief, thus:

"And further pray the Court to enjoin the Minis-
ters, officers and members of the Cumberland Presby-
terian Church, at Warrensburg, Missouri, who repu-
diate and renounce the action of the General Assembly
and the Presbyteries of said churches in agreeing to
and forming a union with the Presbyterian Church in
the United States of America, or who renounce the
United Church resulting from said union, known as the
Presbyterian Church in the United States of America,
together with all their associates, confederates, agents

and representatives, and that said persons be enjoined from doing the following things, to-wit:

"First. From interfering with or molesting the Pastors, Elders, Deacons, Church Members or other Ecclesiastical Agencies who adhere to and recognize said United Church, in the use, enjoyment, possession and exclusive control of all houses of worship, parsonages, endowment funds or other property or effects which belong to the Cumberland Presbyterian Church or any of its Boards, Committees, Judicatories, Congregations or Institutions, or are held in trust for them.

"Second. From using the name of the Cumberland Presbyterian Church as the name or any part of the name of any of their Organizations, Congregations, Sessions, Presbyteries, Synods, General Assemblies, Boards, Committees or other Ecclesiastical Judicatories, Institutions or Agencies, in connection with the claim on the part of said Judicatory, Organization or Agency, or any one acting for it, that it is a Judicatory Organization or Agency of the Original Cumberland Presbyterian Church as organized in 1810, as described in said deeds.

"And plaintiffs pray for such other and further relief as the Court in equity and good conscience may find them entitled to."

The real bone of contention is three lots of ground upon which is a church house, which was deeded to trustees for the Cumberland Presbyterian Church of Warrensburg, Missouri. The petition is long, as also is the answer thereto. By answer, the defendants, among other things, deny the validity of the alleged union, and claim that by reason thereof, and that by reason of their deeds they are entitled to the property.

Other matters, of both petition and answer, may become pertinent later and if so will be adverted to in the course of the opinion.

Going further into the historical part of the case,

it appears that in 1903 the Presbyterian Church, U. S. A., amended its Confession of Faith by some additions thereto, and it also undertook to declare what certain other portions, although written in plain English, meant. Shortly thereafter, through overtures, the two churches appointed committees upon union. These committees devised what they called a scheme or plan of *union* and *re-union*. Why both words union and' re-union were used will only appear in the shades of the background, and then only to the careful thinker. The Cumberland Presbyterian Church was a separate and distinct entity and always had been. Its religious tenets were different and its church polity different. As a church entity it never had been a part of the other church. The joint report of this committee was submitted and voted upon by the general assembly of each of the two churches. It will only be necessary to note the action of the Cumberland Presbyterian Church in detail.

The courts or judicatories of the Cumberland Presbyterian Church consisted first, of a church session, made up of the minister and the ruling elders, the latter chosen by the congregation; secondly, the Presbytery made up of the ministers and certain selected ruling elders for the several congregations in a certain district; thirdly, a Synod, made up of three or more presbyteries; and, fourthly, of a General Assembly. We have noted them in regular gradation beginning with the lowest. In 1904, this joint report was presented to the General Assembly of the Cumberland Presbyterian Church. The material portion reads:

"Therefore, we cordially recommend to your respective general assemblies, that the reunion of the Presbyterian Church in the United States of America and the Cumberland Presbyterian Church be accomplished as soon as the necessary steps can be taken, upon the basis hereinafter set forth.

"1. The Presbyterian Church in the United

States of America, whose General Assembly met in the Immanuel Church, Los Angeles, Cal., May 21st, 1903, and the Cumberland Presbyterian Church, whose General Assembly met in the First Cumberland Church, Nashville, Tenn., May 21st, 1903, shall be united as one church under the name and style of the Presbyterian Church in the United States of America, possessing all the legal and corporate rights and powers which the separate churches now possess.

"2. The union shall be effected on the doctrinal basis of the Confession of Faith of the Presbyterian Church in the United States of America, as revised in 1903, and of its other doctrinal and ecclesiastical standards; and the Scriptures of the Old and New Testaments shall be acknowledged as the inspired word of God, the only infallible rule of faith and practice.

"3. Each of the Assemblies shall submit the foregoing Basis of Union to its Presbyteries, which shall be required to meet on or before April 30th, 1905, to express their approval or disapproval of the same by a categorical answer to this question:

" 'Do you approve of the reunion and union of the Presbyterian Church in the United States of America and the Cumberland Presbyterian Church on the following basis: The union shall be effected on the doctrinal basis of the Confession of Faith of the Presbyterian Church in the United States of America, as revised in 1903, and of its other doctrinal and ecclesiastical standards; and the Scriptures of the Old and New Testament shall be acknowledged as the inspired word of God, the only infallible rule of faith and practice?'

"Each Presbytery shall, before the 10th day of May, 1905, forward to the Stated Clerk of the Assembly with which it is connected, a statement of its vote on the said Basis of Union."

Upon the incoming of this joint report, the follow-

ing resolution was offered by Dr. Templeton in the General Assembly:

"Resolved, 1. That the foregoing Report and Supplemental Report of the Committee on Presbyterian Fraternity and Union, appointed by the General Assembly in 1903, be received and spread upon the minutes of this General Assembly, and that the included Joint Report on Union be adopted; and that the Basis of Union be and is recommended to the Presbyteries of the Cumberland Presbyterian Church for their approval or disapproval.

"Resolved, 2. That the Moderator and the Stated Clerk be instructed to submit the Basis of Union, contained in said report, to the Presbyteries of the Cumberland Presbyterian Church, in the usual constitutional manner, upon receiving official notification of the adoption of said Joint-Report on Union by the General Assembly of the Presbyterian Church in the United States of America."

This resolution was adopted by a vote of 162 to 74, and was declared to be by the constitutional two-thirds vote. Upon a submission to the Presbyteries of the question to be categorically answered, set out above, it was found that 111 Presbyteries had returned their vote. Of these, 60 answered the question in the affirmative and 51 answered it in the negative. A summary of the vote in the 111 Presbyteries voting upon this question, shows that 691 ministers and 649 elders, or 1,340, voted for union, and 470 ministers and 1,007 elders, or total of 1,477, voted against union, so that whilst the question was answered in the affirmative by a majority of nine Presbyteries, it was answered in the negative by a majority of 137 votes of those ministers and elders who voted thereon. The Union was declared adopted.

In the General Assembly of the Cumberland Presbyterian Church for the year 1906, just after the resolution as to union and re-union was declared passed by

the vote above mentioned, there was a protest signed by a hundred of the commissioners, in which they charged the invalidity of the action upon many grounds not necessary here to state. The Assembly appointed a committee to answer the protest and after its answer was read, and some other business was transacted, the majority adjourned the Assembly *sine die*. Before this was done, however, the protestants gave notice that they would continue the work of the General Assembly under the rules, Confession of Faith and practice of the Cumberland Presbyterian Church. Pursuant to such notice the protestants did reorganize such Assembly, proceeded with their work and finally adjourned to a day and place named for the next meeting. From that time to this there has been a General Assembly under which were Synods, Presbyteries and Congregations, regularly meeting and adhering in the strict letter to the Cumberland Presbyterian Confession of Faith, as well as to the name. Now to the particular case.

The defendants in this case were within the jurisdiction of the Lexington Presbytery, and entered their protest to that body. In answer to their protest, they were, after kindly admonitions as to their spiritual welfare, notified that they had no standing in that judicatory and that the civil courts would not protect them in their alleged property rights, for that such Assembly in addition to advice from the attorneys of their respective boards, had taken the written opinion of seventeen lawyers and judges of courts, both Federal and State, and with one accord they held that the property interest of the Cumberland Presbyterian Churches had been so safeguarded as to have been safely transferred to the Presbyterian Church, U. S. A. Just who had the temerity to approach a judge of a court for a written opinion upon a disputed legal proposition, or what judges, both State and Federal, so far forgot their high position as to give such opin-

ion, we are not advised by the record. Suffice it to say that notwithstanding this reply, the defendants held possession of the property in dispute, and this action resulted.

The temporary injunction was made permanent as to the property in question, but by the grace of the judge, *nisi,* the defendants were permitted to cling to the name Cumberland Presbyterians.

From this judgment involving title to this property and constitutional questions as well, the defendants in proper order and due time appealed to this court. This sufficiently states the case for a discussion of legal questions involved.

## I.

An all-important preliminary question is as to what extent this, a civil court, can go into the questions raised in this case. As has been stated, there was a division in the Cumberland Presbyterian General Assembly when the union of the two churches was declared adopted. A very large minority of the commissioners, after having protested and given notice before final adjournment, immediately elected proper officers and proceeded with the General Assembly and adjourned it to a named time and place; and such General Assembly is going on under the Constitution of the Cumberland Presbyterian Church, with its Congregations, Presbyteries and Synods. There is also a division in the local congregation, some having gone over to the Presbyterian Church, U. S. A., and others remaining steadfast to the original organization. The question before us is to determine property rights in a case wherein there is a schism in a church organization from its highest to its lowest judicatory, as well as in its membership. Presbyterian disputes of this character are not new to this court. We have had them before. Respondents contend in effect that we have but to register the edict of the highest church judicatory.

and by so doing pass all Cumberland Presbyterian property to the Presbyterian Church, U. S. A. Appellants contend that the action of the General Assembly was *ultra vires* and void.

In an early Presbyterian controversy, the case of Watson v. Garvin, 54 Mo. 1. c. 377, this court said: "At the threshold of this inquiry, we are met with the startling proposition that, in cases like this, the judgments or decrees of ecclesiastical judicatories are final and conclusive, and that the civil courts have no authority in the premises, except to register these decrees and carry them into execution. It is to be regretted that loose expressions, by elementary writers, and also by judges in delivering their opinions, have given too much foundation for this false doctrine. Even the Supreme Court of the United States, in Watson v. Jones, 13 Wallace 679, gives prominence to this idea by making it the chief foundation of their opinion. That court seemed to think the judges not sufficiently learned in ecclesiastical law to pass on such questions, and that the ecclesiastical courts, being better qualified than themselves, ought to be allowed to be the exclusive judges. The civil courts are presumed to know all the law touching property rights; and if questions of ecclesiastical law, connected with property rights, come before them, they are compelled to decide them. They have no power to abdicate their own jurisdiction and transfer it to other tribunals. If they are not sufficiently advised concerning the questions that arise, it is their duty to make themselves acquainted with them, in all their bearings, and not to blindly register the decrees of tribunals having no jurisdiction whatever over property."

The opinion recognized that there were certain church decisions or adjudications that it would not interfere with, not on the theory that such adjudications were in any way binding upon this court, but on the theory that this court had no jurisdiction of the sub-

ject-matter involved in the cases. On this question we then said: "The true ground why civil courts do not interfere with the decrees of ecclesiastical courts, where no property rights are involved, is not because such decrees are final and conclusive, but because they have no jurisdiction whatever in such matters, and cannot take cognizance of them at all, whether they have been adjudicated or not by those tribunals. This principle forms the foundation of religious liberty in republican governments. The civil authorities have no power to pass or enforce laws abridging the freedom of the citizen in this regard, and hence, in matters purely religious or ecclesiastical, the civil courts have no jurisdiction. A deposed minister or an ex-communicated member of a church cannot appeal to the civil courts for redress. They can look alone to their own judicatories for relief and must abide the judgment of their highest courts as final and conclusive. But when property rights are concerned, the ecclesiastical courts have no power to pass on them so as to bind the civil courts. If they expel a member from his church, and he feels himself aggrieved in his rights of property by the expulsion, he may resort to the civil courts, and they will not consider themselves precluded by the judgment of expulsion, but will examine into the case to see if it has been regularly made upon due notice, and if they find it to be duly made, they will let it stand; otherwise they will disregard it, and give the proper relief. In most cases, no doubt, the judgment will be found to be sufficiently regular to fix the status of the expelled member and to warrant the civil courts in denying the desired relief."

Under a note to the case of Hendryx v. People's United Church of Spokane, 4 L. R. A. (N. S.), 1154, the learned annotator thus speaks of the Watson case, *supra*: "It is apparent, therefore, that, unless there is some civil or property right involved so as to confer jurisdiction upon the civil court, the question as to the

effect of a decision of the ecclesiastical tribunal cannot
legitimately arise. The distinction is clearly drawn in
the statement of the court in Watson v. Garvin, 54 Mo.
355, that the true ground why civil courts do not inter-
fere with the decrees of ecclesiastical courts where no
property rights are involved is not because such de-
crees are final and conclusive, but because the courts
have no jurisdiction whatever in such matters, and
cannot take cognizance of them at all, whether they
have been adjudicated or not by those tribunals.''

In Prickett v. Wells, 117 Mo. l. c. 504, this court
further said: ''While it is true that the civil courts
may not properly interfere with that part of church
management which concerns the spiritual welfare and
discipline of the members, yet, when rights of property
are involved in controversies of this class, those courts
cannot justly evade the exercise of such jurisdiction as
is necessary to the determination and vindication of
such rights.''

And to a like effect is Fulbright v. Higginbotham,
133 Mo. l. c. 677, whereat it is said: ''It is well-settled
law that the civil courts have and will exercise no jur-
isdiction to review the action of ecclesiastical bodies in
matters relating purely to the faith and discipline of
the church. It was for the congregation itself to deter-
mine whether these members held to doctrine that was
contrary to that taught and held by the church, and to
prescribe the rules of discipline. But the members of
these bodies have the same right as those of other vol-
untary associations of persons formed for charitable
and benevolent purposes, to seek the aid of civil courts
to prevent a diversion of its property from the uses
and trusts to which it was devoted, and to secure to
the members the enjoyment of the rights of member-
ship in respect to the use of the property. It there-
fore sometimes becomes necessary for the civil courts,
for the purpose of determining property rights of
members, to pass upon questions which are ecclesiasti-

cal in their nature. [State ex rel. v. Farris, 45 Mo. 183; Prickett v. Wells, 117 Mo. 503; Russie v. Brazzell, 128 Mo. 107.]''

In the case of Russie v. Brazzell, 128 Mo. l. c. 113, we said: ''The question of this branch of the case is, did the revised confession, as requested by the members and adopted by the General Conference, so change the distinctive doctrines of the Church as to destroy its identity, and operate as a perversion of the trust under which the property in question was held? However embarrassing it may be, it becomes our duty to determine this question. The action was one of law. The question thus raised is one of fact, which was passed upon by the circuit court without declaration of law, and the conclusion reached is binding upon this court, unless the finding was clearly erroneous. [Mead v. Spalding, 94 Mo. 47, and cases cited.]''

For the purpose of determining the question as to whether or not there had been a diversion of the property which was held in trust, in the Russie case, we compared the two Confessions of Faith (the old and the new) and determined the right of property by determining that there was in fact no change in the creed of the church, and in so doing we followed the cases of Schlichter v. Keiter, 156 Pa. St. 145; Kuns v. Robertson, 154 Ill. 394, and Bear v. Heasley, 98 Mich. 300, which cases had considered the same revised Confession of Faith that we had under consideration. The latter case held that there was a difference between the original and amended documents, the former two that there was not. But each case passes upon the question. All these cases grew out of disputes having their origin in certain amendments made to the Confession of Faith of the Church of the United Brethren in Christ. The organization was a large one and cases reached the appellate courts of several States, as above indicated.

An analysis of our cases shows that in cases where civil or property rights are involved the courts of this State will inquire into matters ecclesiastical.

In the Watson case, *supra*, we held an act of the General Assembly of the Presbyterian Church, U. S. A., to be invalid and void, and to do so reviewed the constitution of the church, seeking for the alleged authority claimed by the General Assembly. So that this court has authorized an investigation of the fundamental laws of the church to determine whether or not its acts were valid thereunder.

In the Russie case, *supra*, for the purpose of determining whether or not the property had been diverted from a trust, we compared two Confessions of Faith to see whether or not they differed in doctrine. Thus it appears that under our holdings, we will for ourselves examine such instruments for that purpose.

And may we now be permitted to add that, in our humble judgment, it would be a flagrant violation of constitutional mandates for the civil courts of this State, in cases involving property rights, to attempt to hide behind the judgments and decrees of any ecclesiastical tribunal. The duty of our courts in such cases is to investigate the facts, and all the facts bearing upon the issue as to property rights. If that investigation in a measure intrudes upon the decrees of bodies having no authority to pass upon property rights, there is no remedy for it. Of those pure ecclesiastical questions of creed, faith or church discipline, we should wash our hands, unless an investigation thereof is required to determine property rights. If for that purpose it should be required, our constitutional duty is to so investigate. Some of the courts are not as explicit in terms as was this court in the case of Watson v. Garvin, *supra*, but from the cases may be deduced the following:

(a) Civil courts will investigate ecclesiastical decrees when it becomes necessary so to do in determin-

ing property rights. [Grimes' Exrs. v. Harmon, 35 Ind. l. c. 254; Smith v. Pedigo, 145 Ind. l. c. 375; Hatfield v. Delong, 156 Ind. l. c. 207; Bird v. St. Mark's Church, 62 Iowa l. c. 573; Bridges v. Wilson, 11 Heisk. l. c. 470; Deaderick v. Lampson, 11 Heisk. 523; Associate Reformed Church v. Trustees, etc., 4 N. J. Eq. 77; Free Church of Scotland v. Lord Overtoun, L. R. App. Cas. (1904) 515, *et seq.*]

All of these cases and those that follow under further lettered subdivisions recognize the right of civil courts to investigate matters ecclesiastical in case property rights are involved. We shall not quote lengthily, nor from all, but as indicative of the trend of authority, short excerpts from some cases upon the question involved under each subdivision are at least pardonable in view of the bold stand taken by counsel for respondents in the oral argument before the court and reiterated in briefs herein filed, i. e., that for no purpose would the civil courts go behind the adjudications of ecclesiastical tribunals. So strong did they put it in oral argument that they declared that if an ecclesiastical judicatory declared that the word "white" meant "black," we had but to enter the decree. The writer received such argument with a mental reservation of a right to dissent therefrom, but this dissent is better expressed in the case law than can we, with our limited ability, express it.

In the Grimes case, *supra,* the Indiana Court says: "That over the church, as such, the legal tribunals do not have, or profess to have, any jurisdiction whatever, except to protect the civil rights of others and to preserve the public peace. All questions relating to the faith and practice of the church and its members belong to the church judicatures to which they have voluntarily subjected themselves. But the civil courts will interfere with churches and religious associations, *and determine upon questions of faith and practice of*

*a church* when rights of property and civil rights are involved.''

Note the language contained in the last sentence. Does that mean that a church court can say black is white and the civil court be bound thereby? Not by a long ways. It means what it says, as should church confessions mean what they say. It means that the courts will determine the meaning of the documents which express the doctrines of faith, aided by such lights as the law permits. And why not? In all other cases wherein the rights of property are on trial the civil courts must construe all written instruments introduced in evidence and bearing upon the issues. That we will not construe them in purely ecclesiastical cases, in which no property rights are involved, is because they cannot lawfully be before us for construction. But if a civil, as distinguished from a pure ecclesiastical right, is before us, we must construe it and determine its effect in so far as the property interest is concerned.

Again says the Indiana Court in the Smith case, *supra*: ''While the courts of this State have no ecclesiastical jurisdiction whatever, yet they are charged with the duty and clothed with the jurisdiction of protecting property rights of religious societies, corporations and churches, as well as that of individuals, and thereby, of necessity, they may be compelled to decide a question of ecclesiastical law when that law becomes a fact upon which property rights depend. They ought not, however, to be inclined to 'rush in where angels fear to tread,' and where necessity does not compel them.''

In the Bird case, *supra,* the Iowa Court says: ''The civil courts will not revise the decisions of churches or religious associations upon ecclesiastical matters; but they will interfere with such associations when rights of property or civil rights are involved.''

In the Deaderick case, *supra,* the Tennessee Court, following Gartin v. Penick, of the Kentucky Court, says: "The rule is thus laid down and we think correctly, by Judge ROBERTSON, of the Supreme Court of Kentucky, in the case of Gartin v. Penick, 9 Am. Law Reg. (N. S.) 213, that 'while the general desire of courts is to avoid ecclesiastical or spiritual questions, they find it impossible to do so. If a body of men have wrongful possession of a church, or of a sum of money, on the pretense, for example, that they are the religious body to which the money or the building was destined, their opponents have no right of redressing the wrong and vindicating their own right, except by appealing to the civil tribunals of the country, and civil tribunals have no means of doing justice in such cases, except by investigating into differences of doctrine, discipline, or practice, which, to the litigants, may be religious differences, but to the judge are mere matters of fact bearing on a question of civil right.' He then adds, that while courts could not 'control or mould the faith or doctrines of the church,' nor settle questions of orthodoxy, yet 'so far as the identity of the respective claimants with the beneficiary to whom the church property was dedicated, may be affected by their doctrines, or by the acts of the General Assembly in that case, the essential coincidence of the doctrines and the legal effect of those acts must necessarily be considered for the purpose of deciding the question of title to the property. These principles will sustain the jurisdiction of civil courts in cases like the present, and the views we have above expressed."

(b) And in the investigation of property rights the civil courts will investigate and see that the church judicatory has acted, and if so, whether it has acted within the terms of the constitutional grant of power.

If beyond the constitutional provisions of the church, the acts will be declared void. [Watson v. Garvin, *supra*; Watson v. Avery, 2 Bush 332; Perry v.

Wheeler, 12 Bush l. c. 549; Gartin v. Penick, 5 Bush 110; Bouldin v. Alexander, 15 Wallace 131; Krecker v. Shirey, 163 Pa. St. l. c. 551; Brundage v. Deardorf, 55 Fed. 839; Kerr's Appeal, 89 Pa. St. l. c. 112; McAuley's Appeal, 77 Pa. St. 397; McFadden v. Murphy, 149 Mass. 341.]

Speaking to the contention that the action of the church judicatories of the Presbyterian Church could not even be questioned upon the ground that the action was unconstitutional, and that such bodies were judges of their own jurisdiction, the Court of Appeals of Kentucky in the Watson case, *supra,* says: "Such a construction of the powers of church tribunals would, in our opinion, subject all individual and property rights, confided or dedicated to the use of religious organizations, to the arbitrary will of those who may constitute their judicatories and representative bodies, without regard to any of the regulations or constitutional restraints by which, according to the principles and objects of such organizations, it was intended that said individual and property rights should be protected. Especially is this so with reference to the powers of the higher courts of the Presbyterian Church. Those powers are not only defined, but limited by the constitution. But if it be true, as insisted for the appellees, that the inferior courts and people of the church are bound to accept as final and conclusive the assembly's own construction of its powers, and submit to its edicts as obligatory, without inquiring whether they transcend the barriers of the constitution or not, the will of the assembly, and not the constitution, becomes the fundamental law of the church. But the constitution having been adopted as the supreme law of the church, must be supreme alike over the assembly and people. If it is not, and only binding on the latter, the supreme judicatory is at once a government of despotic and unlimited powers. But we hold that the assembly, like other courts, is limited in its authority

by the law under which it acts; and when rights of property, which are secured to congregations and individuals by the organic law of the church, are violated by unconstitutional acts of the higher courts, the parties thus aggrieved are entitled to relief in the civil courts, as in ordinary cases of injury resulting from a violation of a contract, or the fundamental law of a voluntary association."

This is peculiarly applicable to the case at bar because upon the question of limitation of power, the Cumberland Presbyterian constitution is similar to that of the Presbyterian.

So, too, says Mr. Justice STRONG in the Bouldin case, *supra*: "But we may inquire whether the resolution of expulsion was the act of the church, or of persons who were not the church, and who consequently had no right to excommunicate others. And, thus inquiring, we hold that the action of the small minority, on the 7th and 10th of June, 1867, by which the old trustees were attempted to be removed, and by which a large number of the church members were attempted to be exscinded, was not the action of the church, and that it was wholly inoperative."

In the Krecker case, *supra,* the Pennsylvania court said: "But if such decisions plainly violate the law they profess to administer, or are in conflict with the laws of the land, they will not be followed. [Commonwealth ex rel. v. Cornish, 13 Pa. St. 288; O'Hara v. Stack, 90 Pa. St. 477.]"

And on the same page, the court also says: "It does not matter that a majority of any given congregation or annual conference is with those who dissent. The power of the majority as well as that of the minority is bound by the discipline and so are all the tribunals of the church from the lowest to the highest. [McAuley's Appeal, 77 Pa. St. 397; Sutter v. Reformed Dutch Church, 42 Pa. 503; O'Hara v. Stack, 90 Pa. 477; Schlichter v. Keiter, 156 Pa. St. 119.]"

In Kerr's case, *supra,* the same court, in speaking of a previous case decided by it in which the court had sustained a *mandamus* to reinstate certain exscinded members of a church, says: "This was, indeed, but a reiteration of that principle so well known to our jurisprudence, that the decree of a church judicatory is binding only when it is affirmatively shown that it has acted within the scope of its authority and has observed its own organic forms and rules. But the decree under consideration is not only open to the objection that it is not in accord with the well-known law of the church, that no one shall be condemned without due process, but it is also open to the charge that it is opposed to the cardinal principles of natural justice as being a judicial sentence without notice or hearing. [Gibson, C. J., in Commonwealth v. Green, 4 Whart. 601.] As a judicial decree, therefore, the synodical resolution was *ultra vires* and ineffectual to dispose of the charter and property of the Second Reformed Congregation."

It thus appears that Missouri does not stand alone when in the Watson case we examined the constitution of the Presbyterian Church and condemned its action as *ultra vires.*

And in the Brundage case, *supra,* no less a personage than Judge WILLIAM H. TAFT, in speaking of an amended Confession of Faith, has said: "Even if the supreme judicatory has the right to construe the limitations of its own power and the civil courts may not interfere with such a construction, and must take it as conclusive, we do not understand the Supreme Court in Watson v. Jones, to hold that an open and avowed defiance of the original compact, and an express violation of it, will be taken as a decision of the supreme judicatory which is binding on the civil courts."

In Bear v. Heasley, 98 Mich. l. c. 307, the Michigan Court says: "The relation between the members of this association is one of contract, and the Confession

of Faith and the constitution constitute the terms of the agreement, which is binding upon all.''

(c)    And in such investigation of property rights the courts will take and compare the two creeds, and award the property to the parties, whether in the majority or the minority, who have adhered to the doctrine and faith, which existed prior to the schism or division.    [Krecker v. Shirey, 163 Pa. St. 1. c. 560; Brundage v. Deardorf, 55 Fed. 1. c. 846; Bear v. Heasley, 98 Mich. 279; Lemp v. Raven, 113 Mich. 375; Deaderick v. Lampson, 11 Heisk. 1. c. 535; Rodgers v. Burnett, 108 Tenn. 1. c. 183; Free Church of Scotland v. Lord Overtoun, L. R. App. Cas. (1904), 515.]

In the Brundage case, supra, Judge TAFT says: ''The question is one of identity, and that identity is to be determined by a reference to the fundamental law of the church which was the original contract or compact under which its organization was effected, and in pursuance of which, and subject to which, all the property acquired for its use became vested in the church.    An open, flagrant, avowed violation of that original compact, by any persons theretofore members of the church, was necessarily a withdrawal from the lawful organization of the church, and the forfeiture of any rights to continued membership therein and to the control and enjoyment of the property conferred on such organization.''

. We shall not quote further under this proposition. Suffice it to say that in determining the question of whether or not property has been diverted from a trust it    becomes    necessary    to    show    the    identity    of the organization claiming the property with the organization existing when the trust was created.    This identity is shown by the creed or confession of faith. In each of these cases cited supra the courts did examine the creeds to determine the identity of the organization.    No more thorough exposition of the Calvinistic doctrine can be found in the law books than in

the discussion of the two creeds under review by the House of Lords in the Free Church of Scotland case, supra.

In the case of McBride v. Porter, 17 Iowa 203, much relied upon by the respondents in this case, the court examined the creeds of the two churches which had united and found them to be the same, and held for that reason the identity of the beneficiary had not been lost by the mere change of name. But the court puts it on the ground that the two churches were "*entertaining the same faith and doctrine.*" The italics are ours.

These observations as to the law indicate our purpose to go into all the questions in the case, and such is our purpose.

(d)    There is yet another and further reason why civil courts should investigate the jurisdiction of ecclesiastical courts, even though they are going to accept proper decrees therefrom.

The idea is well expressed by the Michigan court in the Bear case, supra: "It has been expressly held by this court that the provision of the Federal Constitution that full faith and credit shall be given in each State to the records and judicial proceedings of every other State does not preclude an inquiry into the jurisdiction of courts; and if, in fact, the subject-matter of a suit was not within the jurisdiction of the State from which the court derives its authority its judgment is a nullity, and may be so treated everywhere. [People v. Dawell, 25 Mich. 247; Wright v. Wright, 24 Id. 180; McEwan v. Zimmer, 38 Id. 765.]"

It is useless for me to cite cases in Missouri that we will see that the foreign court had jurisdiction before we give its judgment the full faith and credit required by the Federal Constitution. By what reason can it then be said that we shall blindly register the decrees of ecclesiastical bodies holding their courts respectively in Illinois and Iowa?

## II.

That there must be identity of doctrines and faith before a majority of a church organization can take the church property into another church is fully recognized by McBride v. Potter, 17 Iowa 203. That in case of a division in a church organization, that portion of the organization, whether the majority or the minority, which adheres to the existing creed, doctrines and faith at the time of the dispute, is entitled to the church property, is unquestioned law.

In the case at bar, even if civil courts were bound to recognize and register the ecclesiastical decrees, which we deny, yet there has been no decree from either of these church judicatories, saying that there was an identity of confessions of faith, doctrines, disciplines or church polity. The most that is said is "it is mutually recognized such agreement now exists between the systems of doctrine contained in the Confessions of Faith in the two churches as to warrant this union—a union honoring alike to both."

If this be the ecclesiastical judgment, and it is the only one in the record upon the question, then there has never been an adjudication of the fact that there was identity in the two confessions of faith. There might be such a similarity of the confessions as to warrant united action between the churches, and yet not such an identity as is required to pass trust property. The question as to whether or not these two confessions of faith are the same has never been adjudicated.

In Bear v. Heasley, *supra,* Judge McGRATH, speaking of an amended confession of faith against which the defendants were protesting, well said: "It is urged, however, that the judgments of ecclesiastical tribunals in matters of faith and discipline and the general polity of the church are binding upon civil courts. In the present case there has been no judicial

determination of any matter of faith or discipline or general polity adverse to defendants. As already suggested, there has been no adjudication that the confession of faith has not been changed.''

So, too, in this case, if the adoption of the resolution for a union of these two churches is to be taken that the Cumberland Presbyterian Church amended its whole confession of faith by adopting that of the Presbyterian Church, U. S. A., then there is and has been no adjudication that such amendment did not change the original confession of faith. Therefore, even if we were disposed to make the decree of the church judicatory our decree, we have no decree upon the vital question to be adjudicated by this court.

### III.

Was there identity of church faith, discipline and polity? Was there identity of the confessions of faith? We say not, and for two reasons. First, from the evidence before us nobody claims that there was, and, secondly, an examination of the documents themselves fails to so indicate. We shall consider in this paragraph the testimony (by way of written statements) of the parties themselves that there was no identity of the confessions of faith.

With the report of the Committee on Fraternity and Union there came to the Cumberland Presbyterian Assembly a supplemental report, signed by William H. Black for the committee. I take it this was the action of the Cumberland Presbyterian half of the joint committee. This supplemental report urges many reasons for action in favor of union. This report concludes with this remarkable admission:

''Further, it is the opinion of your committee that the doctrinal status as between the two Confessions of Faith favors it. There never can be a unanimity that is absolute, where many finite intelligences are concerned. We see things from different points of

222 Sup— 42

view, with different degrees of emphasis, out of different personalities and impelled by disparate motives; therefore it is to be expected that any one who so desires can find objections in the statements of another; but brethren dwell together in unity, not by identity of beliefs, nor by the acceptance of absolutely unobjectionable doctrinal symbols, but by mutual tolerance, forbearance and love. If this union is consummated, the real tie which binds will not be in the confessional symbol of the United Church, but the spirit of Christ in the hearts of the brethren."

Note the language, "but brethren dwell together in unity, *not by identity of beliefs,* nor by the acceptance of absolutely unobjectionable doctrinal symbols, *but by mutual tolerance, forbearance and love.*"

This comes from the committee which for twelve long days considered the subject, and all they can say is "that the doctrinal status" favors union, but adds that such union will be *"not by identity of beliefs . . .* but by mutual tolerance, forbearance and love." Such identity is not sufficient to carry with it trust property.

By the report itself it is suggested, as in paragraph two of this opinion fully quoted, that "it is mutually recognized that such an agreement now exists between the systems of doctrines contained in the confessions of faith . . . as to warrant this union." Not a word said about the identity of the system of doctrine in the respective confessions of faith.

Further they say, "It is also recognized that liberty of belief exists by virtue of the declaratory statement," etc.

Why suggest that there was liberty of belief if identity of doctrine and faith was to be procured by this union? It is further said that the ordination vows required of the ministers, ruling elders and deacons "require the reception and adoption of the confession of faith, *only* as containing the system of doctrine

taught in the Holy Scriptures.'' And in the Moffatt resolution passed by the Presbyterian Assembly and spread upon the minutes of the other Assembly it is said: ''The ministers and ruling elders and deacons in expressing approval of the Westminster Confession of Faith as revised in 1903 are required to assent only to the system of doctrine contained therein, and not to every particular statement in it.'' In other words, the officers of the church need not endorse what is contained in the Confession of Faith, unless they thought it was well founded in the Holy Book. But how about the unofficial members of the church, and the applicants for admission? No provision for these except to accept the Westminster Confession of Faith and the slight additions thereto, in toto. No regard for the conscientious scruples of such individuals, as we read this report. It would appear from this that we have a confession of faith that can be accepted in part by a class, but must be accepted as a whole by another class. We confess that we do not know whether this is usual or unusual, but we had thought that one who was a member of a church with a written confession of faith would be classed as heretical who taught or believed doctrines contrary to the Confession of Faith. Our theology may be lame upon this proposition, and we only here mention this matter as indicating that this joint committee and these two churches fully recognized that there was not identity of doctrine and faith.

We are not prepared to say that our theology is lame, however. What is a Confession of Faith as applied to this or any other church? As we understand it, a Confession of Faith is simply the construction which a particular religious organization gives to the Holy Book, and of this no one will speak with more reverence than the writer. Different views of the meaning of the Holy Word, have been the occasion of denominational differences, and have forced

the different denominations of the church. I dare say that neither layman nor theologian will deny that the churches generally expect their followers to entertain the peculiar construction of the Holy Book given in their respective Confessions of Faith. Such facts we gather from profane history, as well as from theology.

We do not mean that the Presbyterian Church, U. S. A., actually required the member to subscribe to an oath or an obligation that he or she believed in the construction placed upon the Holy Word in their Confession of Faith, but what we do mean is that this church and all other churches having a written Confession of Faith, expect their respective members to be in accord and sympathy with the construction of the Bible which has been placed thereon by the church authorities. Such has been the history of the Presbyterian Church, U. S. A. As evidence thereof we have only to refer to the incident heretofore referred to, as to the origin of the Cumberland Church. Not only did the Presbyterian Church, U. S. A., adhere in strictness to their Westminster Confession of Faith, as to doctrine, when they practically cut off the Cumberland Presbytery, but they adhered in all strictness to one of their rules as to the educational requirements for ordained ministers. But for the fact that the Presbyterian Church required, at that time, a strict adherence to their doctrinal tenets, there would have been no Cumberland Presbyterian Church, and we have seen nothing manifested (by constitutional edict) since that time to lead us to believe there has been a change of heart in the Presbyterian Church, U. S. A., to demand less of its members than an adherence to their doctrinal tenets as found in the Confession. On the contrary if the rules and discipline of the Church mean anything, they mean that the members of the church, both children and adults, are to be taught from the Catechisms, which in doctrine have never been changed from the days of Calvin, and can't

be changed except by the action of the Presbyteries. In other words, if I have children in the Presbyterian Church, U. S. A., whether voluntarily or involuntarily, the discipline of the church requires that they be taught this doctrine. To close, why found a church upon this construction of Holy Writ, and yet say the members are to be in good standing, if they deny the central thought of the doctrine? The statement of the question answers it, in the minds of thinking persons. If the church has changed its original position then by constitutional amendments both to the Confession of Faith and the Catechisms, that change of mind can be evidenced, but it cannot be done by mere declaratory statement, which leaves all the text of the Confession of Faith in full force, and does not even mention the Catechisms, the remaining doctrinal standards of the church. No attempt to change all the doctrinal standards, yet the alleged union was on the basis not only of the Confession of Faith of the Presbyterian Church, U. S. A., but upon that "and the other doctrinal standards," a part of which are the unchanged books of Catechism, which they teach from and which remain as they have heretofore been.

Now let us take the Presbyterian side of the question and get their views of the identity. When the General Assembly voted upon and adopted the plan of union reported by the joint committee it passed a resolution making it clear what effect that church thought the revision of 1903 had upon the Westminster Confession of Faith. Section 4 reads: "That the Assembly, in connection with this whole subject of union with the Cumberland Presbyterian Church, places on record its judgment, that the revision of the Confession of Faith effected in 1903 has not impaired the integrity of the system of doctrine contained in the Confession and taught in Holy Scripture, but was designed to remove misapprehensions as to the proper interpretation thereof."

If the revision of 1903 "has not impaired the integrity of the system of doctrine" in their Confession of Faith, which was the Westminster Confession of Faith, then by the declaration of the Presbyterian Assembly itself, the Westminster Confession of Faith stands unimpaired with all of its doctrines of fatality in full force. If it has not been impaired it remains unimpaired—unchanged.

The representatives appointed by the Presbyterian Church on the joint committee made a report to their church, when they presented the joint report upon union. In this report, among other things, it was said that at the outset certain things were made plain to the Cumberland brethren of the committee, and among these things made plain was this: "And that the revision of the Confession of Faith had effected no material change in the doctrinal attitude of our Church." That doctrinal attitude prior to 1903 was the Westminster Confession of Faith and this had not been materially changed.

This committee further says: "The language used in the first paragraph of Concurrent Declaration No. 1, declaring that 'such agreement now exists between the systems of doctrine contained in the Confession of Faith of the two churches as to warrant this union—a union honoring alike to both,' was primarily the language of that committee [meaning the Cumberland committee.] It is to be interpreted in the light of the fact that preceding it the statement is found that the Cumberland Presbyterian Church is to adopt the Confession of Faith of the Presbyterian Church in the U. S. A. Whatever the differences between the churches have been, and there have been decided differences, these brethren must be regarded as giving expression to the sincere conviction that such a doctrinal agreement now exists between the churches as to warrant their adopting our Confession as interpreted by the Declaratory Statement. Your committee likewise

appreciated the power of this presentation made by the brethren of the other committee, and while the language of Declaration No. 1 was not satisfactory to them or to us, and effort was made to secure a different phraseology, it was felt by all that some cordial acknowledgment of a sufficient doctrinal agreement to warrant union, should union be deemed advisable, was due to a church, which it is proposed by both committees should yield its name, adopt our standards as an entirety, and find complete union with us."

If there could be a clearer admission that the parties considering the question did not think there was substantial identity, we misinterpret the language of these distinguished theologians.  Not only were they not satisfied that there was identity of faith and doctrine, but what they did agree upon was satisfactory to neither, but this committee felt there should be "some cordial acknowledgment of a sufficient doctrinal agreement to warrant union."

No concession here that there were two churches with one same faith, but that there would be if the Cumberland Presbyterians would "adopt our standards as an entirety, and find complete union with us."

Referring to the differences in church polity as to the selection of negroes as commissioners to the General Assembly and the maintaining separate Presbyteries and Synods for them, a thing not tolerated by the Cumberland Presbyterians, this committee said: "The committee in all its negotiations stood firm upon the Scriptural principles of the real unity of the household of faith and the equality of all its members," and they close with these remarks:  "If this General Assembly and the Cumberland Presbyterian General Assembly cannot see their way clear to acknowledge a sufficient agreement in doctrine between the two churches to warrant the union, and if this Assembly and Church feel unable to provide in a constitutional manner for the existence of more than one Presbytery

on the same ground, then it is respectfully submitted that the proper course to pursue would be to recommit the Plan of Union with a view to further and modified action.''

In 1907 the General Assembly of the Cumberland Presbyterian Church sent a communication to the General Assembly of the Presbyterian Church, U. S. A., to which reply was made. In this reply we find this language: ''We had not heard, until your communication announced it, that anybody had claimed or induced others to believe that the Presbyterian Church in the U. S. A. had abandoned the Westminster Confession of Faith. This is not true. The fact is in easy view of all, and nobody could have obscured it, if it had been attempted, that the re-union was effected upon the doctrinal basis of the Westminster Confession of Faith as revised in 1903 *and the other doctrinal standards* of the Presbyterian Church in the U. S. A.'' The answer then reiterated the often-repeated phrase that the churches in adopting the plan of reunion ''declared that there was sufficient agreement between the system of doctrine of the churches to warrant this union,'' etc.

This record evidence, which speaks louder than words, shows that the Presbyterian Church, U. S. A., is holding on with tenacity to the system of doctrine promulgated at Westminster. After the Union that church through its General Assembly boldly announces that if anybody claimed or induced others to believe that it had abandoned the Westminster Confession of Faith such was not true. Note the language above, ''This is not true.''

But why multiply words with these admissions from both sides? As between the two confessions of faith, no one claims that there was even substantial identity. From the record it appears that the Presbyterian Church, U. S. A., was taking legal advice, and this advice was to the effect if the union was

made it must be upon the basis that all the standards
of the new church should be the doctrines and stand-
ards of the Presbyterian Church, U. S. A., and that
the name of the Presbyterian Church, U. S. A., must
be retained. Their church had large holdings of prop-
erty in trust. These lawyers realized that this prop-
erty might be lost if the doctrines of that church were
impaired in the slightest, and they would not even per-
mit a change of name. Their idea was to preserve
absolute identity throughout. Not mere identity of
faith, doctrines and standards, but name as well. They
were not willing to stand upon McBride v. Porter, 17
Iowa 203, so often cited in respondent's brief, which
held that if there was identity of doctrinal standards,
a new name would not destroy the identity of the
church. We are not criticising these lawyers, for they
gave good legal advice. Nor are we criticising the
church for seeking advice, because their vast interests
demanded it, and their officers would have been derelict
in duty had they failed to seek proper legal advice.
But we dare say that the advice then given was far
from what is now urged in this court. In our state-
ment we refer to the use of the words "union" and
"reunion" in the submission of the question. We were
impressed with the notion when reading the record
that the able counsel, whoever they were, in advising
how the plan should be submitted, had likewise sug-
gested the use of both words as a better means of
safeguarding the property rights of their client, and
hence our statement that the reason for the use of the
two words appeared only in the shadows of the back-
ground. But we repeat that this was proper legal ad-
vice, and the Church was right in seeking it.

But all this goes to show that at no place through-
out the proceedings did these two churches consider
that there was even substantial identity of doctrines
and standards. "Sufficient agreement of doctrine for
union" is an uncertain and intangible thing. What

one person would say was a sufficient agreement might not be so considered by another. Then the character of united action must be considered. In the broad sense of the mere saving of souls there is sufficient agreement of doctrines for all churches to unite upon. Identity of faiths, doctrines and standards, described merely as "sufficient agreement to warrant this union," is not that identity which the law demands when determining the rights of parties to trust property.

We conclude this paragraph by saying that the evidence of the parties themselves does not show that they considered there was identity of doctrines such as the law demands.

Now, going a step further, let us take up the two doctrines themselves and compare them. We shall not go elaborately into them, but far enough to illustrate that there is not identity of doctrine in the two confessions of faith. For a better exposition of them we refer the inquiring mind to the able and learned opinion of NEIL, J., of the Tennessee Supreme Court, in the case of Landrith v. Hudgins, 120 S. W. 783.

Boyles v. Roberts.

Below in parallel columns we set out material portions of the two confessions of faith:

**Presbyterian Church in the United States of America.**

CONFESSION OF FAITH.

CHAPTER III.

OF GOD'S ETERNAL DECREE.

III.  By the decree of God, for the manifestation of His glory, some men and angels are predestined unto everlasting life, and others fore-ordained to everlasting death.

IV.    These angels and men, thus predestined and fore-ordained, are particularly and unchangeably designed; and their number is so certain and definite that it cannot be either increased or diminished.

V.  Those of mankind that are predestined unto life, God, before the foundation of the world was laid according to His eternal and immutable purpose, and the secret counsel and good pleasure of His will, hath chosen in Christ, unto everlasting glory, out of His mere free grace and love, without any foresight of faith or good works, or perseverance in either of them, or any other thing in the creature, as conditions or causes moving Him thereunto; and all to the praise of His glorious grace.

VI.    As God hath appointed the elect unto glory, so hath He, by the eternal and most free purpose of His will, fore-ordained all the means thereunto. Wherefore they who are elected, being fallen in Adam, are re-

**Cumberland Presbyterian Church.**

CONFESSION OF FAITH. DECREES OF GOD.

8.    God, for the manifestation of His glory and goodness, by the most wise and holy counsel of His own will, freely and unchangeably ordained or determined what He himself would do, what He would require His intelligent creatures to do, and what should be the awards respectively of the obedient and the disobedient.

9.    Though all divine decrees may not be revealed to men, yet it is certain that God has decreed nothing contrary to His revealed will or written Word.

deemed by Christ, are effectually called unto faith in Christ by His spirit working in due season; are justified, adopted, sanctified and kept by His power through faith unto salvation. Neither are any other redeemed by Christ, effectually called, adopted, justified, sanctified and saved, but the elect only.

, VII. The rest of mankind, God was pleased, according to the unsearchable counsel of His own will, whereby He extendeth or withholdeth mercy as He pleaseth, for the glory of His sovereign power over His creatures, to pass by, and to ordain them to dishonor and wrath for their sin, to the praise of His glorious justice.

## FREE WILL.

34. God, in creating man in His own likeness, endued him with intelligence, sensibility and will, which form the basis of moral character, and renders man capable of moral government.

35. The freedom of the will is a fact of human consciousness and is the sole ground of human accountability. Man in his estate of innocence, was both free and able to keep the Divine law, also to violate it. Without any constraint, from either physical or moral causes, he did violate it.

## CHAPTER X.

### OF EFFECTIVE CALLING.

III. Elect infants, dying in infancy, are regenerated and saved by Christ through the Spirit, who worketh when, and where, and how He pleaseth. So also are all elect persons, who are incapable of being outwardly called by the ministry of the Word.

IV. Others, not elected, although they may be called by the ministry of the Word, and may have some common operations of the Spirit, yet they never truly come to Christ, and therefore cannot be saved; * *

## DIVINE INFLUENCE.

38. God, the Father, having set forth His Son, Jesus Christ, as a propitiation for the sins of the world, does most graciously vouchsafe a manifestation of the Holy Spirit with the same intent to every man.

### REGENERATION.

51. Those who believe in the Lord Jesus Christ are regenerated, or born from above, renewed in spirit, and made new creatures in Christ.

54. All infants dying in infancy, and all persons who have never had the faculty of reason, are regenerated and saved.

The General Assembly of the Presbyterian Church in 1903 adopted what they called a "Declaratory Statement" with reference to Chapter 3 of their Confession of Faith, from which chapter, Sections 3 to 7, quoted above, are taken. The Declaratory Statement thus reads:

First. With reference to Chapter 3 of the Confession of Faith: That concerning those who are saved in Christ, the doctrine of God's eternal decree is held in harmony with the doctrine of His love to all mankind, His gift of His son to be the propitiation for the sins of the whole world, and His readiness to bestow His saving grace on all who seek it. That concerning those who perish, the doctrine of God's eternal decree is held in harmony with the doctrine that God desires not the death of any sinner; but has provided in Christ a salvation sufficient for all, adapted to all, and freely offered in the Gospel to all; that men are fully responsible for their treatment of God's gracious offer; that His decree hinders no man from accepting that offer; and that no man is condemned except on the ground of his sin.

We have some views of our own on this Declaratory Statement, but that we may not be said to express only worldly views, we quote a few lines from the eminent Presbyterian preacher and teacher, Rev. Benjamin B. Warfield, D. D., LL. D., of Princeton Theological Seminary. Writing upon the subject of "The Confession of Faith as revised in 1903" in the Union Seminary Magazine, Richmond, Va., Vol. 16, No. 1, he says, among other things, as follows:

The Declaratory Statement is not a "revision" of the text of the confession, nor an "addition" to the text of the confession; it is only an "explanation" of the text of the confession. The text itself it leaves intact; and not only leaves the text intact, it reaffirms that text. What it sets itself to do, in fact, is to protect this text from false inferences and to strengthen it by application. That this is the real state of the case will be apparent if we give attention to the terms of the Preamble by which the Declaratory Statement is introduced. . . . This doctrine it declares, we observe, "is held." It is not repudiated; it is not modified; it is not qualified; it is not in any way weakened or diluted; it simply "is held." Reaffirmation could not be more explicit.

In our humble judgment, Dr. Warfield is not far from right. Had he gone further and examined Chapter XXIV of the "Form of Government" of the Presbyterian Church, which chapter pertains to amendments, he would have found that it is neither an amendment in law nor fact. Such a document finds no constitutional support under the constitution of his church. Nor does the instrument itself purport to be a legislative act amending or changing the text. It affirms that everything in the sections we have quoted is correct, but it further holds said statements are in harmony with certain other named doctrines. But even giving it the status of an amendment, it leaves the sections we have quoted as fully in force and effect as the day they were adopted in the Westminster Conference. In other words the effect of it, considered as an amendment, is that all of the old sections are right, and are harmonious with the other things stated. That the two doctrines are in harmony we are wholly unable to see. If it is meant by this instrument that they want the court to say that the original sections do not teach that some men were damned from the beginning by the decree of God and that some others were saved by the same decree, from the same date, we will not so say. The language of these sections is in plain English, and the court is presumed to be able to understand English, whether it appears in a contract or a confession of faith. Confessions of faith to be read and understood by the masses, the ignorant as well as the highly educated, are presumed to be in plain terms and we presume they generally are in plain terms. At least this one is in plain terms. It is not claimed that these sections do not form a part of the Confession of Faith, or that a letter or syllable therein has been changed. The preamble says that the Declaratory Statement was for the purpose of "a disavowal by the church of certain inferences drawn from statements in the Confes-

sion of Faith." What these inferences were, we are left to gather from what follows. But this is immaterial. It is evident that these sections are left, and are unimpaired, as Dr. Warfield says, and as the Church itself said in the Assembly of 1907.

We cannot say that there is identity of doctrine between these sections, and the sections quoted from the other confession of faith. They are diametrically opposed to each other.

But going to another matter. When the committee was appointed to prepare this identical Declaratory Statement it received instructions from the General Assembly thus: "It being understood that the revision *shall in no way impair the integrity of the system of doctrines set forth in our Confession* and taught in the Holy Scriptures."

Thus they were charged in advance to in no way impair the Westminster Confession of Faith, and we think they have obeyed instructions.

Remembering that the union was effected "on the doctrinal basis of the confession of faith of the Presbyterian Church in the United States of America, as revised in 1903, *and of its other doctrinal and ecclesiastical standards,"* let us now go to a portion of such standards, about which there is no claim of wrong inference having been drawn, and which have not been either explained or modified by Declaratory Statement or otherwise. The Catechisms contain the doctrines actually and daily taught. These Catechisms cannot be changed, except by amendment, approved by two-thirds of the Presbyteries in the Presbyterian Church. [Chap. XXIV, Sec. 3, of Presbyterian Form of Government.] There is no pretense that these have been amended. Let us therefore compare the doctrinal tenets of the two churches from these standards, for they are the standards from which they teach both the young and the old.

### Presbyterian U. S. A.

### The Larger Catechism.

Q. 12. What are the decrees of God?

A. God's decrees are the wise, free and holy acts of the counsel of His will, whereby from all eternity, He hath, for His own glory, unchangeably fore-ordained whatsoever comes to pass in time, especially concerning angels and men.

Q. 13. What hath God especially decreed concerning angels and men?

A. God, by an eternal and immutable decree, out of His mere love, for the praise of His glorious grace, to be manifested in due time, hath elected some angels to glory; and in Christ hath chosen some men to eternal life, and the means thereof; and also, according to His sovereign power, and the unsearchable counsel of His own will (whereby He extendeth or withholdeth favor as He pleaseth), hath passed by, and fore-ordained the rest to dishonor and wrath, to be for their sin inflicted, to the praise of the glory of His justice.

Q. 67. What is effectual calling?

A. Effectual calling is the Work of God's almighty power and grace, whereby (out of His free and especial love to His elect, and from nothing in them moving Him thereunto) He doth in His accepted time invite and draw them to Jesus Christ, by His word and Spirit, savingly enlightening their minds, renewing and powerfully determining their wills, so as they (although in themselves dead in sin) are

### Cumberland Presbyterian. Catechism.

Q. 7. What are the decrees of God?

The decrees of God are His wise and holy purposes to do what shall for His glory. Sin not being for His glory, therefore, He has not decreed it.

hereby made willing and able, freely to answer His call, and to accept and embrace the grace offered and conveyed therein.

Q. 68. Are the elect only effectually called?

A. All the elect, and they only, are effectually called; although others may be and often are outwardly called by the ministry of the Word, and have some common operation of the Spirit; who, for their wilful neglect and contempt of the grace offered to them, being justly left in their unbelief, do never truly come to Jesus Christ.

### The Shorter Catechism.

Q. 19. What is the misery of that estate whereinto man fell?

A. All mankind, by their fall, lost communion with God, are under His wrath and curse, and so made liable to all the miseries of this life, to death itself, and to the pains of hell forever.

Q. 20. Did God leave all mankind to perish in the estate of sin and misery?

A. God, having out of His mere good pleasure, from all eternity, elected some to everlasting life, did enter into a covenant of grace, to deliver them out of the estate of sin and misery, and to bring them into an estate of salvation by a Redeemer.

Q. 21. Who is the Redeemer of God's elect?

A. The only Redeemer of God's elect is the Lord Jesus Christ, who, being the eternal son of God, became man and so was and continueth to be God and Man, in two distinct natures and one person forever.

222 Sup— 43

21. What are the evils of that estate into which mankind fell?

Mankind, in consequence of the fall, have no communion with God, discern not spiritual things, prefer sin to holiness, suffer from the fear of death and remorse of conscience, and from the apprehension of future punishment.

22. Did God leave mankind to perish in this estate?

No; God, out of His mere good pleasure and love, did provide salvation for all mankind.

23. How did God provide salvation for mankind?

By giving His Son, who became man, and so was and continues to be, both God and man in one person, to be a propitiation for the sins of the world.

Page after page might be taken up, but it is use-less. From these catechisms, the people are taught the doctrinal theories of the churches. Some churches go so far as not to confirm the member until they have been fully studied and memorized. If the Presbyterian Church to-day is complying with the discipline of their church, and teaching from these Catechisms, either Larger or Shorter, they are teaching Calvinism in its purity. We are to presume that, as faithful Christians, as they are, they are not remiss in this regard. But be that as it may, these quotations are of their standards of doctrine and faith. Had that .Church desired to depart from them under their Constitution, they should have been stricken out by amendment.

So, too, had it been the purpose to depart from the old Westminster Confession of Faith, they would have stricken out by way of amendment that part relating to the Decrees of God, which teach fatalism in terms too concise and plain to require argument here.

The position of the Cumberland Presbyterian Church is well stated by the following excerpts from Blake's Old Log House, pp. 267 to 270:

The Cumberland Presbyterian Church claims to occupy what it denominates the "MEDIUM SYSTEM OF THEOLOGY"—a middle ground between Calvinism and Arminianism. The two latter systems (Calvinism and Arminianism) as we all know, are regarded as the extremes of theology. It is claimed by the advocates of the systems that there is no medium ground; that everyone must either be a Calvinist or an Arminian in his religious belief or else he is nothing; but such an assertion, when analyzed, is absurd—might as well say there is no territory between the North and South Pole, or that there is no space between the extreme ends of a platform! How could these two systems be the extremes of theology without having this intermediate area—this medium ground?

But let us examine those systems (Calvinism and Arminianism), and see if there is not a theological medium ground.

1. The Doctrine of Election—Calvinism teaches that election is unconditional. Arminianism teaches that there is no election in this life. Medium system teaches that there is an election, but that it is conditional.

2. The Doctrine of Salvation.—Calvinism teaches that salvation is unconditional to sinners, but certain to Christians. Arminianism teaches that salvation is conditional to sinners but uncertain to Christians. Medium system teaches that salvation is conditional to sinners but certain to Christians.

3. The Date of Election.—Calvinism teaches that the date of election is before man was created. Arminianism teaches that the date of election is not prior to the death of the Christian, if indeed, it occurs then. Medium system teaches that the date of election is the moment when the sinner is regenerated.

4. The Extent of the Atonement.—Calvinism teaches that Christ died for only a part of the human race—that salvation is not possible to all, and that none but those who were "elected from the foundation of the world," will be saved. Arminianism teaches that the atonement of Christ was made for all mankind—that salvation is possible to all; but, as Christians may fall from grace, it is not certain that any one will be saved. Medium system, salvation is possible to all, and that every one who has been truly regenerated will be saved.

5. The perseverance of the Saints.—Calvinism teaches that perseverance depends principally upon the immutability of the decree of unconditional election. Arminianism teaches that perseverance depends principally upon the good works of the creatures. Medium system teaches that perseverance depends, not upon the immutability of the decree of unconditional election, nor upon the good works of the creature, but upon the love of God, the merits of Christ, the abiding of the Spirit and the covenant of Grace.

At the first meeting of the first Cumberland Presbyterian Synod, there was promulgated the following:

1. That there are not eternal reprobates.

2. That Christ died, not for a part only, but for all mankind.

3. That all infants dying in infancy are saved through Christ and the sanctification of the Spirit.

4. That the Spirit of God operates on the world, or as co-extensively as Christ has made atonement, in such a manner as to leave all men inexcusable.

Such is found implanted in every line of their subsequently made Confession of Faith. Such was there at the time of this union, and such is there both in spirit and letter at this time.

We cannot hold that there is substantial identity between these two confessions of faith.

To so say would be but to call from the grave the earnest protests of such venerable fathers in Israel as Ewing, McAdow, King, Calhoun, Donnell, Morrow, Buie, Burrow, Sloan, Patton, Renick and others, who from the beginning, framed and fostered the spirit of Cumberland Presbyterianism both in the East and West, and some of whom are buried beneath the sod in Missouri.

We, therefore, hold that the parties leaving the Cumberland Presbyterian Church and going into the Presbyterian Church, U. S. A., are dissenters from the Cumberland Presbyterian doctrines and faith, and it matters not whether they be in the majority or minority, they are in no position to claim property conveyed and held in trust for the Cumberland Presbyterian Church. This statement is here made subject to the views we have as to the legality of the proceedings for union, which follow.

## V.

We do not decide that the Cumberland Presbyterian Church could not amend its Confession of Faith by striking out portions thereof, or adding portions thereto. Under their constitution this can be done, for section 60 of their constitution reads: "Upon the recommendation of the General Assembly at a stated meeting, by a two-thirds vote of the members thereof, voting thereon, the Confession of Faith, Catechism, Constitution and Rules of Discipline, may be amended or changed when a majority of the Presbyteries, upon the same being transmitted for their action, shall approve thereof."

We have set out what was submitted to the Presbyteries to be voted upon. The question there submitted was the question of union, not the question of amending the Cumberland Presbyterian Confession of Faith. We have read this voluminous record, contain-

ing the proceedings of both Assemblies upon the question of union, and no word is found therein showing that they considered for a moment an amendment of the Cumberland Confession of Faith. Not an amendment was suggested by the General Assembly of the Cumberland Presbyterian Church, nor was one voted upon by the Presbyteries. The question of amending this Confession of Faith is never mentioned, and it remains in full tact to-day.

For the present, grant it that two churches having like creeds and doctrines can unite, and by such union, because of the identity of doctrine, carry to the union the property held in trust by both, yet that does not reach this case. Here we have two churches of different doctrines and faiths attempting to unite without changing by amendment the confession of faith of either. In the language of Judge NEIL, in Landrith v. Hudgins, supra: "The union must be effected in strict accord with the constitution. That is, if it requires a preliminary change of faith and of name and these changes can only be made by amendment, then such amendment must precede the actual union, and must be made in the manner pointed out in the contract. The principle is that as far as the method is distinctly pointed out it should be pursued."

The constitution is the contract of association in churches and all unincorporated societies. It is binding upon all portions of the church, as well as all judicatories thereof. It is the supreme law of the church and must be adhered to by every part thereof. To pass upon the meaning of such instrument is not dealing with ecclesiastical questions at all, but only determining the meaning of an organic agreement or contract. That these organizations cannot go beyond their constitutional powers is amply shown by the cases. [Watson v. Garvin, 54 Mo. 379; Watson v. Avery, 2 Bush 332; Bear v. Heasley, 98 Mich. 279; Bunn v. Gorgas, 41 Pa. St. 446; Krecker v. Shirley, 163 Pa.

St. 534; Gartin v. Penick, 5 Bush 110; Kerr's Appeal, 89 Pa. St. 97; Deaderick v. Lampson, 11 Heisk. 523; Presbyterian Church v. Wilson, 14 Bush 278.]

In fact, this contention is admitted in the case of Wallace v. Hughes, of the Kentucky Court of Appeals, which we will mention later as one of the cases growing out of this particular union. Other cases might be cited, but we take it that it is clear that whenever a church has a written constitution, such constitution is the contract between the members and all are bound thereby.

The only way, under section 60, supra, by which the General Assembly of the Cumberland Presbyterian Church could change the name of that organization or change its doctrines or faith, was by proper amendments offered as to their own confession of faith and organic law. It has no inherent power to wipe out the name Cumberland Presbyterian Church, until by a two-thirds vote of the Assembly, it has asked its Presbyteries, by way of a proposed amendment, whether or not they will so permit. The parties had thought along this line, for in their Plan of Union which was adopted, the first provision was: ''The Presbyterian Church in the United States of America, whose General Assembly met in the Immanuel Church, Los Angeles, Cal., May 21st, 1903, and the Cumberland Presbyterian Church, whose General Assembly met in the First Cumberland Presbyterian Church, Nashville, Tenn., May 21st, 1903, shall be united as one Church, under the name and style of Presbyterian Church in the United States of America, possessing all the legal and corporate rights and powers which the separate Churches now possess.''

Even if it could be said that if this had been submitted it would have the effect of an amendment to the Cumberland Presbyterian Constitution, so as to change the name of that church, yet this section 1 was

never submitted to nor voted upon by the Presbyteries of that church.

Judge NEIL, in the Tennessee case, has so forcibly presented this point that we use his language rather than our own. He says:

"The first subdivision of the Plan which involved a surrender of the name and organization of the Cumberland Presbyterian Church, was not submitted to the Presbyteries; but was left to be determined, and was determined by the General Assemblies of the two Churches; or rather by the General Assembly of the Cumberland Presbyterian Church. The question did not arise in the Presbyterian Church, U. S. A., because under the Plan of Union that Church was to retain both its name and organization.

"Did the General Assembly of the Cumberland Presbyterian Church, without submitting the matter to the Presbyteries, have the power to surrender the name and organization of the Church, and dissolve it, by consenting to its absorption into another organization? The view entertained by the two General Assemblies, it seems, from the recitals and resolutions contained in the Joint Report, was that it was not necessary to submit the general Plan to the Presbyteries, or rather, that by submitting the question whether the Union should be made on the basis of the Confession of Faith of the Presbyterian Church, U. S. A., as revised in 1903, the whole plan was submitted. Indeed, from a letter which the Moderator and Stated Clerk of the Cumberland Presbyterian General Assembly wrote to the Presbyteries, it appears that they signified to these bodies that their vote on these questions would mean the 'acceptance or rejection of the whole Plan.' It is provided in the Plan of Union that each of the Assemblies shall submit the basis of union to its Presbyteries, to express their approval or disapproval, by a categorical answer to this question, setting forth the doctrinal question copied here-

in, concerning the adoption of the Confession of Faith
of the Presbyterian Church, U. S. A.   That is, while
the Plan consisted of two distinct parts—the matter
of doctrine, and the matter of dissolving the organi-
zation of the Cumberland Presbyterian Church and
its absorption into the Presbyterian Church, U. S. A.,
only the question of doctrine was ordered to be sub-
mitted to the Presbyteries, and their answer to this
was to be regarded, according to the Plan, as an an-
swer to the other; in other words, only a part of the
Plan was to be submitted to the Presbyteries, but this
submission was to be regarded as a submission
of the whole. So, passing the statement above
quoted from the letter of the Moderator and the Stated
Clerk to the Presbyteries as to what the effect of their
vote would be as expressing merely their opinion,
which, of course, was not binding upon the Presbyte-
ries, or upon the court, because it does not appear that
they had any authority to make such statement, but
were merely required by the resolution of the Assem-
bly to submit the basis of Union to the Presbyteries,
and also because the question is one for this court to
determine,—we must consider the question as one aris-
ing upon the basis of union itself—whether the submis-
sion of the single question referred to (the doctrinal
basis), was also a submission of the other, concerning
the surrender of the name of the Church, and the
breaking up and dissolution of its organizations.
The question asked the Presbyteries was: 'Do you
approve of the reunion and union of the Presbyterian
Church in the United States of America and the Cum-
berland Presbyterian Church on the following basis:
The union shall be effected on the doctrinal basis of
the Confession of Faith of the Presbyterian Church
in the United States of America, as revised in 1903,
and of its other doctrinal and ecclesiastical standards;
and the Scriptures of the Old and New Testaments
shall be acknowledged as the inspired Word of God,

the only infallible rule of faith and practice?' Was
that equivalent to asking the Presbyteries to vote upon
the proposition involved in the first section of the
Plan, that the Cumberland Presbyterian Church
should surrender its name and organization, and be
incorporated into the body of the Presbyterian Church
in the United States of America, and under the name of
the latter? Does the submission of the question ('Are
you willing to effect a union upon a certain doctrinal
basis?') also submit the question, 'Are you willing
that the Cumberland Presbyterian Church shall aban-
don its name and organization and be merged into the
Presbyterian Church, U. S. A.?' We think not. Per-
haps this might be true as a necessary implication,
if merger were the only form of union, but it is by
no means the only form. At all events, the people
of the church were entitled to have the whole question
submitted to the Presbyteries. We do not think that
the General Assembly had power to determine this
question without a submission to the Presbyteries.
There is nothing in any part of the constitution of the
Church which confers this power upon the Assembly,
and by section 25 that body is denied all powers not
expressly conferred."

The General Assembly of the Cumberland Pres-
byterian Church in 1906, by its action undertook to
surrender not only the creed and doctrines of its
church, but likewise to surrender its name, organiza-
tion and property, and this without a vote of the Pres-
byteries. This cannot be done under the Cumberland
Constitution. The act was *ultra vires* and void.

## VI.

But to our mind there is another phase of this
case to be emphasized. We are firmly of the opinion
that there was no power in the General Assembly of
the Cumberland Presbyterian Church to submit the
question of union. In this view we are opposed to

some of the cases growing out of the controversy now
before us.  Section 43 of the Constitution reads:

"43.  The General Assembly shall have power to
receive and decide all appeals, references and com-
plaints regularly brought before it from the inferior
courts; to bear testimony against error in doctrine
and immorality in practice, injuriously affecting the
Church; to decide in all controversies respecting doc-
trine and discipline; to give its advice and instruction,
in conformity with the government of the Church, in
all cases submitted to it; to review the records of the
Synods; to take care that the inferior courts observe
the Government of the Church; to redress whatever
they may have done contrary to order; to concert
measures for promoting the prosperity and enlarge-
ment of the Church; to create, divide, or dissolve Syn-
ods; to institute and superintend the agencies neces-
sary in the general work of the Church; to appoint
ministers to such labors as fall under its jurisdiction;
to suppress schismatical contentions and disputations,
according to the rules provided therefor; to receive
under its jurisdiction other ecclesiastical bodies whose
organization is conformed to the doctrine and order
of this Church; to authorize Synods and Presbyteries
to exercise similar power in receiving bodies suited to
become constituents of those courts, and lying within
their geographical bounds respectively; to superintend
the affairs of the whole Church; to correspond with
other Churches; and, in general, to recommend meas-
ures for the promotion of charity, truth and holiness
throughout all the Churches under its care."

It will be noticed that there are but two provisions
herein that relate to changing the Church status, and we
mean by that the Church as a whole.  First, it says,
"to concert measures for promoting the prosperity
and enlargement of the Church," and, secondly, "to
receive *under its jurisdiction* other ecclesiastical bod-

ies whose organization is conformed to the doctrines and order of this Church.''

Then follows the clause that they can authorize Synods to do the same things.

It is hardly necessary to say that the word Church in these clauses quoted has reference to the Cumberland Presbyterian Church, and none other.

In this light does the enlargement of the Cumberland Presbyterian Church as spoken of in the first quoted clause, mean the absolute surrender of the name, organization and creed of the Church? To my mind it means to enlarge the Cumberland Presbyterian Church organization itself, and not to destroy or surrender it. This construction receives sanction in the second clause quoted, because it there provides one method of enlargement and that is to ''receive'' unto itself other organizations of like creed and faith. These powers, when fairly construed, mean (1) that by work in different ways they shall strive to secure individual members to join and thus enlarge the Church, and (2) to receive other bodies of a similar faith, creed and government. Neither of these contemplates the merger of the Church into another organization. The constitution has dealt with the manner of enlarging the Church, and in a manner which does not indicate that there should be a surrender of the church organization, the church name or the creed. Authority to ''receive'' unto itself does not mean to go to another body. The written instrument having mentioned the specific way by which mergers or unions can be formed with the church, i. e., by receiving other bodies *under its jurisdiction,* excludes the idea of enlargement by such church going in under another organization.

The maxim *"inclusio unius, exclusio alterius"* has peculiar application here. There is express provision for the consolidation of this church with other churches, but that provision is for the other to so

amend its creeds, doctrines and form of government as to make them conform to that of the Cumberland Presbyterian, and then come in under the jurisdiction of the Cumberland Presbyterian Church. Had the constitution been silent upon the question as to how the Cumberland Church should unite with other churches, there might be something in what respondents call the inherent power to unite. If the written Constitution prescribes a method for union, and this Constitution does, that method and none other should be followed. Any other method would be *ultra vires*. When they dealt with the question of merger or union, as they did, then the method adopted excludes the idea of any other. This constitutional method was ''to receive under its jurisdiction other ecclesiastical bodies whose organization is conformed to the doctrine and order of *this* Church.''

The Constitution provides for a union in express terms, but the one sought and attempted to be consummated was not such as is prescribed by the Constitution. It was violative of the Constitution and therefore void.

The sovereign power rests with the Church as a whole, and the several judicatories, beginning with the Church Session and ending with the Assembly; are but agencies of the Church with granted powers, which are expressly limited by section 25 of the constitution. The General Assembly is not the Church, neither is any other minor judicatory. They are but the constitutional agents of the Church, and whilst they can amend the constitution as well as the creed, yet until it is amended in strict compliance with the limiting terms of such constitution, the existing organic law is binding alike upon the General Assembly and the humblest member. So that we say that the attempted method of union was in direct violation of the constitution and void. In other words, until the Church has amended section 43 of its constitution it

cannot form a union with any other ecclesiastical body, except to receive such other body under its own jurisdiction.

## VII.

We do not feel that we should pass this case without some little comment upon the cases which have grown out of this controversy and the case much relied upon by respondents, i. e., Watson v. Jones, 13 Wallace 729. This last-named case, in so far as it holds that civil courts will not look into the judgments of ecclesiastical courts, has been condemned in terms by the Supreme Courts of Missouri, Kentucky, Michigan and New York, and sharply distinguished if not criticised by TAFT, J., in the Brundage-Deardorf case, *supra*. In the Brundage case, however, the U. S. Court of Appeals, 92 Fed. 214, said that they felt bound by that decision. But as we have shown, the great weight of authority is that civil courts will investigate ecclesiastical judgments in all cases wherein property rights are concerned.

In Schnorr's Appeal, 67 Pa. St. 138, Justice SHARSWOOD uses this forceful language: "Courts which have the supervision and control of all corporations and unincorporated societies or associations must be guided by surer and clearer principles than those to be derived from the nature of intellectual and spiritual life. The guaranty of religious freedom has nothing to do with the property. It does not guarantee freedom to steal churches. It secures to individuals the right of withdrawing, forming a new society, with such creed and government as they please, raising from their own means another fund, and building another house of worship; but it does not confer upon them the right of taking the property consecrated to other uses by those who may now be sleeping in their graves. The law of intellectual and spiritual life is

not the highest law, but must yield to the law of the land.''

In Fussell v. Hail, a case growing out of this particular union, the Illinois Supreme Court said: ''The civil courts afford no remedy for an abuse of ecclesiastical authority which does not violate a civil or property right. Church tribunals ought to perform their functions honestly, impartially and justly, with due regard to their constitutional powers, sound morals and the rights of all who are interested; but if tyranny, force, fraud, oppression or corruption prevail, no civil remedy exists for such abuse except where it trenches upon some property or civil right.''

This, the Fussell case, is the first of a series of cases growing out of this union. The bill was one in chancery, the object of which was to prevent the two bodies from declaring a union. In other words, they sought to stop the two bodies from acting. The Supreme Court sustained the action of the lower court in sustaining a demurrer to the bill in this language: ''There is no allegation setting forth any deed, devise, declaration of trust or gift of any property, or any clause therein or the terms thereof, whereby it can be seen that the proposed union would defeat its purpose. There is no statement whereby it appears that the complainants, or any of those they represent, have an interest in any property which will be in any way affected by the proposed union. It is not alleged that any action is proposed to be taken which will interfere with the management and control of the property of the various churches, boards, schools and other institutions of the Cumberland Presbyterian Church by the boards of trustees or other managers now in control thereof, and of their successors appointed in accordance with the trusts upon which they are held. We do not find that any property right is directly involved or can be directly affected by the proposed action of the General Assembly which it is sought to

enjoin. This proposed action was still pending in the General Assembly undetermined, when the bill was filed. It may well be doubted whether the proceedings of an ecclesiastical body can in any event be controlled by injunction while the matter is still *in fieri*. But without regard to this question, the case stated in the bill was not within the jurisdiction of a court of chancery and the demurrer to the bill was therefore properly sustained.''

It thus appears that the Supreme Court of Illinois clearly indicates that had there been allegations of property rights an investigation should have been made by the civil courts. It so indicates throughout the entire opinion, and in this is opposed to what respondents say was the ruling in Watson v. Jones, supra. The Illinois Court of Appeals had sustained the action of the lower court upon other grounds, holding among other things that under the Cumberland Presbyterian Constitution giving it power ''to promote the prosperity and enlargement of the church,'' they could unite. The Supreme Court had that opinion before it, but did not see fit to endorse it. We have discussed this constitutional provision elsewhere.

Next we have Mack v. Kime, by the Georgia Supreme Court, 129 Ga. 1, which court followed the opinion of Fussell v. Hail, in the Illinois Court of Appeals, 134 Ill. App. 620, and holds that the court will not go back of the Church adjudications. This court does not discuss the distinction between cases wherein property rights are involved, but bases its opinion upon Fussell v. Hail, supra, wherein the Illinois Supreme Court afterwards said no property rights were involved.

Next we have Wallace v. Hughes, 115 S. W. 684, by the Kentucky Court of Appeals, wherein by a divided Court, SETTLE, C. J., not sitting, and NUNN, J., dissenting, the court held that the C. P. General As-

sembly had the power to enter into the union. The court goes into the constitutional power to form the union and is of the opinion that there was such, but proceeds upon what we deem an erroneous theory, in that it holds that the adjudications of ecclesiastical tribunals are binding upon the civil courts. This is apparent from the following language in the opinion: "We think the foregoing authorities establish beyond question that, unless there is something in the constitution of the Cumberland Presbyterian Church, as it existed before the union, which denied jurisdiction to the General Assembly, with the approval of the Presbyteries, to authorize the union under discussion, the action by which the two churches were reunited must be held valid and binding so far as the civil courts are concerned."

Next in order is Brown v. Clark, by the Supreme Court of Texas. That court follows and relies upon the following cases: Fussell v. Hail, 134 Ill. App. 620, a case in which no property rights were involved, and practically ignored by the Supreme Court of the State in the same case; Mack v. Kime, 129 Ga. 1, which followed the Illinois Court of Appeals; Wallace v. Hughes, Kentucky Court of Appeals, and Watson v. Jones, 13 Wallace. Not another case is cited and the court sought cover under the doctrine that civil courts are bound by the decrees of ecclesiastical tribunals, even where property rights were involved, as they were. The court overrules the opinion of the court of Civil Appeals, which opinion reviews many of the authorities which we have reviewed, and cites even others. For thoroughness of research the latter is much the better of the two opinions.

The views which we have expressed upon this union have been entertained in full or in part by the following cases: Clark v. Brown, 108 S. W. 421, Texas Court of Appeals; Ramsey v. Hicks, 87 N. E. 1091, Ind. Court of Appeals; Landrith v. Hudgins, Supreme

Court of Tennessee, and Fussell v. Hail, Supreme Court of Illinois.

In the later case, the court clearly indicates that had property rights been involved, an inquiry into all matters would have been proper.

But whatever may be the views of other courts as to the duty of a civil court to merely act as the clerk of an ecclesiastical court and register its decrees upon any question, in a case wherein property rights are involved, it has never been the doctrine of this court, from the case of Watson v. Garvin, in 54 Mo., to this date, and our views, as we think we have shown, have been those of a great majority of the courts. Justice MILLER in the Watson v. Jones case, supra, concedes that his ruling was contrary to English authority, and in the Free Church of Scotland case, in Appeal Cases for year 1904, the English rule is adhered to in all its strictness and the two church creeds examined, pronounced not identical and the union declared void.

## VIII.

This union is an unwarranted merger of the Cumberland Presbyterian Church into the Presbyterian Church, U. S. A. It is an unwarranted surrender of name, confession of faith, judicatories, and an unconditional merging of the one church into the other. We say unconditional surrender and merger, because one party kept name, creed, government and everything, whilst the other abandoned everything. Such mergers have been condemned by the best-considered cases both in this country and England.

In England the attempted union and merger of the Free Church of Scotland and the United Presbyterian Church, was condemned by the House of Lords. [Appeal Cases, 1904, p. 695.]

Such a union is likewise condemned by one of the strongest Chancery Courts in this country, that of

222 Sup— 44

New Jersey. [Associated Reformed Church v. Trustees of Theological Seminary, 4 N. J. Eq. 77.]

You cannot by union or merger put one church into another having a different creed and doctrines, without forfeiting the property held in trust, to such members of the body as remain faithful to the original creed and doctrine.

By the deeds, the property in this case is held by F. M. Cockrell, J. L. Roberts and W. K. Morrow, as "trustees of the Cumberland Presbyterian Church of the Warrensburg Congregation" in one deed, and in the others as "trustees of the Cumberland Presbyterian Church in Warrensburg, Mo." This attempted union being invalid, and the plaintiffs herein having dissented from the Cumberland faith and cast their lot with another Church of a different faith and creed, they are not entitled to the beneficial use of this property, but the beneficial use thereof belongs to defendants and all other members of the congregation of the Cumberland Presbyterian Church of Warrensburg, Missouri, who have remained faithful to the doctrines of that Church.

The universal rule is that where there is a schism in a church, those remaining faithful to the tenets of the church at the time of the dispute, whether they be in the majority or the minority, are entitled to hold the property. Of course, if the whole congregation departed from the true faith, and the deed was for the benefit of the local congregation as in this case, they could not be disturbed in their use by an outsider, who had no interest in the trust property. Such is not the case here, however. There is a substantial number of the old congregation adhering to the Cumberland faith, and as such, they are entitled to the beneficial use of the property involved.

The decree *nisi*, is for the wrong party. The judgment will be reversed and the cause remanded with directions to the circuit court to dissolve the injunction

and dismiss the bill of the plaintiffs and enter judgment in favor of defendants and against the plaintiffs for all costs. It is so ordered. *Valliant, C. J., Burgess* and *Fox, JJ.,* concur in these views. *Valliant, C. J.,* whilst concurring in all that is said in this opinion, in separate opinion on motion for rehearing has added some additional views, in which *Burgess, Fox* and *Graves, JJ.,* concur. *Woodson, J.,* dissents in separate opinion. *Lamm, J.,* likewise dissents and expresses his views in separate opinion. *Gantt, J.,* did not sit.

## SEPARATE CONCURRING OPINION ON MOTION FOR REHEARING.

VALLIANT, C. J.—The opinion of my learned brother GRAVES, in which I concur, so completely covers all the points in the case that I hesitate to attempt to add anything more, but in the motion for a rehearing there are two points urged with so much earnestness and force by the learned counsel for respondents that in deference to them I feel constrained to say a few words.

I. It is contended that the General Assembly of the Cumberland Presbyterian Church had full control of the subject and had authority to do what they essayed to do and what respondents think they accomplished.

Before and until the accomplishment of that act there were two separate organizations, two separate entities, the Presbyterian Church, U. S. A., and the Cumberland Presbyterian Church, each having a confession of faith essentially different from the other, at least a confession of faith which one of them interpreted to be essentially different from the other, and which, because of that interpretation, whether right or wrong, held itself independent of and separate from the other. But that act, whether we call it a merger, a union or a reunion, if full effect be given to it, was an extinguishment of the Cumberland Presbyterian

Church as an entity; it was an extinguishment even of the General Assembly itself which committed the act.

As a rule an executive body appointed to administer the affairs of an association, is created to effectuate the purpose of the association—to preserve it, not to destroy or extinguish it. However plenary in words the powers given to such a body may be, they must be construed in the light of the purpose for which they were given. In this particular there can be no difference between a church organization and an organization of any other kind, unless it be that the presumption that the executive board was created to preserve and perpetuate is stronger in regard to a church organization than any other, because a church organization always looks to perpetuity.

It is almost impossible to imagine an organization delegating to its executive board, or its administrative body, by whatsoever name it may be called, the power to take its own life, to destroy the organization; certainly no such power can be implied, and if it is conferred, it must be by express terms. There is nothing in the record in this case to show that any such power was conferred on the General Assembly of the Cumberland Presbyterian Church. All the powers conferred were to aid in carrying into effect the purpose for which the Church was organized. The powers that the General Assembly had at the date of this alleged union were the same and only the same that it had from the beginning of the organization of the Church. Surely there was nothing in the original act of the church organization that indicated a purpose to unite with or become merged into the Presbyterian Church, therefore it cannot be implied that the power to effect such a union or merger was given to the General Assembly at the beginning of the church organization, and there have been no additional powers given since. It is argued in one of the briefs that the power of the General Assembly was derived, not from the people composing

the church, but from the Divine Founder of the Christian religion. That may or may not be true as a theological dogma—we do not know. Human tribunals are limited within the bounds of human laws and, therefore, if we should attempt to follow that argument it would lead us outside of our boundary and we should be unable to find our way. The Church has its written laws and those laws were written by men and we can only interpret them as the work of men. The only knowledge we have of the powers of the General Assembly is derived from those written laws. It is said in the brief that all the membership of the Cumberland Presbyterian Church assented to a declaration contained in the Church constitution to the effect that the governmental power of the Church comes from the Divine Founder, and therefore the defendants in this suit cannot question the act of the General Assembly. But the same constitution which it is claimed concedes the Divine authority of the General Assembly in matters of church government, specifies certain powers which are conferred on the General Assembly, and among those specifications the power to transfer all members of this church into another church is not expressed.

If we are to understand the argument to be that the power of the General Assembly is unlimited because of its Divine authority, then it would follow that the General Assembly could merge this church into any other Christian church, however different in its confession of faith. Assuming that the General Assembly of the Cumberland Presbyterian Church derived its authority from the Divine Founder, we must assume also that the General Assembly of the Presbyterian Church, U. S. A., derived its authority from the same Divine source, and if so, in matters of Christian faith both General Assemblies were unerring. Yet we find that in 1810 there was a wide difference in the Confessions of Faith of the two churches as each interpreted it, and that difference existed

until 1906, when the General Assembly of the Cumberland Presbyterian Church extinguished that Church by merging into the Presbyterian Church, U. S. A. For nearly a hundred years the Divinely created and Divinely empowered General Assembly of the Cumberland Church suffered its members to grope in error on the very point of faith on which that church was founded; that is to say, the members of the Cumberland Church groped in error if there was during all that time really no difference in what they deemed was essential in the dogmas of the two churches, because the Presbyterian Church, U. S. A., has been careful to say that it has not receded from the position it has held from the first. We say this with perfect reverence, and only to show how impossible it is for a human tribunal to follow the purely theological argument of the learned counsel who advance it. We are concerned now only with a question of title to property, and we are bound to decide that question according to human law. Whilst title to real estate is the only question before us to decide, yet in the argument a question of personal right might arise if full effect is given to the alleged act of union or merger. If that act carries the property of the Cumberland Presbyterian Church into the Presbyterian Church, U. S. A., it carries also its members, who *ipso facto* become members of the Presbyterian Church and subject to its discipline; the only way an individual member could avoid it would be to withdraw, and withdrawal concedes membership. Therefore, either one of these defendants, if he should act contrary to a rule of the Presbyterian Church or express a disbelief in one of the articles of Confession of Faith, would be liable to have charges preferred against him in a court of that church and if found guilty have the stigma of expulsion pronounced against him. Is it possible that one could be so stigmatized by a Church in which he never voluntarily became a member?

II.  The other point on which I will express my views is the contention that in so far as the defendants' case rests on what they claim to be a difference in the Confessions of Faith of the two churches it is without foundation because the General Assembly of the Presbyterian Church, U. S. A., has so interpreted its Confession of Faith that it does not mean to teach fatalism and is therefore not what the founders of the Cumberland Church thought it was, and that judgment of the ecclesiastical court on that question is final, and cannot be reviewed or its correctness questioned by this or any other court.

It may be conceded that the judgment of the Church court declaring the meaning of the Church dogmas is conclusive on all the members of that Church, but it is not conclusive on those who are not members.  It may be conceded also that even a majority of the members of the Church, if they should dissent from the interpretation put upon its written doctrines by the Church court, would have no right to claim to be the Church and to hold the Church property in opposition to the minority who yield to the judgment of the Church court; but when the Church is seeking to reach out and take in people who never were members and who refuse to become members, a different case is presented.

Doubtless many of the points of difference between different churches arise because those outside of a particular church interpret its dogmas to mean what the church itself says they do not mean.  The interpretation put on its dogmas by the church itself is binding on its own members, but not on those who are not its members, and a person outside has a right to put his own interpretation on them when they concern him and to govern himself accordingly.  Perhaps if the General Assembly of the Cumberland Presbyterian Church had adopted the Confession of Faith of the Presbyterian Church and had then put an interpreta-

tion on it, that interpretation would be binding on its members, but that was never done; the only thing the General Assembly of the Cumberland Church did was to merge its church into the Presbyterian Church, while that church in its most solemn form declared it had never receded from the dogmas which it had always declared.

Therefore, in a case involving title to property, if a question arises as to the meaning of certain clauses in the Confession of Faith of a particular church and if the parties litigant are all members of the same church and if the highest ecclesiastical court of that church has put on the disputed clauses a certain interpretation, this court would adopt that interpretation as conclusive; but if the parties litigant on one side were not members of the church, we would have to take the written Confession of Faith and interpret it as we would any other written instrument. *Burgess, Fox* and *Graves, JJ.,* concur in the views herein expressed. *Gantt, J.,* not sitting. The motion for rehearing is overruled.

## DISSENTING OPINION.

WOODSON, J.—I was one of the dissenters from the opinion handed down in this case, but was prevented by the pressure of other official duties from then expressing my views of the case. Since then a motion for a rehearing has been filed, and I will now avail myself of this opportunity to submit the following observations in reference thereto.

### ' I.

The main legal proposition involved in this case regards the power of the Presbyterian Church, U. S. A. (which will hereafter be designated as the Presbyterian Church), and the Cumberland Presbyterian Church (which will hereafter be designated as the

Cumberland Church) to unite and become one church. The affirmative of this proposition is contended for by the former, while the latter maintains the negative thereof.

If we should concur with the view entertained and presented by counsel for the latter, then that would dispose of the entire case and would render it wholly unnecessary to decide any of the other questions presented for our determination, and for that reason I will express my views upon that question first.

If I correctly understand counsel for respondent, they contend that the governing bodies of these two churches have the inherent power to order and consummate a union between them, while counsel for appellant insist that the constitutions of these respective churches do not authorize a union between them nor empower those bodies to unite them into one church; but being creatures of those constitutions, their authority in that regard is limited to the powers expressly granted therein. These bodies, or courts, are denominated by section 24 of the Constitution of the Cumberland Church as Church Sessions, Presbyteries, Synods and General Assemblies.

In order to properly understand the character of these courts, we must first ascertain from the constitution what is "The Church" and what is "A Particular Church" over which they exercise jurisdiction.

The Church is defined by sections one and two of the constitution as follows:

"1. Jesus Christ, who is now exalted far above all principality and power, has established in this world a kingdom which is His Church.

"2. The universal Church consists of all those persons, in every nation, who make profession of the holy religion of Christ and of submission to His laws.

"As this immense multitude cannot meet together in one place to hold communion or to worship God, it is proper, and authorized by Scripture example, that

they should be divided into many particular churches.''

Section 3 prescribes the requisites for membership, but has no bearing upon any of the questions involved in this litigation.

And ''A Particular Church'' by section four is declared to consist of a number of professing Christians voluntarily associated together for Divine worship and Godly living, agreeable to the Holy Scriptures, and submitting to a certain form of government.

Its officers are the Ministers in charge, the Ruling Elders and the Deacons. Its jurisdiction is lodged in the Church Sessions, composed of the Minister in charge and Ruling Elders.

Section 8 provides that ''the ordinary and perpetual officers of the Church are Teaching Elders or Ministers of the Word, who are commissioned to preach the Gospel and administer the sacraments; Ruling Elders, the representatives of the people; and Deacons.''

Section 17 prescribed the duties of the Ruling Elders, and in so far as it is material to this suit is as follows:

''Ruling Elders, the immediate representatives of the people, are chosen by them, that, in conjunction with the Ministers, they may exercise government and discipline, and take the oversight of the spiritual interests of the particular Church, and also of the Church generally, when called thereunto. It appertains to their office, both severally and jointly, to watch diligently over the flock committed to their charge, that no corruption of doctrine or morals enter therein. Evils which they cannot correct by private admonition they should bring to the notice of the Church Session.''

The Church Session and its jurisdiction are defined by sections 26, 27 and 28 of the constitution, as follows:

''The Church Session consists of the Minister in

charge and two or more Ruling Elders of a particular ·Church.

"In the absence of the Minister in charge, and in a vacant church, the Ruling Elders alone may form a Church Session for the transaction of any business.

"The Church Session shall be convened when any two Ruling Elders shall so request. The Minister in charge may convene the Church Session at any time.

"A majority of the Church Session shall be necessary to constitute a quorum, unless, with the concurrence of the Church, the Church Session shall otherwise determine; but any two of the Ruling Elders, in conjunction with a Minister, may receive members and grant letters of dismission.

"27. The Church Session is charged with maintaining the spiritual government of the' Church, for which purpose it is its duty to inquire into the doctrines and conduct of the Church members under its care; to receive members into the Church; to admonish, suspend, or ex-communicate those found delinquent, subject to appeal; to urge upon parents the importance of presenting their children for baptism; to grant letters of dismission, which, when given to parents, shall always include the names of their baptized children; to ordain and install Ruling Elders and Deacons when elected, and to require those officers to devote themselves to their work; to examine the records of the proceedings of the Deacons; to establish and control Sabbath schools and Bible classes, with especial reference to the children of the Church; to order collections for pious uses and Church purposes; to take the oversight of the singing in the public worship of God; to assemble the people for worship when there is no minister; to concert the best measures for promoting the spiritual interests of the Church; to observe and carry out the injunctions of the higher courts; and to appoint representatives to the higher

courts, and require on their return a report of their diligence.

"28. Every Church Session shall keep an accurate record of its proceedings, which must be, at least once in every year, submitted to the inspection of the Presbytery. . . ."

Sections twenty-nine to thirty-four, both inclusive, define what is a Presbytery and its jurisdiction in the following language: .

## "*Presbytery.*

"29. A Presbytery consists of all the ordained ministers and one ruling elder from each church within a certain district.

"Every particular Church which is willing to support the Gospel as God has prospered it shall be entitled to be represented by a ruling elder in Presbytery.

"Every ruling elder not known to the Presbytery shall produce evidence of his regular appointment from the Church he represents.

"30. Any three ministers belonging to the Presbytery being met at the time and place appointed shall be a quorum competent to proceed to business.

"31. The Presbytery has the power to examine and decide appeals, complaints and references brought before it in an orderly manner; to receive, examine, dismiss, and license candidates for the holy ministry; to receive, dismiss, ordain, install, remove and judge ministers; to review the records of the Church Sessions, redress whatever they may have done contrary to order, and take effectual care that they observe the government or the Church; to establish the pastoral relation, and to dissolve it, at the request of one or both of the parties, or where the interests of religion imperatively demand it; to set apart evangelists to their proper work; to require ministers to devote themselves diligently to their sacred calling, and to censure and otherwise discipline the delinquent; to see that the injunc-

tions of the higher courts are obeyed; to condemn erroneous opinions which injure the purity or peace of the Church; to resolve questions of doctrine and discipline seriously and reasonably proposed; to visit particular churches, to inquire into their condition, and redress the evils that may have arisen in them; to unite or divide churches, with the consent of a majority of the members thereof, and, for cause, to dissolve the relations between it and a particular church, which shall thereafter cease to be a constituent of the Cumberland Presbyterian Church and forfeits all rights as such to form and receive new churches; to take special oversight of vacant churches; to concert measures for the enlargement of the church within its bounds; in general, to order whatever pertains to the spiritual welfare of the churches under its care; to appoint representatives to the higher courts; and, finally, to propose to the Synod, or to the General Assembly, such measures as may be of common advantage to the church at large.

"32. The Presbytery shall keep a full and fair record of its proceedings, and shall send it up to the Synod annually for review. It shall report to the Synod and the General Assembly every year the condition and progress of religion within its bounds during the year, and all the important changes which may have taken place, such as the licensures, the ordinations, the receiving or dismissing of members, the removal of members by death, the union and division of churches and the formation of new ones, and such statistical information as may be required.

"33. The Presbytery shall meet as often as once a year on its own adjournment, and when an emergency shall require a meeting sooner than the time to which it stands adjourned, the Moderator, or, in case of his absence, death, or inability to act, the Stated Clerk, shall, with the concurrence or at the request of two ministers and two ruling elders of different churches,

call a special meeting. For this purpose he shall give notice—specifying the particular business of the intended meeting—to every minister belonging to the Presbytery, and to the Church Session of every particular church, in due time previous to the meeting, which shall not be less than ten days. And nothing shall be transacted at such special meeting besides the particular business for which the Presbytery has been thus convened.

"34. If, for any cause, the Presbytery shall fail to meet at the time and place to which it stands adjourned, it shall be the duty of the Moderator, or, in case of his absence, death, or inability to act, the Stated Clerk, or, in case of his absence, death. or inability to act, any three ministers belonging to the Presbytery, to call a meeting as early as practicable, at such place as may be designated, for the transaction of the regular business; and for this purpose a circular letter shall be sent, as before prescribed, not less than ten days before the meeting."

*A Synod* and its jurisdiction are stated in the following sections:

"35. The Synod consists of all the ministers and one ruling elder from each church in a district comprising at least three Presbyteries. The Synod may be composed, at its own option, with the consent of a majority of its Presbyteries, either of all the ministers and one ruling elder from each Church in its district, or of equal delegations of ministers and ruling elders selected by the Presbyteries on a basis and in a ratio determined in like manner by the Synod and its Presbyteries.

"36. Five ministers, who are members of one or more of the Presbyteries composing the Synod, shall constitute a quorum for the transaction of Synodical business, provided there be present at least one minister or one ruling elder from each of three Presbyteries. Members of the different Presbyteries in Synod shall

not be entitled to vote on questions of appeal before the Synod from their own Presbyteries, nor on other questions immediately concerning their own Presbyterial action.

"37. The Synod has power to receive and decide all appeals, complaints, and references regularly brought up from the Presbyteries; to review the records of the Presbyteries, and to redress whatever they may have done contrary to order; to take effectual care that Presbyteries observe the government of the church, and that they obey the injunctions of the higher courts; to create, divide, or dissolve Presbyteries, when deemed expedient; to appoint ministers to such work, proper to their office, as may fall under its own particular jurisdiction—in general, to take such order with respect to the Presbyteries, Church Sessions, and Churches under its care as may be in conformity with the principles of the government of the Church and of the word of God, and as may tend to promote the edification of the Church; to concert measures for promoting the prosperity and enlargement of the Church within its bounds; and, finally, to propose to the General Assembly such measures as may be of common advantage to the whole Church.

"38. It shall be the duty of the Synod to keep full and accurate records of its proceedings, to submit them to the inspection of the General Assembly at each of its stated meetings, and to report to it the number of its Presbyteries, and of the members thereof; and, in general, all important changes which may have occurred within its bounds during the year, as well as such statistical information as may be required.

"39. The Synod shall meet as often as once in two years, on its own adjournment. If, for any cause, the Synod shall fail to meet at the time and place to which it stands adjourned, it shall be the duty of the Moderator, or, in case of his absence, death, or inability to act, the Stated Clerk, or, in case of his absence,

death, or inability to act, any three ministers entitled to membership in the Synod, and belonging to different Presbyteries, to call a meeting as early as practicable, at such place as may be designated, for the transaction of the regular business; and for this purpose a circular letter shall be sent to every minister and ruling elder entitled to membership, or constituent body entitled to representation, therein, not less than thirty days before the meeting.''

And *the General Assembly* and its jurisdiction are stated in the following sections:

''40.   The General Assembly is the highest Court of this Church, and represents in one body all the particular churches thereof.   It bears the title of the General Assembly of the Cumberland Presbyterian Church, and constitutes the bond of union, peace, correspondence, and mutual confidence among all its churches and courts.

''41.   The General Assembly shall meet as often as once every two years, at such time and place as may have been determined at its preceding meeting, and shall consist of commissioners from the Presbyteries in the following proportion:   Every Presbytery shall be entitled to send one minister and one ruling elder; but if it consists of eighteen or more ministerial members, it may send an additional minister and ruling elder.

''Each commissioner, before his name shall be enrolled as a member of the General Assembly, shall produce from his Presbytery satisfactory evidence of his appointment.

''42.   Any twenty or more of these commissioners, at least ten of whom shall be ministers, being met on the day and at the place appointed, shall be a quorum for the transaction of business.

''43.   The General Assembly shall have power to receive and decide all appeals, references and complaints regularly brought before it from the inferior

courts; to bear testimony against error in doctrine and immorality in practice, injuriously affecting the church; to decide in all controversies respecting doctrine and discipline; to give its advice and instruction, in conformity with the government of the Church, in all cases submitted to it; to review the records of the Synods; to take care that the inferior courts observe the government of the Church; to redress whatever they may have done contrary to order; to concert measures for promoting the prosperity and enlargement of the church; to create, divide or dissolve Synods; to institute and superintend the agencies necessary in the general work of the church; to appoint ministers to such labors as fall under its jurisdiction; to suppress schismatical contentions and disputations, according to the rules provided therefor; to receive under its jurisdiction other ecclesiastical bodies whose organization is conformed to the doctrine and order of this Church; to authorize Synods and Presbyteries to exercise similar power in receiving bodies suited to become constituents of those courts, and lying within their geographical bounds respectively; to superintend the affairs of the whole church; to correspond with other churches; and, in general, to recommend measures for the promotion of charity, truth and holiness throughout all the churches under its care.

"44. If, for any cause, the General Assembly shall fail to meet at the time and place to which it stands adjourned, it shall be the duty of the Moderator, or, in case of his absence, death, or inability to act, the Stated Clerk, to call a meeting as early as practicable, at such place as he may designate, for the transaction of the regular business; and for this purpose a circular letter shall be sent to the Stated Clerk of the Presbyteries not less than sixty days before the proposed time for the meeting.

"In case of the death, absence, or inability to act of both the Moderator and Stated Clerk, such meeting

222 Sup— 45

may, in like manner, be called by the Commissioners, or one or more of them, from any five of the Presbyteries.''

The Confession of Faith, Catechism, Constitution and Rules of Discipline are governed by section 60, which reads as follows:

"60.   Upon the recommendation of the General Assembly at a stated meeting, by a two-thirds vote of the members thereof, voting thereon, the Confession of Faith, Catechism, Constitution and Rules of Discipline, may be amended or changed when a majority of the Presbyteries, upon the same being transmitted for their action, shall approve thereof.''

The other parts of the government—that is to say, the General Regulations, the Directory of Worship, and the Rules of Order—may be amended or changed at any meeting of the General Assembly by a vote of two-thirds of the entire number of Commissioners enrolled at that meeting, provided such amendment or change shall not conflict in letter or spirit, with the Confession of Faith, Catechism, or Constitution.

The jurisdiction of the foregoing courts is limited by the express provisions of section 25, which reads as follows:

"Sec. 25.   The church session exercises jurisdiction over a single church, the Presbytery, over what is common to the ministers, church sessions, and churches within a prescribed district; the Synod, over what belongs in common to three or more Presbyteries, and their ministers, church sessions and churches; and the General Assembly, over such matters as concern the whole church; and the jurisdiction of these courts is limited by the express provisions of the constitution. Every court has the right to resolve questions of doctrine and discipline seriously and reasonably proposed, and in general to maintain truth and righteousness, condemning erroneous opinions and practices which tend to the injury of the peace, purity or progress of

the church; and, although each court exercises exclusive original jurisdiction over all matters especially belonging to it, the lower courts are subject to the review and control of the higher courts, in regular gradation. All church courts shall be opened and closed with prayer.''

The Constitution of the Presbyterian Church in so far as it is material to the question of the power of these two churches to unite is substantially the same as are the foregoing provisions copied from the Constitution of the Cumberland Church; and it will for that reason be unnecessary to burden this opinion with extracts from the former; and what is said of the one will apply equally as well to the other.

In the discussion of this proposition it is all important to bear closely in mind those constitutional provisions which are common to both churches, showing that the judicatories of each possess and exercise the same authority, jurisdiction and powers; and upon these provisions are based the contentions of counsel for the respective parties.

In order to successfully maintain appellants' position as stated at the beginning of this opinion, counsel must also successfully maintain this preliminary question, namely, that these constitutional provisions are not only expressive of the sole mode of union, but are also a limitation upon the authority of the governing bodies of the churches to act in the premises. In other words, they contend that ''the jurisdiction of the General Assembly and of the Presbyteries, as well as the other courts of the church, being limited in their nature and by the express provisions of section 25 of the constitution, and those provisions not conferring the power in question, it must follow inevitably that the union and merger attempted, as aforesaid, and all steps taken for the accomplishment of that end were without constitutional authority, and therefore, *ultra vires* and void. Their powers being restricted by the

constitution to those enumerated, the courts of the church cannot constitutionally exercise any other power.''

I am unable to lend my concurrence to that contention, for the reason that when we read the constitution it is to be seen that while section 25 purports to limit the jurisdiction and powers of the courts as regards the matters and things enumerated therein, as long as they remain in force, yet there is nothing contained in that instrument which even remotely indicates that they have no other powers or authority than those stated. Much light may be shed upon this question by a brief consideration of the Presbyterian Church and its mode of government. Both of these churches are of the associated class of religious societies, the initial unit of each being the ''particular church,'' or local congregation, then ascending to the Presbytery, embracing all local churches within a given territory, then extending to a Synod including not less than three Presbyteries, and, finally, reaching the General Assembly, which comprises all of the local churches, Presbyteries and Synods, and constitutes the supreme judicatory of the church. These courts possess not only judicial power, but also legislative and executive. [Mack v. Kime, 129 Ga. 1.]

These powers are inherent in these bodies, and are not delegated to them by the constitution. In fact, the General Assemblies of these churches are not only the legislative bodies thereof, but they also have the power, with the approval of the Presbyteries, to formulate, adopt, amend and repeal the constitutions of their respective church, and under this form of government their power is unlimited in that regard. (I am not now speaking of its effect upon property rights. That will be discussed later.) Of course, as long as the constitution, or any provision thereof, is in force it is binding upon the General Assembly and upon all other judicatories of the church; but, as before stated,

there is no provision contained therein, or exists elsewhere, which prevents the General Assembly, with the concurrence of the Presbyteries, from repealing or amending any and all provisions of the constitution. The individual church members have no voice in such matters. The General Assembly is supreme, and can no more be bound by a law enacted by a previous session than one Legislature of the State can bind a succeeding one by statute. The only limitation that is placed upon its authority in church matters is written in the constitution, and as long as it is in force, its mandate is supreme and must be obeyed by all, the General Assembly included; but where the constitution is silent, the Assembly is supreme. The constitution of neither of these churches is like the Constitution of the United States—a delegation of power—but it is more in the nature of the Constitution of the State—a limitation upon the inherent and otherwise absolute powers of the Legislature. [McBride v. Porter, 17 Iowa 211; McGinnis v. Watson, 41 Pa. St. 9; Methodist Church Case, 16 How. 288; Mack v. Kime, 129 Ga. 1; Fussell v. Hail, 134 Ill. App. 620; Ramsey's Appeal, 88 Pa. St. 60.]

In the Iowa case the Synod was the highest court; and in discussing the inherent power of the churches to unite the court used this language: "But, upon principle as well as by concession, the Synod possessed the power. If it is regarded as a representative body, and governed by the republican principle that a majority must rule, its acception [action] must be sustained; or, if the more fundamental principle is appealed to, that the people who are to be affected by a law, is the primary source from whence comes the power to enact that law, we find a practical and literal adherence to that principle in the action of the Synod, by which the question was first referred or overtured to the several churches, and by them acted upon as instructions to the Synod. The Synod then had the power, for it

derived it from the primary source of all governmental power—the people."

The inherent power of a church to divide into two branches was involved in the case cited from the Supreme Court of the United States, and in passing upon that question the court used this language:

"It is insisted, however, that the General Conference of 1844 possessed no power to divide the Methodist Episcopal Church as then organized, or to consent to such division; and hence, that the organization of the Church South was without authority, and the traveling preachers within it separate from an ecclesiastical connection, which is essential to enable them to participate as beneficiaries" in the fund in controversy.

"But we do not agree that this division was made, without the proper authority. On the contrary, we entertain no doubt that the General Conference of 1844 was competent to make it; and that each division of the church, under the separate organization, is just as legitimate, and can claim as high a sanction, ecclesiastical and temporal, as the Methodist Episcopal Church first founded in the United States. The same authority which founded that church in 1784 has divided it, and established two separate and independent organizations occupying the place of the old one.

"In 1784 when this church was first established, and down till 1808, the General Conference was composed of all the traveling preachers in that connection. This body of preachers founded it by organizing its government, ecclesiastical and temporal, established its doctrine and discipline, appointed its superintendents or bishops, its ministers and preachers, and other subordinate authorities to administer its policy and promulgate its doctrines and teachings throughout the land.

"It cannot therefore be denied, indeed, it has scarcely been denied that this body, while composed of

all the traveling preachers, possessed the power to divide it and authorize the organization and establishment of the two separate independent churches. The power must necessarily be regarded as inherent in the General Conference.''

This principle is the same whether exercised in dividing or uniting two churches.

Again, the court, after noticing certain restrictions placed upon the General Conference, says: ''In all other respects and in everything else that concerns the welfare of the church, the General Conference represents the sovereign power the same as before.'' [Methodist Church Case, 16 How. l. c. 306.]

The Supreme Court of Georgia had before it the identical union under consideration in the case at bar, and, in Mack v. Kime, 129 Ga. l. c. 29, said upon this branch of the case: ''The authority of the General Assembly of the Cumberland Presbyterian Church is derived from the constitution. This church, in its form of government, is like its predecessors. The form of government is not unlike the Federal form of government under which we live. The General Assembly of the church is the highest legislative, executive and judicial power of the church. It has, in these three capacities, all of the authority that is expressly conferred by the constitution, as well as that which is to be necessarily implied from any of the express powers therein granted or from the general design and purpose for which the organization was formed. It being settled by the judgment of the General Assembly, as the final arbiter of the church in all such matters, that there is no substantial difference between the teachings and doctrines of the two churches, the question as to whether it was expedient for the two churches to unite under one name and form of government was a matter addressed to the sound judgment of the General Assembly of the Cumberland Presbyterian Church itself. The very constitution contemplates union with the other church-

es.  It is authorized to receive into its jurisdiction other ecclesiastical organizations that conform to the doctrine and order of the Cumberland Presbyterian Church.  When this provision was inserted in the constitution, it was probably contemplated that such organizations would generally be organizations of less power and less strength and less numbers than the existing Cumberland Presbyterian Church; but there is no limitation in the constitution upon the power to receive other organizations, and this power carries with it the implied power to unite with other organizations under the same limitations under which they could receive in their name and in their jurisdiction similar organizations.  In the judgment of the General Assembly of the Cumberland Presbyterian Church, the purpose for which it was organized is to be promoted by the reunion with the church from which it sprang. They may be mistaken in this. The reunion may thrust upon them and their associates perplexing questions, which in time to come may bring about disagreement and separation.  But all of those matters are matters for the ecclesiastical body itself, and, when determined by it, those members of the church who are not in accord with the governing authority must either bow in submission to the powers that be, or make their alignments with other organizations with whom they can live in accord and harmony.''

In Fussell v. Hail, decided by the Appellate Court for the Third District of Illinois, and cited with approval by the Georgia Supreme Court, in discussing this union, the court said, in referring to the sections of the constitution of the Cumberland Presbyterian Church defining the powers of the General Assembly: ''The effect of such sections is to make the General Assembly, not only the legislative and administrative body, but one with judicial powers upon ecclesiastical questions as well.  It represents, in one body, all the particular churches in the Cumberland Presbyterian

Church organization, and constitutes one bond of union. Why is it not possible to promote the prosperity and enlargement of the church by uniting with another body that teaches a doctrine of faith identical with its own? If these two churches, in their confession of faith and their religious teachings, are the same, then these interests may be promoted by uniting all those who preach, teach and believe in and care for those interests, the same as can be done by individuals joining their interests in copartnerships or corporations. United action is productive of more good than divided action under the circumstances. The General Assembly has power to receive under its jurisdiction other ecclesiastical bodies of the same faith. This clause must be read with the clause that directs the taking of measures to promote and enlarge the church; and in our judgment the church is enlarged, and its prosperity made more sure, by receiving the support of a stronger sister church. If a smaller church can be received, surely affiliation and union can be made with a stronger sister church, if thereby the church, as a religious body, is prospered and enlarged."

It will thus be seen that the courts, in the above cases, held that, under a reasonable construction of the express provisions of the written constitution, the power to form the union exists.

But returning to the analogy between the General Assembly and the Legislature of the State—the former is not bound with the same degree of firmness with which the Legislature of the State is bound by the Constitution, for the former may enact and enforce any and all laws for the good of the church, whether they be constitutional in character or merely ordinances for its government; while the latter can enact no law in conflict with the Constitution of the State. [Russie v. Brazzell, 128 Mo. 93.]

Under the constitution of the Church, the powers of the General Assembly are just as absolute and unlim-

ited in that regard as are the powers of the framers of the State Constitution, yea, more so, for the former may adopt a constitutional provision proposed by itself with the approval of the Presbyteries, while the latter can only frame and refer it to the people for adoption.

Whether or not that is a wise form of church government, we have nothing to do, but must be content to deal with the situation as we find it. We might add, however, that there are other churches and even governments which are governed substantially in the same manner.

If the foregoing observations regarding the church judicatories are sound, and I do not believe they will be questioned, we must look to the constitution as it stood at that time to determine whether or not there is any provision therein preventing a union, or which prohibited the General Assemblies of the two churches from submitting the question of union to the Presbyteries, or from entering into a union with each other.

Counsel for appellants contend that there is such a provision in the constitution, and call our attention to section 43 thereof, and especially to the following language therein, to-wit: first, "to concert measures for promoting the prosperity and enlargement of the Church;" and, second, "to receive under its jurisdiction other ecclesiastical bodies whose organization is conformed to the doctrines and orders of this Church."

Appellants' contention is that those provisions expressly authorize a consolidation of the Cumberland Church with other churches whose organization conforms to the doctrines and ordinances of that church, and having failed to provide for any other mode of union, the maxim *inclusio unius exclusio alterius est* applies.

In my opinion counsel misconceive the proposition in hand. The question involved in this litigation is one

of union between separate and independent churches, whose doctrines and ordinances were not the same, while those referred to in section 43 refer to the consolidation of two or more churches of the same faith and doctrine, or to receive into its organization another church which would conform to its doctrines and would come under and submit to its jurisdiction.

It is not pretended that the Presbyterian Church proposed to submit itself to the jurisdiction of the Cumberland, and thereby become consolidated as one church under the name of the Cumberland Presbyterian Church; but the express intention of both was to adopt a new confession of faith, which was a modification of the Westminster Confession; neither to adopt the doctrines and ordinances of the other or to become subject to the jurisdiction of the other; but to unite as one church under the name of the Presbyterian Church U. S. A., as above indicated.

From this it seems perfectly clear to my mind that section 43 of the constitution is perfectly foreign to the question of the power of these two churches to form a union with each other; and that being true, and failing to find any other provision prohibiting their union, I am therefore forced to the conclusion that section 43 of the constitution is not only not a delegation of power to the General Assembly, but at most is only a limitation of power as long as it stands unrepealed by the General Assembly.

That being unquestionably true, then it must necessarily follow that the various judicatories of the church possessed all the ecclesiastical powers of the church which had not been taken from them by the express provisions of the constitution at the time this union is alleged to have been entered into. The same conclusion was reached by the Court of Appeals of Kentucky in the case of Wallace v. Hughes, 115 S. W. 684. To the same effect are the following cases: Clark v. Brown, 108 S. W. 421 (Supreme Court of Texas); Lan-

drith v. Hudgins, 120 S. W. 783 (Supreme Court of Tenn.); Ramsey v. Hicks, 87 N. E. 1091.

All of these cases cited grew out of the same church controversy, and involved the question of the power of these two churches to form a union, and all held that they had that inherent power, and no case can be found which holds to the contrary.

## II.

This brings us to the consideration of another important question, namely: was there a union in fact effectuated between these two churches?

Section 60 of the constitution provides that "upon the recommendation of the General Assembly, by a two-thirds vote of the members thereof, voting thereon, the Confession of Faith, Catechism, Constitution and Rules of Discipline may be amended or changed when a majority of the Presbyteries, upon the same being transmitted for their action, shall approve thereof."

In pursuance to this constitutional provision, the General Assembly of each of these two churches appointed a committee upon union. These committees devised a scheme, called a "plan of reunion and union." This plan of union was by this joint committee submitted to the General Assembly of each of the two churches, which was as follows:

### "2. Joint Report on Union.

"As the second part of our report we submit the following Joint Report on Union:

"The Committee on Church Co-operation and Union of the Presbyterian Church in the United States of America, and the Committee on Fraternity and Union of the Cumberland Presbyterian Church, after a free and full interchange of views, with continued supplication for Divine guidance, unanimously recommended to their respective General Assemblies

for their consideration, and, if they deem proper, for their adoption, the accompanying papers, viz.:

"I. Plan of Re-union and Union of the two churches.

"II. Concurrent Declarations to be adopted by the respective General Assemblies meeting in 1904.

"III. Recomendations.

"*I. Plan of Re-Union and Union of the Two Churches.*

"We believe that the union of the Christian Churches of substantially similar faith and polity would be to the glory of God, the good of mankind, and the strengthening of Christian testimony at home and abroad.

"We believe that the manifest providential developments and leadings in the two churches since their separation, together with present conditions of agreement and fellowship, have been and are such as to justify their reunion.

"Therefore, we cordially recommend to our respective General Assemblies, that the Re-union of the Presbyterian Church in the United States of America and the Cumberland Presbyterian Church be accomplished as soon as the necessary steps can be taken, upon the basis hereinafter set forth.

"1. The Presbyterian Church in the United States of America, whose General Assembly met in the Immanuel Church, Los Angeles, Cal., May 21st, 1903, and the Cumberland Presbyterian Church, whose General Assembly met in the First Cumberland Presbyterian Church, Nashville, Tenn., May 21st, 1903, shall be united as one church, under the name and style of The Presbyterian Church in the United States of America, possessing all the legal and corporate rights and powers which the separate churches now possess.

"2. The union shall be effected on the doctrinal basis of the Confession of Faith of the Presbyterian Church in the United States of America, as revised in 1903, and of its other doctrinal and Ecclesiastical

Standards; and the Scriptures of the Old and New Testaments shall be acknowledged as the inspired word of God, the only infallible rule of faith and practice.

"3. Each of the Assemblies shall submit the foregoing basis of Union to its Presbyteries, which shall be required to meet on or before April 30th, 1905, to express their approval or disapproval of the same by a categorical answer to this question:

"'Do you approve of the re-union and union of the Presbyterian Church in the United States of America and the Cumberland Presbyterian Church, on the following basis: The union shall be effected on the doctrinal basis of the Confession of Faith of the Presbyterian Church in the United States of America, as revised in 1903, and of its other Doctrinal and Ecclesiastical Standards; and the Scriptures of the Old and New Testament shall be acknowledged as the inspired word of God, the only infallible rule of faith and practice?'

"Each Presbytery shall, before the tenth day of May, 1905, forward to the Stated Clerk of the Assembly with which it is connected, a statement of its vote on the said Basis of Union.

"4. The report of the vote of the Presbyteries shall be submitted by the representative Stated Clerk to the General Assemblies meeting in 1905, and if the General Assemblies shall then find and declare that the foregoing Basis of Union has been approved by the constitutional majority of the Presbyteries connected with each branch of the Church, then the same shall be of binding force, and both Assemblies shall take action accordingly.

## II. *Concurrent Declarations.*

"As there are matters pertaining to the interests of the Church, which will manifestly require adjustment when the reunion shall have been accomplished,

and concerning which it is highly desirable that there shall be a previous good understanding, the two Assemblies agree to adopt the following Concurrent Declarations, as in their judgment proper and equitable arrangements and agreements.

"1. In adopting the Confession of Faith of the Presbyterian Church in the United States of America, as revised in 1903, as a basis of union, it is mutually recognized that such agreement now exists between the systems of doctrine contained in the Confessions of Faith of the two Churches as to warrant this union —a union honoring alike to both. Mutual acknowledgment also is made of the teaching and defense of the divine favor and blessing that have made this common faith and service effectual.

"It is also recognized that liberty of belief exists by virtue of the provisions of the Declaratory Statement, which is part of the Confession of Faith of the Presbyterian Church in the United States of America, and which states that 'the ordination vow of ministers, ruling elders and deacons, as set forth in the form of Government, requires the reception and adoption of the Confession of Faith, only as containing the system of doctrine taught in the Holy Scriptures.' This liberty is specifically secured by the Declaratory Statement, as to Chapter III and Chapter X, Section 3, of the Confession of Faith. It is recognized also that the doctrinal deliverance contained in the Brief Statement of the Reformed Faith, adopted in 1902, by the General Assembly of the Presbyterian Church in the United States of America, 'for a better understanding of our doctrinal beliefs,' reveals a doctrinal agreement favorable to reunion.

"2. All the ministers and churches included in the two denominations shall be admitted to the same standing in the United Church which they may have held in their respective connections up to the consummation of the reunion,

"3. The boundaries of the several Presbyteries and Synods shall be adjusted by the General Assembly of the United Church.

"4. The official records of the two Churches during the period of separation shall be preserved and held as making up the history of the one Church.

"5. As soon as practicable after the union shall have been effected, the General Assembly shall reconstruct and consolidate the several permanent committees and boards, which now belong to the two Assemblies, so as to represent, with impartiality, the views and wishes of the two bodies constituting the reunited Church.

"The institutions of learning, together with the endowment and other property, real and personal, owned by them which are now under the control of the Cumberland Presbyterian Church, shall remain in charge of and be controlled by the board of trustees, or other managers respectively, now in charge of such institutions, endowment and property, or by their successors similarly appointed or elected; and no greater control of such institutions, their property or affairs shall be exercised by the General Assembly, or other ecclesiastical court, or body, of the reunited Church, than is now exercised by the General Assembly, or other ecclesiastical church or body, of the Cumberland Presbyterian Church. Provided, that the governing board of any of said institutions of learning shall be at liberty to enter into such special arrangement or agreement with the ecclesiastical body controlling it, as may enable said institution to preserve its integrity and maintain its present policy. And also provided that nothing in this declaration shall affect the relationship or control of any of the institutions of learning now connected with the General Assembly, or other ecclesiastical court or body, of the Presbyterian Church in the United States of America.

"7.  The corporate rights now held by the two General Assemblies and by their boards and committees, shall be consolidated and applied for their several objects as defined and permitted by law.

"8.  It should be regarded as the duty of all our judicatories, ministers and people to study the things which make for peace, to guard against all needless and offensive references to the causes which have divided us, and to avoid the revival of past issues.

### III.  Recommendations.

"1.  It is recommended that such a change be made in the form of government of the Presbyterian Church in the United States of America, as will allow additional or separate Presbyteries and Synods to be organized in exceptional cases, wholly or in part, within the territorial bounds of existing Presbyteries or Synods respectively, for a particular race or nationality, if desired by such race or nationality.

"2.  The foregoing Basis of Union and eight Concurrent Declarations shall be submitted to the respective General Assemblies of 1904, and the above Recommendation, Numbered 1, shall be submitted to the General Assembly of the Presbyterian Church in the United States of America, meeting in 1904; and this entire plan of union shall be operative when said Basis of Union, Concurrent Declarations, and Recommendation Numbered 1, shall have been adopted in their entirety, and where necessary by Presbyterial action.

"3.  That the blessing of the great Head of the Church may rest upon the results of our efforts for reunion and union, it is earnestly recommended to the congregations throughout both branches of the Church, that they observe Sabbath, September 18th, 1904, as a day of fervent and united prayer to Almighty God, that he would grant unto us all 'the spirit of counsel and might, the spirit of knowledge and of the fear of the Lord,' and in the new relation now con-

222 Sup— 46

templated, enable us to keep 'the unity of the spirit in the bond of peace.'

"W. H. Black, R. M. Tinnon, Ira Landrith, E. E. Beard, S. M. Templeton, M. B. Templeton, B. P. Fullerton, W. E. Settle, D. E. Bushnell, A. E. Turner, W. J. Darby, B. G. Mitchell, W. H. Roberts, Chas. A. Dickey, Robert F. Coyle, Reuben H. Hartly, Douglass G. Putnam, Reuben Tyler, E. S. Wells, Wm. N. Page, Wilton M. Smith.

"In conclusion, we unite heartily and prayerfully in the recommendation that the 'Joint Report on Union' be adopted and its provisions carried out with an eye single to the glory of God.

"Fraternally and obediently submitted.

"WM. H. BLACK, Chairman;
"JAMES M. HUBBERT, Sec'y."

Upon the incoming of this report, the following resolution was offered by Dr. Templeton in the General Assembly.

"Resolved, 1. That the foregoing report and supplemental report of the Committee on Presbyterian Fraternity and Union, appointed by the General Assembly in 1903, be received and spread upon the minutes of this General Assembly, and that the included joint-report on union be adopted; and that the basis of union be and is recommended to the Presbyteries of the Cumberland Presbyterian Church for their approval or disapproval.

"Resolved, 2. That the Moderator and the Stated Clerk be instructed to submit the basis of union, contained in said report, to the Presbyteries of the Cumberland Presbyterian Church, in the usual constitutional manner, upon receiving official notification of the adoption of the said joint-report on union by the General Assembly of the Presbyterian Church in the United States of America."

This resolution was adopted by a vote of 162 to 74,

and was declared to be by the constitutional two-thirds vote. Upon a submission to the Presbyteries of the question to be categorically answered, set out above, it was found that all Presbyteries had returned their vote. Of those, 60 answered the question in the affirmative and 51 answered in the negative, thereby adopting the plan of reunion and union recommended and submitted to them by the General Assembly, by a constitutional majority of nine. The same action, with like results, was taken by the Presbyterian Church.

In the General Assembly of the Cumberland Church for the year 1906, upon the announcement of the adoption of the resolution of union and reunion, about one hundred of the delegates thereto filed a protest, in which they charged the invalidity of the action of the Presbyteries and General Assembly, in forming the union, assigning many grounds in support thereof.

Counsel for respondents contend that the foregoing proceedings show that all of the steps necessary to ascertain the will of the churches and for the orderly determination of the question of union in accordance with the constitution and form of their church government were regularly taken; that the General Assemblies of these two churches, had the power, with the consent and approval of a majority of their respective Presbyteries, to form the union; that the highest judicatories of these churches have declared the plan of union duly and legally adopted, and consequently that said decision is binding upon the civil courts of the State.

In the discussion of a kindred question involving this same principle, this court, in the case of Russie v. Brazzell, supra, at page 112, used this language:

"It was said in the recent case of Prickett v. Wells, 117 Mo. 502: 'The people of that society' (which was a Congregational church) 'in the exercise of their religious liberty, had the undoubted right to adopt

rules for their own church government, if not incon-
sistent with the laws of the land. In adjusting their
respective claims to the use of church property, as
between themselves, the civil courts will give effect to
those rules, subject to the qualifications just, ad-
verted to.'

"In another case it was agreed 'that, according
to the rules governing the church, a majority of those
present and voting at a regular meeting should govern,
and its action is binding upon the whole body.' It was
accordingly held that a majority vote, taken according
to the customs and rules of the church, authorized an
incorporation of the body, and the transfer of the
property of the congregation to the corporation,
though a majority of all the members did not vote in
favor of the proposition. [North St. Louis Christian
Church v. McGowan, 62 Mo. 279.]

"The general conference of the United Brethren,
being the highest legislative and judical body of the
church, declared that an affirmative vote of two-thirds
of those voting on the amendments should be taken as
a request of two-thirds of all the members. This reso-
lution must be taken, not only as expressive of the
rules and customs of the church, but as also declaring
what vote should be required on the question sub-
mitted. The civil courts should take this action of the
conference as conclusive."

And the Supreme Court of Georgia in discussing
this question, growing out of this same schism, in the
case of Mack v. Kime, supra, at page 19, said:

"2. The constituted tribunal of the religious or-
ganization has jurisdiction to determine all ecclesias-
tical questions which are submitted to it under the law
and usages of the society. It has also the authority to
determine for itself whether it has jurisdiction in a
given case. The highest church court of a religious
society is like the highest civil court. It has submitted
to it not only questions growing out of controversies,

but it has, of necessity, imposed upon it the duty and responsibility of determining what are within the limits of its jurisdiction. In the case of State ex rel. Watson v. Farris, 45 Mo. 183, it was held that the General Assembly of the Presbyterian Church, commonly known as the 'old school,' possessed extensive original and appellate jurisdiction, and whether a case is regularly or irregularly before it is a subject for it to determine for itself. In the opinion Judge WAGNER says (page 197): 'Now, the General Assembly is the highest court of judicatory known to the Presbyterian Church. It possesses extensive original and appellate jurisdiction; and whether the case, in the matter of the Declaration and Testimony signers, was regularly or irregularly before it, was a subject for it to determine for itself, and no civil courts can revise, modify, or impair its action in a matter of purely ecclesiastical concern.' When a controversy involving the rights of a member is presented to the civil courts, they will examine into the constitution and laws of the religious society, to determine whether a tribunal has been erected for the decision of ecclesiastical questions, and they will also examine into the laws of the association, to determine whether the decision by the tribunal was concerning a matter which was within its jurisdiction. If its jurisdiction depends upon the construction of its own laws, and such laws have, either expressly or impliedly, conferred upon it the right to determine the limits of its jurisdiction, the decision of the church tribunal as to its jurisdiction will be no less binding than its decision on the merits of the ecclesiastical question determined by it."

In the case of Watson v. Jones, 13 Wallace, at page 727, the Supreme Court of the United States, in speaking through Mr. Justice MILLER, said: "In this class of cases we think the rule of action which should govern the civil courts, founded in a broad and sound view of the relations of Church and State under our

system of laws, and supported by a prepondering weight of judicial authority is, that, whenever the question of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them.''

The Circuit Court of Appeals of the Sixth Circuit, in the case of Brundage v. Deardorf, 92 Fed. 214, l. c. 228, used this language: ''What effect will a civil court give to the interpretation and construction by the highest judicatory of an ecclesiastical body of its own fundamental law? Is that judgment subject to review in the civil courts? Or, will the civil courts accept the interpretation placed upon the organic law of the church by its highest judicatory, and apply the law so interpreted to the settlement of property questions depending upon that law? As we have already stated, the property here involved was not devoted by the express terms of any grant, gift, will, or sale to the support of any specific religious dogma, doctrine, or belief, but is property acquired by the church for the general use of the society for religious purposes, and with no other limitation. The property here in question is held for the particular use of a congregation, which is only one of numerous others united to form a general body of churches, and subject to the ecclesiastical control of the General Conference, whose jurisdiction extends to all congregations composing the general body. The question here presented is merely one of identity—which of the two bodies claiming to be the legitimate successor of the original united organization is the legal successor of the body to which this property was conveyed? When this question is answered, the property must be awarded to that organization. The decision of this question involves the interpretation of the organic law of the church in re-

spect to the appropriate method of altering or amending that law. But that fundamental law has been construed, interpreted, and applied by the highest judicatory of this church before its division, and the very changes in the constitution and confession now complained of as irregular and revolutionary sanctioned and approved as having been made in accordance with the method prescribed by the fundamental law of the church for its own amendment. Shall we review that decision, and overturn its conclusiveness, upon questions purely relating to ecclesiastical law and government, and take from the majority the general property of the church upon some difference of opinion as to whether the highest authority within the church had not mistaken the meaning of the church organic law? The question is not an open one in courts of the United States. It is the duty of this court under the law as settled to accept that decision as final, and as binding upon it in so far as that decision has application to the case for decision. This question was most thoroughly and elaborately considered by the Supreme Court of the United States in the leading case of Watson v. Jones, 13 Wall. 679-726. That case originated in a schism which occurred in the Presbyterian Church in respect to certain declarations made by its General Assembly during the late Civil War touching the subjects of slavery and secession.''

In the case of Connitt v. R. P. D. C. of N. Prospect, 54 N. Y. l. c. 561, EARL, C., speaking for the court, said: ''Having thus reached the conclusion that this was an ecclesiastical matter, and that the church judicatories had jurisdiction of it, we cannot inquire whether they have proceeded according to the laws and usages of their church, nor whether they have decided the matter correctly. It is the settled law of this country, repeatedly announced by the most learned judges and highest courts, that in such cases the civil courts must take the decisions of the eccle-

siastical courts as final and binding upon the parties. . . . In German Reformed Church v. Seibert (3 Barr 291), it is said by the court: 'The decisions of ecclesiastical courts, like every other judicial tribunal, are final, as they are the best judges of what constitutes an offense against the Word of God and the discipline of the church. Any other than those courts must be incompetent judges of matters of faith, discipline and doctrine; and civil courts, if they should be so unwise as to attempt to supervise their judgments on matters which come within their jurisdiction, would only involve themselves in a sea of uncertainty and doubt, which would do anything but improve either religion or good morals.' "

And Chief Justice ANDREWS, in the case of Trustees of Trinity M. E. Church v. Harris, 47 Atl. l. c. 119, in speaking for the Supreme Court of Connecticut, said: "The consolidation of the three churches into one was a matter of ecclesiastical law and practice, and the decision of the ecclesiastical tribunal on that matter is binding on the superior court and on this court. In all ecclesiastical matters the courts are bound by the decision of the ecclesiastical tribunal. It is so laid down by this court in Whitney v. Society, 5 Conn. 406, and in Gibbs v. Society, 38 Conn. 153. 'In this class of cases we think the rule of action which should govern the civil courts, founded in a broad view of the relations of the Church and State under our system of laws, and supported by a preponderating weight of judicial authority, is that, whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law, have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final and as binding on them in their application to the case before them.' [Watson v. Jones, 13 Wall. 727, 20 L. Ed. 666; Bouldin v. Alexander, 15 Wall. 131, 21 L. Ed. 69.]"

In Lamb v. Cain, 14 L. R. A. 1. c. 527, the Supreme
Court of Indiana, in speaking through Chief Justice
COFFEY, said:

"All who unite with such associations, when so
organized, impliedly consent to submit to such govern-
ment. From these considerations the rule in this coun-
try has become elementary that when a civil right de-
pends upon some matter pertaining to ecclesiastical
affairs, the civil tribunal tries the right and nothing
more, taking the ecclesiastical decisions out of which
the civil right has arisen as it finds them, and accepts
such decisions as matters adjudicated by another le-
gally constituted jurisdiction. [White Lick Quarterly
Meeting of Friends v. White Lick Quarterly Meeting
of Friends, 89 Ind. 135; Watson v. Jones, supra;
Dwenger v. Geary, 113 Ind. 106, 12 West. Rep. 691;
Connitt v. Reformed P. D. Church of New Prospect,
54 N. Y. 551; Gaff v. Greer, 88 Ind. 122; Harrison v.
Hoyle, 24 Ohio St. 254.]

"In the case of White Lick Quarterly Meeting of
Friends v. White Lick Quarterly Meeting of Friends,
supra, this court said: 'The civil courts act upon the
theory that the ecclesiastical courts are the best judges
of merely ecclesiastical questions, and of all matters
which concern the doctrines and discipline of the re-
spective religious denominations to which they belong.
When a person becomes a member of a church he be-
comes so upon the condition of submission to its eccle-
siastical jurisdiction, and however much he may be
dissatisfied with the exercise of that jurisdiction, he
has no right to invoke the supervisory power of a
civil court so long as none of his civil rights are in-
vaded.'

"In the case of German Reformed Church v. Sei-
bert, 3 Barr 291, it was said by the court: 'The de-
cisions of ecclesiastical courts, like every other trib-
unal, are final, as they are the best judges of what con-
stitutes an offense against the Word of God and the

disciplne of the Church. Any other than those courts must be incompetent judges of matters of faith, discipline and doctrine; and civil courts, if they should be so unwise as to attempt to revise their judgments on matters which come within their jurisdiction, would only involve themselves in a sea of uncertainty and doubt, which would do anything but improve either religion or good morals.' "

In Gaff v. Greer, 45 Am. Rep. l. c, 452, the Supreme Court of Indiana said:

"In the Presbyterian system, a local church is but a member of a larger and more important religious organization, and is under its government and control. The session or local church, is controlled by the Presbytery, the Presbytery by the Synod, and the Synod by the General Assembly. The general church is controlled and governed by a body of constitutional and ecclesiastical laws, and exercise legislative and judicial power. Questions of rule, usage and custom affecting the local church or the relation of its members to the organization, are subject to the judgment of these several bodies, called judicatories, in the order named, and the decision of the highest to which any question is carried is binding upon all. The decision of the Presbytery in this case adjudged that the withdrawal of the majority from its jurisdiction was a secession from the church. This cannot, we think, be gainsaid. The order was that those who remained constituted and would thereafter be recognized by the Presbytery as the church. This excluded those withdrawing, and if the order is binding the withdrawal operated as a secession from the church as fully and as completely as though these persons had voluntarily severed their connection with the church. The word 'church' is here used for 'congregation,' as a withdrawal from the Presbytery is, of course, a secession from the general organization. The judgment fixes the fact that the appellants seceded from the

church, and if this decision binds the civil courts, the proffered testimony was properly excluded. In Watson v. Jones, 13 Wall. 679, the Supreme Court of the United States, in a similar case, between the two bodies of a Presbyterian church, each contending for the possession of the property, thus states the law: 'In this class of cases we think the rule of action which should govern the civil courts, founded in a broad and sound view of the relations of the Church and State under our system of laws, and supported by a preponderating weight of judicial authority, is that whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final and as binding on them, in their application to the case before them.'

"In Shannon v. Frost, 3 B. Mon. 253, the court, on a similar question said: 'This court, having no ecclesiastical jurisdiction, cannot revise or question ordinary acts of church discipline or excision. Our only judicial power in the case arises from the conflicting claims of the parties to the church property and the use of it. . . . We cannot decide who ought to be members of the church, nor whether the excommunicated have been justly or unjustly, regularly or irregularly, cut off from the body of the church.' The same rule is asserted in the following cases: State ex rel. v. Farris, 45 Mo. 183; Robertson v. Bullions, 9 Barb. 64, 134; German Reformed Church v. Seibert, 3 Barr 282; Gibson v. Armstrong, 7 B. Mon. 481; Harmon v. Dreher, 1 Speer's Eq. 87. These authorities establish the proposition that the decision of these judicatories is binding upon the courts where such questions arise."

I might cite and quote from many other cases of similar import, but I think that is unnecessary, as it clearly appears from the foregoing quotations that

the rule therein stated is elementary and is supported by the great weight of authority. In fact, I do not understand counsel for appellants to controvert the broad principle that, where questions of discipline, or of faith, or ecclesiastical rule, custom or law have been decided by the highest church judicatories to which the matter has been carried, the civil courts must accept such decisions as final, and as binding on them in their application to cases pending before them; but seek to modify that general rule by saying that where property rights are involved in and depend upon such decisions, then the civil courts will not be bound thereby, but will investigate and determine for themselves the ecclesiastical questions so involved.

This is not only an anomaly to me, but, in my judgment, it is supported by neither reason nor by the weight of authority. Anomalous, because all must concede that church property is but a minor incident to religion and religious worship. And it is conceded by all, and supported by all the authorities cited by counsel for both sides, that in all matters purely ecclesiastical the church judicatories have original and exclusive jurisdiction, and that the civil courts have no jurisdiction or authority whatever to interfere therewith. This is true, because where, as in this country, there is a separation of Church and State, the ecclesiastical code constitutes no part of the civil jurisprudence of the State, consequently all questions arising thereunder are beyond the jurisdiction and pale of the State tribunals, thereby leaving all such questions to be determined by the Church judicatories, in accordance with the ecclesiastical laws. The laws and courts of the Church are just as separate and independent of those of the State, as the Church itself is separate and independent of the State. The former follows as an incident of the latter, and the latter is firmly founded upon both a Federal and State constitutional provision. Under this guaranty the Church

has selected for judges of its courts men learned in its laws, devout and pious, and who acknowledge allegiance to its laws and God. No others, according to the ecclesiastical law, are eligible to occupy those positions. Otherwise we might witness the spectacle of a judge of a civil court administering ecclesiastical law which is as foreign to his jurisprudence as the Kingdom of God is foreign to the Kingdom of Man. Not only that, but if the contention of counsel for appellants is correct, then we might also witness a judge of a civil court who is a nonbeliever in Christ and His Holy Religion sitting in judgment, expounding and determining questions of belief and other doctrinal matters according to the laws of the Church, and at the same time disbelieve in them and in the divinity of Christ, to whom he acknowledges no allegiance. What a sacrilege it would be to compel the followers of Christ to submit to the decisions of infidels involving ecclesiastical matters. I can conceive of nothing which would hold religion up to greater ridicule, scorn and disrespect than such a spectacle.

In response to this, it has been suggested that the judgment of the civil court is only binding in so far as it affects the property involved therein; and that the portion of the judgment which construes and determines the question of doctrine, belief or creed may be ignored and disobeyed by all those members of the Church who disbelieve in the doctrine or creed as construed and interpreted by the court, just as was done by them in this and in all other similar cases. That is true, they may disregard that part of the judgment, because, as before stated, the Constitution of the United States and that of this State guarantee religious liberty to all and the right to worship God according to the dictates of their own conscience; and those rights cannot be legally restrained by the judgment and decree of any court of this land. But this presents an anomalous position. Here we have a civil

court sitting in judgment between two contending factions of a church, over the ownership of certain property, which depends upon the proper construction of the creed and doctrine of the church. The ownership of the property is determined and follows as an incident to the decision of the doctrinal questions involved, and not otherwise. So we have a court deciding in this class of case two questions, first, the doctrinal questions which is the principal and paramount one; and, second, the property rights, which is incidental and subordinate to the first, or doctrinal question. The first is not only the principal question to be adjudicated, but it is preliminary to the second, or subordinate question; and, as before stated, the second follows the determination of the first as naturally as day follows night. Yet, notwithstanding these conceded facts, the very moment the judgment is entered and the property is delivered in pursuance thereof, the principal part of the judgment has no binding effect whatever upon either faction of the church; they may violate it with impunity, for the reason the courts have no power to bind a man's religious views or opinions; yet the second part of the judgment, which was purely incidental to the first part, remains in full force and effect, and must be obeyed by all. If the judgment is not binding upon the parties to it, then the court had no authority to render it; and if the court had the authority to render it, then it is binding upon all until it is reversed, modified or set aside according to law. This is axiomatic, but this is clearly a case, if I may be excused for the comparison. where the tail wags the dog, and where the dog is killed for having been wagged.

So it is in all cases of this class; the incident controls the principal, and the church is destroyed because its judicatories construed its own laws differently from what the civil courts thought was correct.

It has also been suggested that the church is not

injured by depriving it of its property.  This I deny.
While the church grounds and buildings are only in-
cidental to religious worship, yet the teachings of
Christ cannot in this day and age be conducted and
carried on successfully without proper grounds and
suitable buildings for that purpose.  It is true one or
both factions might organize a new congregation, and
each might erect new buildings for worship, and get
along nicely and harmoniously until some other doc-
trinal question should arise; but if the decisions of
the judicatories of the two churches did not meet with
unanimous concurrence of all the members, then they
would have the right to split up, and there would then
be another schism in each, and we would have four
weak and impoverished church organizations, incapa-
ble of accomplishing much good, instead of one, the
original, which was stronger than all of its different
branches and off-shoots, and which was capable of ac-
complishing much good for the cause of Christ.  But,
if this policy of appealing from the decisions of the
church tribunals to the civil courts of the country is
continued, then the cause of Christ and his teachings
will be sacrificed upon an altar of gold.  In this way
it is made possible for the courts of the country to
absolutely destroy the Church, if such a thing were
possible, through the improper control of its property.
But it is said that if there was no restraint or limi-
tation placed upon the powers of the Church judica-
tories regarding property rights, then they might, and
probably have in some cases through error of judg-
ment or evil design, divert property from the teach-
ing and promulgation of the doctrine and faith for
which it was donated, to the teaching of some other
doctrine, and thereby defeat the will of the donor and
deprive those of the property who adhered steadfastly
to the faith.  This is only conjectural, but concede it
to be true, yet might it not also be said with equal or
even with a greater degree of truthfulness, that civil

courts also might, through error, ignorance or design, so interpret ecclesiastical questions as to divert such property from the purposes for which it was donated? I dare say the civil courts have and will continue to commit more errors and more serious in character, in the administration of ecclesiastical laws, on account of their ignorance of those laws, than have or will be committed by the judicatories of the Church. This is perfectly natural, because the judges of the latter are more conversant in their laws than a layman can hope to be; and especially is that true in doctrinal questions, which are but the expressions of ·faith and belief in Christ and His teachings which are incapable of being fully and perfectly understood by those who do not believe therein. The 17th verse of the 10th Chapter of Romans reads as follows: "So then faith *cometh* by hearing, and hearing by the word of God."

This, in my judgment, is one of the chief causes for the existence of so much strife and division among Christian people. They do not hear alike, nor do they understand the word of God alike; but those who do hear and understand the Scriptures alike, associate themselves together into one religious body, called a church; and those who hear and understand them in a different way associate themselves together and form another church, and so on unto the end of differentiation. All Christian people recognize the fact that faith is the chief constituent element entering into all doctrines, and that before one can properly and correctly understand and interpret them, he must hear and understand the Scriptures in the same spirit in which they were heard and understood by those who wrote the creed. It is for this reason that the judicatories of all churches and those of the State should be completely barred from passing upon doctrinal questions of another church, for, obviously, without faith being called into requisition as an assistant interpreter, the correctness of their decisions would depend

largely upon mere chance; and, consequently, in most cases would be erroneous. This matter will, however, receive further attention later under a more appropriate topic. The sole effect of such decisions is to transfer the church property from one of the factions to the other and leave both branches of the shattered church to heal their wounds the best they may, permitting the members thereof to form a new church organization, promulgate a new creed and worship God according to the dictates of their own consciences, untrampled by decisions of our civil courts until another schism arises.

The extent of the power of the civil courts to interfere with the authority of church tribunals to decide upon questions involving the rights to church property should be limited to the inquiry as to their jurisdiction of the latter. If under the constitution and laws of the church its judicatories have jurisdiction of the subject, then the hand of the former should be stayed, and leave it to the latter to inquire into and determine all questions of faith, doctrine, discipline, rule, custom and ecclesiastical government, as well as all property rights depending thereon. [Mack v. Kime, supra; Watson v. Jones, supra.]

Nor, in my opinion, as before stated, is the contention of counsel for appellants supported by the weight of authority.

It is true there are cases which hold that wherever rights of property depend upon an ecclesiastical question, the civil courts will not only look into the jurisdiction of the church judicatories, but will also decide for themselves all questions of doctrine, confession of faith, etc., upon which the property right depends, and overrule the decisions of the church judicatories where, in their judgment, the latter have erroneously decided such doctrinal questions. But, in my opinion, that position is not sustained by reason or by the weight of authority.

222 Sup.—47

The Supreme Court of Georgia, in the case of Mack v. Kime, 129 Ga. 1, which grew out of this same church schism, on page 17, said: "When an individual becomes a member of a religious organization, his uniting with it is his voluntary act, and he becomes bound by the rules and usages of the organization. A religious association usually adopts a constitution, by-laws, and form of government. A member, when he enters the organization, voluntarily assumes the duty of obeying the laws of the association. As to all matters purely ecclesiastical he is bound by the decisions of the tribunals fixed by the organization to which he belongs, as an arbiter to determine the disputed questions relating to matters peculiarly within the province of the organization. In attempting to carry out the purpose for which religious associations are formed it becomes necessary, in almost every instance, for the organization to hold and own property. The members of the organization therefore become interested in the property so owned. Differences may arise which bring about disputes as to what interest a member or class of members of an organization may have in this property. Rights of property are as peculiarly within the jurisdiction of the civil courts of the land as purely religious rights are within the jurisdiction of the ecclesiastical tribunals of a religious organization. How far the civil courts will interfere in the affairs of a religious body, where property rights are involved, is a question which has been addressed to many courts of this country. Often the controversy as to the right of the property grows out of a controversy as to creed, doctrine, or teaching. While all of the rulings of the American courts cannot be said to be entirely uniform, the great weight of authority is to the effect that if a religious organization has, under its form of government, a tribunal constituted with jurisdiction to decide differences between its members as to creed, teaching, or doctrine, the civil courts will

not undertake to review or revise the judgment of the church tribunal in reference to such matters. The cases which support this ruling seem to be founded upon sound reasoning, when we take into consideration the constitutional provisions which deny to Congress and the law-making powers of the different States the right to interfere in matters purely ecclesiastical. In some cases it has been said that the decisions of the church tribunals are persuasive, and not to be departed from by the civil courts, except where the decisions are clearly wrong. But the sounder rule is that laid down in those cases in which it is held that, if the matter relates to creed, doctrines, or teaching, the judgment of the constituted church tribunal is absolutely conclusive upon the civil courts, whether, in the opinion of the judge of such courts, the decision appears to be right or wrong. Where a right of property turns upon such a decision the civil courts will allow the property to go in that direction in which the decision of the church tribunal carries it. One of the leading cases on the subject in this country is Watson v. Jones, 13 Wall. (U. S.) 679, 20 L. Ed. 666. It was there held that in a case where the right of property asserted in the civil courts is dependent upon a question of doctrine, discipline, ecclesiastical law, rule, custom, or church government, and that question has been decided by the highest tribunal within the organization to which it has been carried, the civil courts will accept that decision as conclusive, and be governed by it in its application to the case before it. In the opinion Mr. Justice MILLER says, 'It is not to be supposed that the judges of the civil courts can be as competent in the ecclesiastical law and religious faith of all these bodies as the ablest men are in reference to their own. It would therefore be an appeal from the more learned tribunal in law, which should decide the case, to the one which is less so.' [Page 729 of 13 Wall. (20 L. Ed. 666). See, also, 7 Rose's Notes, 769; Brundage v.

Deardorf, 92 Fed. 214, 34 C. C. A. 304; Schweiker v. Husser, 146 Ill. 399, 34 N. E. 1022; Lamb v. Cain, 14 L. R. A. 518, 129 Ind. 486, 29 N. E. 13; Watson v. Avery, 65 Ky. 332; Trustees of Trinity M. E. Church of Norwich v. Harris, 73 Conn. 216, 47 Atl. 116, 50 L. R. A. 636; White Lick Quarterly Meeting of Friends v. White Lick Quarterly Meeting of Friends, 89 Ind. 136.]''

The question was most learnedly and exhaustively gone into by the Supreme Court of the United States in the case of Watson v. Jones, 13 Wall. 679. On pages 722, et seq., Mr. Justice MILLER, speaking for the court, used this language:

''We are next to inquire whether the decree thus rendered is based upon an equally just view of the law as applied to the facts of this controversy.

''The questions which have come before the civil courts concerning the rights to property held by ecclesiastical bodies, may, so far as we have been able to examine them, be profitably classified under three general heads, which of course do not include cases governed by considerations applicable to a church established and supported by law as the religion of the State.

''1. The first of these is when the property which is the subject of controversy has been, by the deed or will of the donor, or other instrument by which the property is held, by the express terms of the instrument devoted to the teaching, support, or spread of some specific form of religious doctrine or belief.

''2. The second is when the property is held by a religious congregation which, by nature of its organization, is strictly independent of other ecclesiastical associations, and so far as church government is concerned, owes no fealty or obligation to any higher authority.

''3. The third is where the religious congregation or ecclesiastical body holding the property is but a

subordinate member of some general church organization in which there are superior ecclesiastical tribunals with a general and ultimate power of control more or less complete, in some supreme judicatory over the whole membership of that general organization.

"In regard to the first of these classes it seems hardly to admit of a rational doubt that an individual or an association of individuals may dedicate property by way of trust to the purpose of sustaining, supporting, and propagating definite religious doctrines or principles, provided that in doing so they violate no law of morality, and give to the instrument by which their purpose is evidenced, the formalities which the laws require. And it would seem also to be the obvious duty of the court, in a case properly made, to see that the property so dedicated is not diverted from the trust which is thus attached to its use. So long as there are persons qualified within the meaning of the original dedication, and who are willing to teach the doctrines or principles prescribed in the act of dedication, and so long as there is any one so interested in the execution of the trust as to have a standing in court, it must be that they can prevent the diversion of the property or fund to other and different uses. This is the general doctrine of courts of equity as to charities, and it seems equally applicable to ecclesiastical matters.

"In such case, if the trust is confided to a religious congregation of the independent or congregational form of church government, it is not in the power of the majority of that congregation, however preponderant, by reason of a change of views on religious subjects, to carry the property so confided to them to the support of new and conflicting doctrine. A pious man building and dedicating a house of worship to the sole and exclusive use of those who believe in the doctrine of the Holy Trinity, and placing it under the control of a congregation which at the time holds the same

belief, has a right to expect that the law will prevent that property from being used as a means of support and dissemination of the Unitarian doctrine, and as a place of Unitarian worship. Nor is the principle varied when the organization to which the trust is confided is of the second or associated form of government. The protection which the law throws around the trust is the same. And though the task may be a delicate one and a difficult one, it will be the duty of the court in such cases, when the doctrine to be taught or the form of worship to be used is definitely and clearly laid down, to inquire whether the party accused of violating the trust is holding or teaching a different doctrine, or using a form of worship which is so far variant as to defeat the declared objects of the trust. In the leading case on this subject, in the English courts, of the Attorney-General v. Pearson, 3 Merivale 353, Lord ELDON said, 'I agree with the defendants that the religious belief of the parties is irrelevant to the matters in dispute, except so far as the King's court is called upon to execute the trust.' That was a case in which the trust-deed declared the house which was erected under it was for the worship and service of God. And though we may not be satisfied with the very artificial and elaborate argument by which the chancellor arrives at the conclusion, that because any other view of the nature of the Godhead than the Trinitarian view was heresy by the laws of England, and any one giving expression to the Unitarian view was liable to be severely punished for heresy by the secular courts, at the time the deed was made, that the trust was, therefore, for Trinitarian worship, we may still accept the statement that the court has the right to enforce a trust clearly defined on such a subject.

"The case of Miller v. Gable, 2 Denio 492, appears to have been decided in the Court of Errors of New York on this principle, so far as any ground of decision

can be gathered from the opinions of the majority of the court as reported.

"The second class of cases which we have described has reference to the case of a church of a strictly congregational or independent organization, governed solely within itself, either by a majority of its members or by such other local organism as it may have instituted for the purpose of ecclesiastical government; and to property held by such a church, either by way of purchase, or donation, with no other specific trust attached to it in the hands of the church than that it is for the use of that congregation as a religious society.

"In such cases where there is a schism which leads to a separation into distinct and conflicting bodies, the rights of such bodies to the use of the property must be determined by the ordinary principles which govern voluntary associations. If the principle of government in such cases is that the majority rules, then the numerical majority of members must control the right to the use of the property. If there be within the congregation officers in whom are vested the powers of such control, then those who adhere to the acknowledged organism by which the body is governed are entitled to the use of the property. The minority in choosing to separate themselves into a distinct body, and refusing to recognize the authority of the governing body, can claim no rights in the property from the fact that they had once been members of the church or congregation. This ruling admits of no inquiry into the existing religious opinions of those who comprise the legal or regular organization; for, if such was permitted, a very small minority, without any officers of the church among them, might be found to be the only faithful supporters of the religious dogmas of the founders of the church. There being no such trust imposed upon the property when purchased or given, the court will not imply one for

the purpose of expelling from its use those who by regular succession and order constitute the church because they may have changed in some respect their views of religious truth.

"Of the cases in which this doctrine is applied no better representative can be found than that of Shannon v. Frost, 3 B. Mon. 253, where the principle is ably supported by the learned Chief Justice of the Court of Appeals of Kentucky.

"The case of Smith·v. Nelson, 18 Vt. 511, asserts this doctrine in a case where a legacy was left to the Associate Congregation of Ryegate, the interest whereof was to be annually paid to their minister forever. In that case, though the Ryegate congregation was one of a number of Presbyterian churches connected with the general Presbyterian body at large, the court held that the only inquiry was whether the society still exists, and whether they have a minister chosen and appointed by the majority and regularly ordained over the society, agreeably to the usage of that denomination. And though we may be of opinion that the doctrine of that case needs modification, so far as it discusses the relation of the Ryegate congregation to the other judicatories of the body to which it belongs, it certainly lays down the principle correctly if that congregation was to be treated as an independent one.

"But the third of these classes of cases is the one which is oftenest found in the courts, and which, with reference to the number and difficulty of the questions involved, and to other considerations, is every way the most important.

"It is the case of property acquired in any of the usual modes for the general use of a religious congregation which is itself part of a large and general organization of some religious denomination, with which it is more or less intimately connected by religious views and ecclesiastical government.

"The case before us is one of this class, growing out of a schism which has divided the congregation and its officers, and the Presbytery and Synod, and which appeals to the courts to determine the right to the use of the property so acquired. Here is no case of property devoted forever by the instrument which conveyed it, or by any specific declaration of its owner, to the support of any special religious dogmas, or any peculiar form of worship, but of property purchased for the use of a religious congregation, and so long as any existing religious congregation can be ascertained to be that congregation, or its regular and legitimate successor, it is entitled to the use of the property. In the case of an independent congregation we have pointed out how this identity, or succession, is to be ascertained, but in cases of this character we are bound to look at the fact that the local congregation is itself but a member of a much larger and more important religious organization, and is under its government and control, and is bound by its orders and judgments. There are in the Presbyterian system of ecclesiastical government, in regular succession, the Presbytery over the session or local church, the Synod over the Presbytery, and the General Assembly over all. These are called, in the language of the church organs, 'judicatories,' and they entertain appeals from the decisions of those below, and prescribe corrective measures in other cases.

"In this class of cases we think the rule of action which should govern the civil courts, founded in a broad and sound view of the relations of Church and State under our system of laws, and supported by a preponderating weight of judicial authority is, that, whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must ac-

cept such decisions as final, and as binding on them, in their application to the case before them.

"We concede at the outset that the doctrine of the English courts is otherwise. In the case of the Attorney-General v. Pearson, cited before, the proposition is laid down by Lord ELDON, and sustained by the peers, that it is the duty of the court in such cases to inquire and decide for itself, not only what was the nature and power of these church judicatories, but what is the true standard of faith in the church organization, and which of the contending parties before the court holds to this standard. And in the subsequent case of Craigdallie v. Aikman, 2 Bligh 529, the same learned judge expresses in strong terms his chagrin that the Court of Sessions of Scotland, from which the case had been appealed, had failed to find on this latter subject, so that he could rest the case on religious belief, but had declared that in this matter there was no difference between the parties. And we can very well understand how the Lord Chancellor of England, who is, in his office, in a large sense, the head and representative of the Established Church, who controls very largely the church patronage, and whose judicial decision may be, and not infrequently is, invoked in cases of heresy and ecclesiastical contumacy, should feel, even in dealing with a dissenting church, but little delicacy in grappling with the most abstruse problems of theological controversy, or in construing the instruments which those churches have adopted as their rules of government, or inquiring into their customs and usages. The dissenting church in England is not a free church in the sense in which we apply the term in this country, and it was much less free in Lord ELDON's time than now. Laws then existed upon the statute book hampering the free exercise of religious belief and worship in many most oppressive forms, and though Protestant dissenters were less burdened than Catholics and Jews, there did not exist that full, entire

and practical freedom for all forms of religious belief and practice which lies at the foundation of our political principles. And it is quite obvious, from an examination of the series of cases growing out of the organization of the Free Church of Scotland, found in Shaw's Reports of Cases in the Court of Sessions, that it was only under the pressure of Lord ELDON's ruling, established in the House of Lords, to which final appeal lay in such cases, that the doctrine was established in the Court of Sessions after no little struggle and resistance. The full history of the case of Craigdallie v. Aikman, in the Scottish court, which we cannot further pursue, and the able opinion of Lord MEADOWBANK in Galbraith v. Smith, 15 Court of Sessions Cases 508, show this conclusively.

"In this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine, which does not violate the laws of morality and *property,* and which does not infringe personal rights, is conceded to all. The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect. The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions

Boyles v. Roberts.

should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for.

"Nor do we see that justice would be likely to be promoted by submitting those decisions to review in the ordinary judicial tribunals. Each of these large and influential bodies (to mention no others, let reference be had to the Protestant Episcopal, the Methodist Episcopal, and the Presbyterian churches), has a body of constitutional and ecclesiastical law of its own, to be found in their written organic laws, their books of discipline, in their collections of precedents, in their usage and customs, which as to each constitute a system of ecclesiastical law and religious faith that tasks the ablest minds to become familiar with. It is not to be supposed that the judges of the civil courts can be as competent in the ecclesiastical law and religious faith of all these bodies as the ablest men in each are in reference to their own. It would therefore be an appeal from the more learned tribunal in the law which should decide the case, to one which is less so.

"We have said that these views are supported by the preponderant weight of authority in this country, and for the reasons which we have given, we do not think the doctrines of the English Chancery Court on this subject should have with us the influence which we would cheerfully accord to it on others.

"We have already cited the case of Shannon v. Frost, in which the appellate court of the State where this controversy originated, sustains the proposition clearly and fully. 'This court,' says the Chief Justice, 'having no ecclesiastical jurisdiction, cannot revise or question ordinary acts of church discipline. Our only judicial power in the case arises from the conflicting claims of the parties to the church property and the use of it. We cannot decide who ought to be members of the church, nor whether the ex-communicated have

been justly or unjustly, regularly or irregularly cut off from the body of the church.'

"In the subsequent case of Gibson v. Armstrong, 7 B. Mon. 481, which arose out of the general division of the Methodist Episcopal Church, we understand the same principles to be laid down as governing that case, and in the case of Watson v. Avery, the case relied on by the appellants at bar, and considered in the former part of this opinion, the doctrine of Shannon v. Frost is in general terms conceded, while a distinction is attempted which we shall consider hereafter.

"One of the most careful and well-considered judgments on the subject is that of the Court of Appeals of South Carolina, delivered by Chancellor JOHNSON in the case of Harmon v. Dreher. The case turned upon certain rights in the use of the church property claimed by the minister, notwithstanding his expulsion from the Synod as one of its members. 'He stands,' says the chancellor, 'convicted of the offense alleged against him by the sentence of the spiritual body of which he was a voluntary member, and whose proceedings he had bound himself to abide. It belongs not to the civil power to enter into or review the proceedings of a spiritual court. The structure of our government has, for the preservation of civil liberty, rescued the temporal institutions from religious interference. On the other hand, it has secured religious liberty from the invasion of the civil authority. The judgments, therefore, of religious associations, bearing on their own members, are not examinable here, and I am not to inquire whether the doctrines attributed to Mr. Dreher were held by him, or whether if held were anti-Lutheran; or whether his conduct was or was not in accordance with the duty he owed to the Synod or to his denomination. . . . When a civil right depends upon an ecclesiastical matter, it is the civil court and not the ecclesiastical which is to decide. But the civil tribunal tries the civil right, and no more, taking the

ecclesiastical decision out of which the civil right arises as it finds them.' The principle is reaffirmed by the same court in the John's Island Church case, 2 Rich. Eq. 215.

"In Den v. Bolton, 7 Halsted (N. J. L.) 206, the Supreme Court of New Jersey asserts the same principles, and though founding its decision mainly on a statute, it is said to be true on general principles.

"The Supreme Court of Illinois, in the case of Ferraria v. Vasconcelles, 23 Ill. 456, refers to the case of Shannon v. Frost with approval, and adopts the language of the court that 'the judicial eye cannot penetrate the veil of the church for the forbidden purpose of vindicating the alleged wrongs of excised members; when they became members they did so upon the condition of continuing or not as they and their churches might determine, and they thereby submit to the ecclesiastical power, and cannot now invoke the supervisory power of the civil tribunals.'

"In the very important case of Chase v. Cheney, 58 Ill. 509, recently decided in the same court, Judge LAWRENCE, who dissented, says, 'We understand the opinion as implying that in the administration of ecclesiastical discipline, and where no other right of property is involved than loss of the clerical office or salary incident to such discipline, a spiritual court is the exclusive judge of its own jurisdiction, and that its decision of that question is binding on the secular courts.' And he dissents with Judge SHELDON from the opinion because it so holds.

"In the case of State ex rel. Watson v. Farris, 45 Mo. 183, which was a case growing out of the schism in the Presbyterian Church in Missouri in regard to this same Declaration and Testimony and the action of the General Assembly, that court held that whether a case was regularly or irregularly before the Assembly was a question which the Assembly had the right to determine for itself, and no civil court could reverse,

modify, or impair its action in a matter of merely ecclesiastical concern.

"We cannot better close this review of the authorities than in the language of the Supreme Court of Pennsylvania, in the case of the German Reformed Church v. Seibert. 'The decisions of ecclesiastical courts, like every other judicial tribunal, are final, as they are the best judges of what constitutes an offense against the word of God and the discipline of the church. Any other than those courts must be incompetent judges of matters of faith, discipline, and doctrine; and civil courts, if they should be so unwise as to attempt to supervise their judgments on matters which come within their jurisdiction, would only involve themselves in a sea of uncertainty and doubt which would do anything but improve either religion or good morals.'

"In the subsequent case of McGinnis v. Watson, this principle is again applied and supported by a more elaborate argument.

"The Court of Appeals of Kentucky, in the case of Watson v. Avery, before referred to, while admitting the general principle here laid down, maintains that when a decision of an ecclesiastical tribunal is set up in the civil courts, it is always open to inquiry whether the tribunal acted within its jurisdiction, and if it did not, its decision could not be conclusive.

"There is, perhaps no word in legal terminology so frequently used as the word jurisdiction, so capable of use in a general and vague sense, and which is used so often by men learned in the law without a due regard to precision in its application. As regards its use in the matters we have been discussing it may very well be conceded that if the General Assembly of the Presbyterian Church should undertake to try one of its members for murder, and punish him with death or imprisonment, its sentence would be of no validity in a civil court or anywhere else. Or if it should at the

instance of one of its members entertain jurisdiction as between him and another member as to their individual right to property, real or personal, the right in no sense depending on ecclesiastical questions, its decision would be utterly disregarded by any civil court where it might be set up. And it might be said in a certain general sense very justly, that it was because the General Assembly had no jurisdiction of the case. Illustrations of this character could be multiplied in which the proposition of the Kentucky court would be strictly applicable.

"But it is a very different thing where a subject-matter of dispute, strictly and purely ecclesiastical in its character—a matter which concerns theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them—becomes the subject of its action. It may be said here, also, that no jurisdiction has been conferred on the tribunal to try the particular case before it, or that, in its judgment, it exceeds the powers conferred upon it, or that the laws of the church do not authorize the particular form of proceeding adopted; and, in a sense often used in the courts, all of those may be said to be questions of jurisdiction. But it is easy to see that if the civil courts are to inquire into all these matters, the whole subject of the doctrinal theology, the usages and customs, the written laws, and fundamental organization of every religious denomination may, and must, be examined into with minuteness and care, for they would become, in almost every case, the *criteria* by which the validity of the ecclesiastical decree would be determined in the civil court. This principle would deprive these bodies of the right of construing their own church laws, would open the way to all the evils which we have depicted as attendant upon the doctrine of Lord ELDON, and would, in effect, transfer to the

civil courts where property rights were concerned the decision of all ecclesiastical questions."

The same result was reached by the Circuit Court of Appeals of the Sixth Circuit, in the case of Brundage v. Deardorf, 92 Fed. 214. The syllabus tersely states the substance of the opinion, as follows: "The general conference of a religious society decided that its constitution and creed, which the conference had previously adopted, and which provided that it should not be amended except on request of two-thirds of its members, etc., was inadequate, and adopted measures for its amendment. The amendments were submitted to a vote of the members, after due notice, and more than two-thirds of those voting voted in favor of the amendments, whereupon the general conference decided that they had been adopted. A portion of the dissenting members then withdrew, and claimed the property purchased by the church, on the ground that those favoring the amendments had departed from the principles and purposes of the church. *Held*, that the amendment to the constitution and creed were matters of ecclesiastical cognizance within the jurisdiction of the conference, that the society was bound by its decisions, and that the withdrawing members were not entitled to such property."

And the Supreme Court of New York announced the same rule in the case of Connitt v. R. P. D. C. of N. Prospect, 54 N. Y. 551; and on page 562 the court quoted approvingly the following language of Chancellor JOHNSON in the case of Harmon v. Dreher (1 Speer's Eq. 87): " 'When a civil right depends upon an ecclesiastical matter, it is the civil court and not the ecclesiastical which is to decide; but the civil tribunal tries the civil right, and no more, taking the ecclesiastical decisions out of which the civil right arises as it finds them.' These views are fully sustained by the courts of our own State. [Dutch Church of Albany v. Bradford, 8 Cowen 457; Walker v. Wainwright, 16

Barb. 486; Robertson v. Bullions, 9 Barb. 64; Dieffen-
dorf v. Reformed Calvinist Church, 20 Johns. 12.]    I
have purposely abstained from discussing the question
whether the decision of the classis and other judicator-
ies was right, that is, in accordance with the constitu-
tion, laws and usages of the church, because of the view
I have taken that those judicatories had jurisdiction
of the subject-matter, and, hence, that we are not to
review their decision.''

And in the case of Trustees of Trinity M. E.
Church v. Harris, 47 Atl. 116, Chief Justice ANDREWS,
in speaking for the Supreme Court of Connecticut, in
a well-considered case, on page 119, said:

"The case of Gaff v. Greer, 88 Ind. 122, is in prin-
ciple precisely identical with the one at bar. That was
an action demanding the title to, and the possession of,
lands, and the case depended upon the application of
ecclesiastical law. Land had been conveyed to certain
persons named in the deed, and decribed as trustees
for the Presbyterian Church in Aurora, Illinois, and
to their successors in office. The church edifice was
erected on this land. A disagreement had arisen be-
tween members of the church in respect to the employ-
ment of a pastor. The matter was taken before the
Presbytery. The Presbytery decided that the further
employment of this pastor was unwise, and directed
the church to secure the services of some other minis-
ter. With this decision the majority were dissatisfied,
and, the Presbytery refusing upon application to re-
cede from its position, they presented to the Presby-
tery a paper reciting their grievances, and asking for
certain relief, which concluded by saying: 'Failing in
this, we have no other alternative but to withdraw from
your ecclesiastical jurisdiction.' The Presbytery con-
sidered the paper, and determined that when any por-
tion of the members of a church withdrew the remain-
ing members constitute the church. This decision has
been approved by the Synod, and by the General As-

sembly of the Presbyterian Church. The majority had possession of the church building, and continuously had regular preaching and services in conformity with the rites and ceremonies of the Presbyterian Church. The minority, under the direction of the Presbytery, thereafter selected elders, elected trustees, employed another minister, demanded the possession of the church property, and, that being refused, brought the suit for its recovery. The court held and decided that the determination of the Presbytery 'that where any portion of the members of a church withdrew the remaining members constitute the church' was binding upon it (the court), and that the minority was entitled to recover. The decision may be expressed in this way: 'Where a Presbytery has decided that certain members of a Presbyterian church have seceded, the decision binds the civil courts, and the seceders, although a majority, lose their rights to the church property.'

"There are many other cases to the same effect, among which we have examined the following ones: State ex rel. v. Farris, 45 Mo. 183; Robertson v. Bullions, 9 Barb. 64, 134; McKinney v. Griggs, 5 Bush 401; Henderson v. Hunter, 59 Pa. St. 335; Krecker v. Shirey, 163 Pa. St. 534, 30 Atl. 440, 29 L. R. A. 476; College v. Wyatt, 27 Or. 390, 31 Pac. 206, 37 Pac. 1022, 26 L. R. A. 68; Shannon v. Frost, 3 B. Mon. 253; Smith v. Swormstedt, 16 How. 288, 14 L. Ed. 942; Hennessey v. Walsh, 55 N. H. 515, 530; Baxter v. McDonnell, 155 N. Y. 83, 49 N. E. 667, 40 L. R. A. 670. In Wheelock v. Presbyterian Church, 119 Cal. 477, 51 Pac. 841, the court said: 'But the ecclesiastical court known as the "Presbytery" had the power to deal with the First Presbyterian Church in all matters ecclesiastical. The church, as an ecclesiastical body, was under the absolute control and dominion of the Presbytery, and the decisions and decrees of that body were binding upon it, as the decisions of this court are binding upon in-

ferior judicial tribunals. These decisions are not only binding upon the church as an ecclesiastical body, but they are binding and conclusive upon courts wherever and whenever material to pending litigation.'

"We think these authorities are sufficient to establish the proposition made a little above, that in all matters ecclesiastical the decision of the ecclesiastical tribunals is binding on the courts, and that the action and decision of Bishop Walden, to the effect that the plaintiffs are, according to the rules, usages, laws and discipline of the Methodist Church, the successors of the grantees named in the deed of Mr. Swan, ought to have been held by the superior court as binding upon it, that the general claims of the plaintiffs are correct, and that their prayers for relief, as the pleadings now stand, should have been granted."

In the case of Lamb v. Cain, 14 L. R. A. 518, at page 527, the Supreme Court of Indiana said: "In this case it is contended by the appellants that the new constitution and the revised confession of faith were never legally adopted, and that those acting under such constitution and confession of faith have created a new organization, which is not the Church of the United Brethren in Christ, while they, adhering to the old constitution and the old confession of faith, which are still in force and unchanged, constitute the church and that they are for that reason entitled to hold and control the property in controversy. We think it must be true that if the old constitution and the old confession of faith have never been legally changed and are still in force, those adhering thereto constitute the church, while, on the other hand, if they have been legally changed and the new constitution and new confession are now the confession of faith and constitution of the Church of the United Brethren in Christ, those who refuse to accept and act under them are to be regarded as seceders, and no longer

members of that church, and have no right to control its property.''

And the same court, in the case of Gaff v. Greer, 45 Am. Rep. 449, held that: ''Where a Presbytery have decided that certain members of a Presbyterian Church under its jurisdiction have seceded, the decision binds the civil courts, and the seceders, although a majority, lose their rights to the church property.''

I think I would be perfectly safe in stating that there are probably a hundred other cases in this country announcing the law to be in harmony with the views expressed by the courts before mentioned, but I will neither cite nor quote from them, because I believe the arguments made and cases referred to in those cited will convince any disinterested and unprejudiced mind that both the reason and great weight of authority are on respondents' side of this question.

The vice underlying the cases relied upon by counsel for appellants consists in their failure to differentiate between the principles of law governing cases decided by the courts of those countries where a union of Church and State exists, and where ecclesiastical law forms a part of their jurisprudence, and where, under that dual form of government, the civil courts must exercise more or less jurisdiction over ecclesiastical questions, as was pointed out by Mr. Justice MILLER in the case of Watson v. Jones, supra; and that class of cases where the property which was the subject of litigation was by the deed or will of the donor, or other instrument by which the same was held, by express terms of the instrument devoted to the teaching, support or spread of some particular form of religious doctrine or belief. In this class of cases the instrument is the declaration of the trust and the terms upon which the property was conveyed to and accepted by the trustee; and in that case the ecclesiastical body occupies the position of an ordinary trustee of an express trust, and it must administer the

property according to the express terms of the instrument creating the same, and not according to the doctrines and beliefs entertained and taught as interpreted by the judicatories of the class of ecclesiastical bodies to which the trustees belong. In all such cases nothing is left to the judgment and discretion of the trustees; consequently its doctrines and beliefs are wholly foreign to and cannot enter into the administration of property so dedicated; the donor has formulated and promulgated his own creed, and the trustee must administer the property according to that creed, and not in accordance with its own.

In the light of these brief observations it can be readily seen that when civil courts assume jurisdiction in that class of cases they do so under the civil and not by virtue of the ecclesiastical laws; and all property so held must be administered under the former law and not under the latter. From this, of course, it follows that the civil courts have exclusive jurisdiction in all such cases, and are not bound by the decisions of church judicatories.

But the property involved in this litigation was not donated to an ecclesiastical body for the purpose of teaching, support or spread of some specific form of religious doctrine or belief; but it was conveyed to the trustees of the Cumberland Presbyterian Church in Warrensburg, Missouri, which was a subordinate member of the general organization known as the Cumberland Presbyterian Church, in which there are superior ecclesiastical tribunals possessing a general and ultimate power of control over the entire membership of the general organization, which, of course, gives them jurisdiction also over all church property as an incident to their general jurisdiction over all church matters. [First Baptist Church v. Fort, 54 S. W. 892; Lamb v. Cain, supra; Watson v. Jones, supra; Mack v. Kime, supra.]

### III.

Counsel for appellants also assail the validity of the union effectuated between these two churches, for the reason that the plan of union, as reported by the committee appointed by the General Assembly of each church, was not submitted as an entirety to the Presbyteries of each church for their approval, but only such portions thereof were submitted as indicated below, namely, that the report of this joint committee, in formulating a plan of union, not only provided for the submission of the questions of union and adoption, by the Cumberlanders, of the doctrines and Confession of Faith of the Presbyterians, as revised by them in the year 1903, but also for the surrender of the former's name and church organization; while the General Assemblies submitted to the Presbyteries only the former, and made no provision whatever for the expression of the will of the Cumberlanders upon the proposition of surrender of name and organization. It is therefore contended by them that the submission of this incomplete report upon the plan of union nullified the entire proceedings and prevented a legal union from being consummated between them.

For the sake of argument concede that to be true, yet it is the first time in the history of parliamentary usage and practice that I ever heard it contended that the conventions or assemblies appointing a committee to report upon any given subject or proposition were bound by such a report, and were not at liberty to accept or reject any or all portions thereof as in their judgment they deemed wise, just and proper. Yet for the first time in history this schism has afforded the basis of a decision which is relied upon by this court for so holding and thereby solemnly adjudicated that the agent has greater powers than its principal, and that the fountain is higher than its source.

The case of Landrith v. Hudgins, 120 S. W. 783, is the case relied upon as the authority supporting this

contention. That case so holds, but no authority is cited by the learned judge who wrote that opinion supporting him in those views. Nor does he give any reason for his conclusion, except the bare statement that section 60 of the constitution of the Cumberland Church required the submission of the entire plan of union.

I do not so read that section. It is set forth *in haec verba* in a former portion of this opinion, and it could serve no good purpose to recopy it at this place. It is sufficient to state that it provides in substance that upon the recommendation of the General Assembly, the Confession of Faith, Catechism, Constitution and Rules of Discipline may be amended or changed with the approval of the Presbyteries.

It should be noted that this section does not require the General Assembly to submit any proposition whatever to the Presbyteries for their approval. It simply provides that the Confession of Faith, etc., may be amended or changed in any manner upon the recommendation of the General Assembly. This, of course, permits it to exercise its own discretion in determining what amendments, if any, it will submit for the approval of the Presbyteries. This record shows that the General Assembly submitted to the Presbyteries two propositions—first, the question of union; and, second, the acceptance by the Cumberland Church of the Confession of Faith of the Presbyterian Church as revised in the year 1903. Both of these recommendations were duly and legally adopted by the Presbyteries, which, upon approval, became operative and binding upon both churches, because both agreed to them in a constitutional manner by and through their duly constituted authorities. But if the question of the surrender of the name and church organization of the Cumberland Church was not included as a necessary incident to those recommended and approved, then it is self-evident that it still retains

its name and its organization. But this can in no manner affect the legality of the propositions which were properly submitted to and duly approved by the Presbyteries; the union of the two churches, and the acceptance by the Cumberland Church of the Confession of Faith of the Presbyterian Church.

But in my judgment appellants' whole contention is untenable, for the reason that the record unmistakably shows that the whole object of the entire proceedings was to bring about the union between these two churches, which was duly submitted to and approved by the Presbyteries, and the question of doctrine and Confession of Faith was the only serious difference existing between them. That question was also properly submitted to the Presbyteries for approval, and it was approved by a constitutional majority. All else was mere formality, and the change of the name and church organization would necessarily in the absence of an agreement to the contrary follow as the result of and as an incident to the union—in the same manner and to the same extent as if, for instance, two business co-partnerships existed under the names of Jones & Smith and Brown & Smith, and they should agree to unite their old businesses and form a new co-partnership and for the same purpose under the name of the former. The moment the union was agreed to and the new co-partnership was formed, the names of the old firms would be surrendered and their business organizations would, as a matter of law, be dissolved. In the supposed case it would be self-evident that after the formation of the new co-partnership neither of the old co-partnerships of Jones & Smith and Brown & Smith could longer exist, much less could those names be retained and transferred by the old firms to the new firm, in the absence of an agreement to the contrary; and that would be true whether the latter had agreed upon a new name or not. In the absence of an agree-

ment to the contrary, as before stated, both of the old names would be surrendered, as a matter of law, thereby leaving the new firm to adopt a name and to organize its business according to its own plans, regardless of the names and organizations of the old firms.

The same is unquestionably true of these two churches. If, however, it be true, which I do not believe, they have not agreed upon a name for the united church, nor formulated its organization, then there is nothing in the civil law which will prevent them from now doing so; and their failure to do so in advance of the formation of the union can in no manner affect the legality of that union. These observations, it seems to me, are self-evident.

## IV.

The next insistence presented by counsel for appellants for determination involves the question of identity of doctrine and Confession of Faith as believed in and taught by these two churches. It is insisted that a radical difference exists in that regard between these two churches; that before a valid union can be effectuated between them there must be identity of doctrine and faith possessed by both; and that in the absence of such showing, the majority of neither can legally take possession of and transfer the property thereof to the other church without the *unanimous consent* of all of the members, or so long as there is a *single dissenter* thereto. Upon the other hand, counsel for respondents contend that at the time of the submission of the question of union to the Presbyteries for their approval there was no substantial difference of doctrine and faith existing between these two churches; that a literal identity was not necessary; that the determination of that question rested exclusively with and was determined by the judicatories of the church; that the decisions of those

courts are conclusive upon all ecclesiastical questions and upon all property rights of the church depending upon those questions; and that the members of the church, as well as all civil courts, are concluded and bound thereby.

(a) What are the doctrines and beliefs of these two churches? They are reduced to writing and are found printed in what is denominated the "Confession of Faith," which in so far as they are material to the questions involved in this case are set forth in the majority opinion. Any one can read them, but like all other written documents, in order to ascertain the meaning of those who wrote and promulgated them, they must be construed; and that brings us to the consideration of the question, by whom should they be construed? Counsel for appellants insist that it should be done in this case by the civil courts, for the reason that upon them depend property rights; while counsel for respondents contend that under the Constitution of the United States and that of this State that authority rests exclusively in the church tribunals.

Article I of the Amendments to the Constitution of the United States reads as follows: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."

And Section 5 of article II of the Bill of Rights of this State, reads as follows: "That all men have a natural and indefeasible right to worship Almighty God according to the *dictates of their own conscience;* that no person can, on account of his religious opinions, be rendered ineligible to any office of trust or profit under this State, nor be disqualified from testifying or from serving as a juror; that no human authority can control or interfere with the *rights of conscience;* that no person ought, by any law, to be molested in his person or *estate on account of his religous persuasion or profession;* but the liberty of

conscience hereby secured shall not be so construed as to excuse acts of licentiousness, nor to justify practices inconsistent with the good order, peace or safety of this State, or with the rights of others."

In order to fully and properly understand these constitutional provisions, we should bear in mind the conditions that existed in other countries, and the evils our forefathers intended to abolish by their adoption. At that time practically all European countries had a union of Church and State, and out of this grew religious intolerance, persecution and oppression; and to that door history has laid many of the most diabolical crimes which are recorded in the annals of time. Under such a union the ecclesiastical laws constituted a portion of the jurisprudence of those countries, and especially was that true of England, our mother country. Without going to the bottom of the question, yet from a superficial investigation of the subject, I conclude those laws were more in the nature of ordinances of cities than general laws of the country. And while the church judicatories were called ecclesiastical courts, yet they were in fact legally constituted institutions of such countries, with the whole power of government back of them. Under this form of government the judges of these courts, and their advisers, were made the arbitrators of religious liberty, the bigotry of many of whom was more profound than was their knowledge of God's word. This, of course, led to sacrifice of individual religious liberty and conviction upon the altar at the feet of the ignorant bigot; and all who possessed the courage of their conviction could not and would not submit to such outrage, which in the course of time led to great strife, persecution and oppression. Our forefathers having seen the outrages which had been perpetrated in the name of the Holy religion, and sanctioned by the laws of the country, wisely made up their minds to prevent a repetition thereof, at least

in this country, by the adoption of the constitutional provisions before mentioned.

But since there is no union of Church and State in this country, where every man is at liberty to worship God according to the dictates of his own conscience, ecclesiastical laws form no part of our jurisprudence or laws of the country, nor are ecclesiastical courts legally constituted institutions of the State or Nation. The former are not laws at all, nor are the latter courts within the meaning in which this term is used in civil government. Under the constitutional provisions before mentioned, all men are at perfect liberty to form voluntary unincorporated church societies, and to organize a church government, not inconsistent with the laws of the land, and to adopt a confession of faith and form of religious worship which is commendable to their own conscience, untrammeled by any law or any other legally constituted authority.

Under this law all church societies were authorized to hold and own church buildings and other property which were necessary incidents to proper and orderly worship. Their properly constituted authorities were authorized to enact their own laws, if we may so call them, create their own judicatories, and elect their own officers. These judicatories alone have jurisdiction to construe and enforce these laws, for the reason they involve questions of religious conviction and confession of faith, which is but the written or oral expressions of one's belief in God and his teachings. Civil courts have no jurisdiction to construe and compare confessions of faith and other religious questions, because they constitute no part of the laws of the land, but are simply doctrinal statements, expressing the religious beliefs entertained and taught by the church which promulgated them; but even if they possessed legislative sanction, still they would be invalid and void, for the reason that they would

clearly violate those constitutional provisions which were adopted for the purpose of preventing the Legislature from enacting any law which would infringe upon religious liberty, or control man's religious convictions. The laws of this State permit members of churches to investigate their own confession of faith and select their own interpreters thereof, and are not bound by the construction placed thereon by either the civil courts or by the judicatories of some other church organization. Either that must be true, or else those courts would have the absolute power of driving every member of the church therefrom by placing a construction upon the confession of faith which would be at war with every religious conviction such members entertain. Most certainly it would have that effect upon all who could not conscientiously subscribe to the faith as expounded by such courts. Not only that, but under the plain letter of the constitutional provisions before mentioned, every man has the perfect right to worship God according to the dictates of his own conscience, untrammeled not only by the laws and courts of the State but also by those of his own church; but notwithstanding that constitutional provision, the majority opinion in this case takes from and deprives appellants, and especially *those members who formerly belonged to the Cumberland Church,* of all of their rights and interests in and to this church property, for no other reason except that they availed themselves of their constitutional right to revise their Confession of Faith in such manner as to express their religious convictions.

Said provision of the State Constitution provides that all men have the right to worship God according to the *dictates of their own conscience,* and that no *human authority can interfere with or control that right, nor molest them in their property rights on account of their religious persuasions.* Clearly, the majority opinion not only *molests appellants in their*

*property* rights, but it has completely deprived them of all of their rights, title and interests in and to the same; and for no other reason, as before stated, except they *expressed their religious persuasion* in their Confession of Faith in a manner guaranteed to them by the Constitution of the State and by the constitution of both of these churches.

Again, a person can no more surrender or contract away his religious liberty and convictions by associating himself with a church than could the Legislature of the State deprive him of them by a statutory enactment—both would be absolutely void. When a person unites with a church it is supposed that he subscribes to the confession of faith as promulgated by that church and agrees to abide by its doctrines and teaching as expounded and taught by its lawfully constituted authorities, with the knowledge and understanding that the confession of faith and all doctrinal questions are liable to be amended from time to time by the judicatories of that church; and in this class of churches it has always been the common understanding of clergy and laymen, that if any member does not subscribe to the doctrines of the church as expounded by the highest tribunal thereof, then his only remedy is to withdraw his membership therefrom; and should he decline to do so, the church may expel him therefrom; and in both instances he would lose whatever interest he had in the church property. This seems to be the consensus of opinion of all of the courts of this country and of England. But in this case the exact reverse is held to be the rule. The majority who remained steadfast with the church have forfeited their property rights to the retiring minority.

If the position contended for by counsel for appellants is sound in this case, then the same contention should also hold good in a similar case arising out of a schism in any other church, This, I suppose, will be conceded; and

in view of the concession, let·us suppose the following case: Suppose the members of the Christian Church at St. Joseph (which is strictly congregational or independent organization governed solely within itself, by a majority of its members) should elect officers and employ a minister who construe the Scriptures to mean and teach Fatalism in the sense in which it was interpreted and stated by the Presbyterian Church in the Calvinistic Confession of Faith prior to its revision; and suppose a minority of the members should disagree with said officers and minister in their interpretation of the Scriptures bearing upon the question of salvation, and should believe and teach that salvation was possible to·all and certain to Christians; and suppose a schism should arise in the church over this difference of construction, and thereupon the minority should attempt to expel the majority, who concur with the minister in his belief and teachings; and suppose the minority should bring suit for the possession of the church property, alleging for their cause of action the above assumed facts, and pray judgment for the possession of the property for the reason that those facts showed the majority had departed from the faith and teachings ·of the church as expounded by Alexander Campbell and other eminent theologians of that church, would it, under that state of facts, be seriously contended by counsel for appellants that the courts of the State would have jurisdiction over and should take up the Scriptures, *which constitute the only creed and confession of faith which that church has,* and construe them for the purpose of ascertaining whether or not they taught foreordination and predestination, and solemnly determine that fact in favor of the minority or majority, and in pursuance to that ascertainment and determination decree the property to the parties whose faith coincides with the interpretation of the court? Certainly not, and any civil tribunal in Christendom which would undertake so foolish a thing would

justly subject itself to contempt and ridicule. Yet, that is just what they ask this court to do in principle in this case. There is not a whit's difference in principle between the two cases. In the case at bar, the Confession of Faith and other doctrinal teachings of the Presbyterian Church are simply condensed statements of the Scriptures, as construed by the church authorities, expressing the religious belief of the church and setting forth the most important doctrines the church believes the Scriptures teach. The Bible itself expressed the religious beliefs and teachings of the Christian Church, while the Confession of Faith in a brief manner expresses that of the Presbyterian Church; and if error has been committed by either church in its construction of the Scriptures, that error should be corrected by another and proper construction; and any law which would prevent that correction would, in my judgment, be unwise and greatly injurious to the Christian religion; and no court should hesitate for one moment to declare it invalid under the constitutional provisions before mentioned. The mere fact that the Presbyterian Church, or other church for that matter, has deemed it proper to summarize and compile its beliefs and teaching into a statement, called a "Confession of Faith," should no more prevent that church from reconstruing the Scriptures and thereby expunge error from its confession any more than the early construction placed upon the Scriptures by Alexander Campbell should prevent the ministers of to-day of the Christian Church from placing a different construction upon them. The only difference I am able to see consists more in the form in which the construction is stated than in substance. The former is in writing and is called a Confession of Faith, while the latter was oral and is called a sermon; and in the former, as I understand it, all of the ministers adhere to and teach the Confession of Faith as written, until it is repealed or amended in the manner provided

for by the constitution of the church; while in the latter each indivdual minister is at liberty to place his own construction upon each passage and preach that construction to all who will hear him. And if error be committed in that regard today, tomorrow will witness its correction by the first minister who discovers it, thereby placing it beyond the power of any individual, or even an entire congregation, from binding the entire church to error, until there is an unanimous agreement among all of the members to correct the error.

The belief of the Presbyterian Church, as well as that of the Christian, is based upon the Scriptures, and the chief distinguishing feature existing between the two churches, as I see it, is the manner in which the Scriptures are interpreted and taught by each. If that is true, and if the minority of the members of the Christian Church would have no right to oust the majority from the possession of the church property because its ministers at different times placed different constructions upon certain portions of the Scriptures, then *a fortiori* should the minority in the Presbyterian Church be denied the power to oust the majority and take possession of the church property for amending the Confession of Faith in conformity to the teaching of the Scriptures, as shown by a later and wiser construction. The churches of the country should be encouraged along this line of progress, in order that they may keep abreast of the times, and throw aside all useless doctrinal matters, and teach and practice Christianity as Christ taught and practiced it while he was on earth.

The framers of the constitutions of these two churches, in their wisdom, foresaw the time when doctrinal questions would cease to play important roles in the teachings and practices of the Christian religion and would give way to broader and higher conceptions of God and Christ and His teachings. In order to meet these important emergencies as they might

arise from time to time, the constitution of each provides that "upon the recommendation of the General Assembly, . . . the Confession of Faith, Catechism, Constitution and Rules of Discipline may be amended or changed" by the approval of a majority of the Presbyteries. The framers of those instruments saw and fully understood that the Confession of Faith was not perfect when adopted, and that in the course of time members of these churches would grow in grace and knowledge through works and faith in Christ, and would for that reason be better fitted to understand the teachings of the Scriptures, which would necessitate a modification or change in the Confession of Faith, in order to conform to this new knowledge of Christian teachings. The founders of these churches, knowing from the teachings of the Scriptures, that this growth of their members in the spirit of God would require a modification of the Confessions of Faith, met that contingency by a constitutional provision, authorizing amendments to the Confession of Faith, and every member when he or she joined the church thereby agreed to that constitutional provision in the same manner that he and she agreed to all other laws of the church. That being true, it must follow as a necessary sequence, that when the two churches through their properly constituted authorities amended the Confession of Faith, in the manner pointed out by the constitutions of the two churches, all members of both churches are bound thereby so long as they remain in the church; and if the amendment does not meet with their religious convictions, they are legally bound according to the ecclesiastical laws of the church to withdraw from its membership, otherwise each and every dissenting member may effectually prevent all amendments to the Confession of Faith, and thereby bind the church to the Confession as originally written, as long as time lasts, although every other member of the entire church may believe in and favor the amendment.

Such a result is clearly against the whole spirit and growth of the church and violative of all of its laws, and no court, civil or ecclesiastical, should lend its aid to such an unwise and unjust result.

Not only are members of religious associations, such as churches, bound by constitutional provisions which authorize amendments to their Confession of Faith and other by-laws, as is fully established by the numerous authorities heretofore cited, but the same rule of law applies in fraternal insurance associations, the primary object of which is pecuniary protection, and upon which property rights depend; and when such amendments are made in the manner provided for by the constitution thereof, they are binding upon all.

The Supreme Court of Indiana in the case of Supreme Lodge, Knights of Pythias, v. Knight, 3 L. R. A. l. c. 412, used this language: ·

"The provisions of the established by-laws of an association such as that with which the assured united are, as appellee's counsel justly affirm, elements of the contract of insurance. They are factors that cannot be disregarded. That they have this effect all who become members of the association must know. A person who enters an association must acquaint himself with the laws, for they contribute to the admeasurement of his rights, his duties and his liabilities. [Bauer v. Samson Lodge K. of P., 102 Ind. 262; Fugure v. Mut. Society of St. Joseph, 46 Vt. 368; Simeral v. Dubuque Mut. F. Ins. Co., 18 Iowa 319; Coles v. Iowa State Mut. Ins. Co., 18 Iowa 425; Coleman v. Knights of Honor, 18 Mo. App. 189; Mitchell v. Lycoming Mut. Ins. Co., 51 Pa. St. 402; People ex rel. v. St. George's Society, 28 Mich. 261; Osceola Tribe v. Schmidt, 57 Md. 98; Sperry's Appeal, 8 Cent. Rep. 215, 116 Pa. St. 391; Bacon, Benefit Societies, sec. 81.]

"It is not one by-law or some by-law of which the

member must take notice, but he must take notice of all which affect his rights or interests. [Poultney v. Bachman, 31 Hun 49.]

"Where, as here, there is an express and clear reservation of the right to amend, he is bound to take notice of the existence and effect of that reserved power. The power to enact laws is inherent in every corporation as an incident of its existence. This power is a continuous one. [Niblack, Mut. Ben. Societies, sec. 124.]

"No one has a right to presume that by-laws will remain unchanged. Associations and corporations have a right to change their by-laws when the welfare of the corporation or association requires it, and it is not forbidden by the organic law. The power which enacts may alter or repeal. [Richardson v. Union Cong. Society, 58 N. H. 187; Com. ex rel. v. Mayor, 5 Watts 152; St. Patrick's Male Beneficial Society v. McVey, 92 Pa. St. 510.]

"The duly chosen and authorized representatives of the members alone are vested with the power of determining when a change is demanded, and with their discretion courts cannot interfere. Were it otherwise, courts would control all benevolent associations, all corporations, and all fraternities. It is only when there is an abuse of discretion, and a clear, unreasonable and arbitrary invasion of private rights, that courts will assume jurisdiction over such societies or corporations. With questions of policy, doctrine or discipline courts will not interfere. Courts will compel adherence to the charter, and to the purpose for which the society was organized, but they will not do more. [Stadler v. Grand Lodge, 3 Am. Law Rec. 589; Crossman v. Massachusetts Ben. Asso., 3 New Eng. Rep. 517, 143 Mass. 435; Hussey v. Gallagher, 61 Ga. 86.]

"The principle which rules here is strictly analogous to those which prevail in controversies between the officers and members of religious organiza-

tions; and it is well settled that in such cases courts' will not control the exercise of discretionary powers, or direct the course of an action in matters of expediency or polity. [Dwenger v. Geary, 12 West. Rep. 691, 113 Ind. 106.]

"To justify interference by the courts, and warrant the overthrow of by-laws enacted in the mode prescribed by the by-laws, it must be shown that there was an abuse of power, or that the later by-law is unreasonable. It is not enough to show that a better or wiser course might have been pursued, for it must be shown that there was an abuse of discretion, or that the by-law is so unreasonable as to be void.

"We do not affirm that a benefit society may, by a change in its by-laws, arbitrarily repudiate an obligation created by a policy of insurance; but we do affirm that where a change is regularly made in its by-laws, and the motive which influences the change is an honest one to promote the welfare of the society, and the members are all given an opportunity to avail themselves of the change, no actionable wrong is done the members of their beneficiaries. It may sometimes happen that the interests of an individual, or of a few individuals, may be impaired; but it is the right, and indeed it is the duty, of the society, to protect the interests of the many, rather than of the few. Persons who become members of such societies must take notice of this; and one person cannot, therefore, demand that the welfare of the society and the interests of the many be sacrificed for his sole benefit.

"In the case before us the change from the one plan to the other was not an arbitrary or unreasonable exercise of power; nor was it the repudiation of a debt, nor the destruction of a vested right. It was not unreasonable, because it may well be that the system of insurance originally adopted, which gave no heed to age, was so infirm as to be incapable of long enduring. It was not arbitrary, because the by-laws

reserved the right of amendment, and a desire to promote the welfare of the society brought about the change. It was not the repudiation of a debt, because the right to the avails of assessment provided for by the contract was not taken away. It was not the destruction of a vested right, because the power to amend was, as reserved, a part of the contract from which the right of the beneficiary emanated, and because, also, the right to enter the new class was open to all members on equal terms.'' If such amendments are valid and binding upon the property rights of members in fraternal associations, whose primary object is to furnish protection for the families of the deceased members, which is purely a property right, then how much stronger should the reason be for holding such amendments valid and binding upon members of religious societies, where the primary object of the society is to care for the spiritual welfare of its members, and where their property rights and interests are purely incidental and of minor and secondary consideration. In each case the members have agreed in advance that the amendment might be made, and where so made in pursuance to their previous agreement, they are bound thereby so long as they remain members of the society; and in each case if they are dissatisfied with and cannot conscientiously subscribe to the amendment, then his only legal remedy is to withdraw from the society and by so doing in the absence of an agreement to the contrary, he forfeits all his interests in and rights to the property of the association.

The mere fact that some of the members of the Cumberland Church could not subscribe to the Confession of Faith of the united church, which was a modification of the Presbyterian confession, which was adopted as the confession of the united church, was wholly immaterial from a legal standpoint, for the reason that the constitutional provisions which authorized

such amendment did not limit the church to any particular kind of amendment, nor require that it should conform to the religious beliefs and convictions of each and all of the members before it should become valid and operative.

(b)  We are now brought to the question, was there an inconsistency and irreconcilable conflict between the confessions of faith at the time the union was approved by the Presbyteries of the two churches? Should we concede this to be true, still that, in my judgment, would not alter the legal aspect of the question involved, for the reason, as before pointed out, there was no limitation placed by the constitution upon the church as to the character of amendments that it might make to the Confession of Faith, Catechism, Constitution and Rules of Discipline; and in the absence of such limitation clearly the church had the power to make any amendments they deemed proper and for the good of the church, especially in doctrine or touching doctrinal matters; and if any member cannot conscientiously subscribe to the confession as amended, then he may withdraw, if he wishes, from the church.  But to my mind such conflict would not warrant the courts in declaring the union invalid, or justify any member in withdrawing from the church any more than he would be warranted in repudiating the Christian religion, simply because there are the same apparent and irreconcilable conflicts contained in the Holy Scriptures themselves.  That such apparent conflict does exist therein is evidenced by the existence of so many churches, all of which believe in the Christian religion, but no two of them construe or interpret the Scriptures alike, thereby showing that they mean one thing to one church and another thing to another church, and so on to the end of the list.

Take this very case, and if it be conceded that the Presbyterian Church prior to the modification of its Confession of Faith in 1903 believed that the Bible

taught fatalism or predestination or foreordination, while the Cumberland Church believes it teaches man is a free, moral agent, and that all men through the atonement and divine influence of God may be saved. In fact, my understanding is that this very difference in belief largely caused the Cumberland Church, in 1810, to separate from the Presbyterian. So, it is seen that it would be just as consistent for the Cumberland members to say that they would repudiate the Christian religion because those apparent inconsistent teachings are found in the Bible as for them to withdraw from the united church because its Confession of Faith contains those same identical inconsistences. But let us withdraw the concessions before made and look at these two confessions of faith as they were at the time the union was voted upon.

In the year 1884, the Cumberland Church amended its Confession of .Faith regarding the question of "Fatalism" and "Free Agency" and promulgated the same with the following preliminary statement:

"The founders of the Cumberland Presbyterian Church in their licensure and ordination by the Presbyterian Church were permitted to 'except the idea of fatality,' as they believed it to be embraced in the doctrines of unconditional election and reprobation, and an atonement, limited to a definitely elected number, as taught in the Westminster Confession of Faith. Subsequently, having for this been cut off from the parent church, in fixing a standard of doctrine for the Cumberland Presbyterian Church, which they organized, they adopted the Westminster Confession of Faith, modified in the following particulars:

"1. That there are no eternal reprobates.

"2. That Jesus died, not for a part only, but for all men, and in the same sense.

"3. That all infants dying in infancy are saved.

"4. That the Holy Spirit operates on all the

world—on all for whom Christ died—in such manner as to render all men responsible, and therefore inexcusable.''

And in 1903 the Presbyterian Church accomplished a revision of its Confession of Faith also, which embraced a declaratory statement intending to explain the objectionable clauses and remove all misapprehension of their meaning, which in so far as is material to this case reads as follows:

## ''II.    The Declaratory Statement.

''While the ordination vow of ministers, ruling elders, and deacons, as set forth in the Form of Government, requires the reception and adoption of the Confession of Faith only as containing the System of Doctrine taught in the Holy Scriptures, nevertheless, seeing that the desire has been formally expressed for a disavowal by the church of certain inferences drawn from statements in the Confession of Faith, and also for a declaration of certain aspects of revealed truth which appear at the present time to call for more explicit statement, therefore the Presbyterian Church in the United States of America does authoritatively declare as follows:

''First, with reference to Chapter III of the Confession of Faith; that concerning those who are saved in Christ, the doctrine of God's eternal decree is held in harmony with the doctrine of His love to all mankind. His gift of His Son to be the propitiation for the sins of the whole world, and His readiness to bestow His saving grace on all who seek it. That concerning those who perish, the doctrine of God's eternal decree is held in harmony with the doctrine that God desires not the death of any sinner, but has provided in Christ a salvation sufficient for all, adapted to all, and freely offered in the Gospel to all; that men are fully responsible for their treatment of God's gracious offer; that his decree hinders no man from ac-

cepting that offer; and that no man is condemned except on the ground of sin.

"Second. With reference to Chapter X, Section 3, of the Confession of Faith, that it is not to be regarded as teaching that any who die in infancy are lost. We believe that all dying in infancy are included in the election of grace and are regenerated and saved by Christ through the Spirit, who works when and where and how he pleases."

For years, yes, for more than half a century, the former church had from time to time made overtures to the latter, looking toward a union between them; and with that idea in view, as I understand this record, the principal difference that existed between them was over the question of fatalism, and in order to harmonize their Confession of Faith with each other in that regard, the amendments before stated, were made. Thereupon steps were taken to form this union, and, as before stated, each church appointed a Committee on Fraternity and Union. These committees met, formulated and agreed upon the joint report hereinbefore set out. This report declared in substance: That such agreement now exists between the system of doctrine contained in the Confessions of Faith of the two churches as to warrant this union—a union honoring alike to both. The plan of union provides that the two churches "shall be united as one Church, under the name and style of the Presbyterian Church in the United States of America, possessing all the legal and corporate rights and powers which the separate churches now possess." It was further provided that "all ministers and Churches included in the two denominations shall be admitted to the same standing in the united Church which they may have held in their respective connections up to the consummation of the reunion." Also "that the boundaries of the several Presbyteries and Synods shall be adjusted by the General Assembly of the United Church, and the offi-

cial records of the two Churches during the period of separation shall be preserved and held as making up the history of the one Church."

This report was duly adopted by the General Assembly of each church, and was by them recommended to their respective Presbyteries for approval, which was duly approved by each in the manner and form provided by their respective constitutions, as before stated.

Counsel for respondents contend that this record shows that the creeds of the two churches are substantially the same, and that there is no real conflict between them.

The two churches, in a constitutional manner, after years of work and deliberation, solemnly declare that they were substantially the same, and that the only difference, "Fatalism" and "Free Agency," that separated and held them apart had been removed by the revision of the Confession of Faith of the Presbyterian Church in the year 1903. It seems to me that the determination of that question by the decisions of the highest judicatories of those two churches should and does fully determine that question. It was purely a question of belief regarding spiritual matters, and in the very nature of things no one can tell what the religious convictions of a man are as well as he can himself. The good people of these churches were not feigning and trying to deceive each other as to what their beliefs were upon the question of "Fatalism." It seems to me that the time, place and subject matter were sufficient inducements for them to speak the truth, and should remove every doubt as to their sincerity, when they solemnly declared that the two Confessions of Faith were substantially the same. This alone, should constitute sufficient reason for this court to adopt the decisions of the courts of these churches upon that question.

But independent of this, a creed or confession of

faith cannot be construed by the same canons of construction with which we construe ordinary written documents.

One of the principal rules for construing wills, deeds and other documents is that all "words and phrases used therein shall be taken in their plain or ordinary and usual sense." When applied to the construction of legal instruments that is a wise and helpful rule in ascertaining the intention and meaning of the parties who executed it, for the reason they refer to things and express ideas about worldly matters with which all are familiar; but that is not true in spiritual matters. No one possesses actual knowledge of God and His infinite wisdom, and for that reason but few persons can have the same conception of Him or of His will. So it must follow therefrom that all words and phrases spoken or written of or concerning God are understood and interpreted in the light of the conception the reader or hearer of those words have of God and of His will, and when so used and interpreted he attaches to them the usual meaning which is given to them by the persons who have the same idea or conception as his own of God, and with whom he usually associates and discusses religious matters. Or to make my meaning plainer, words and phrases are used to express and convey ideas which are transcripts, images or pictures of images of things we have in mind, and when applied to terrestrial matters, such, for instance, as contracts or other legal instruments, the mind naturally reverts to the worldly matters which constitute the subject-matter of the contract, about which practically all persons possess the same common knowledge; and for that reason when words are used regarding such instruments, they convey practically the same image, picture or idea to the minds of all who read or hear the words spoken; and it is for this reason that the rule requires courts in the construction of contracts and other legal instruments to give to the

words thereof their plain and ordinary meaning. But that is not true in religious matters, where the words used refer to spiritual matters and present to the minds of those who use, read or hear them images or pictures of spiritual and invisible things as they conceive them to be, few of whom, however, entertain the same conception or idea of God, Christ and the Holy Spirit, and for that reason when words are used in reference to spiritual matters, they convey to the minds of those who read or hear them quite different ideas, for the reason that they have not the same conception of those matters, as they have in the case of worldly matters, consequently the words used present to the mind of each person the picture or image of God and a transcript of His words as they have previously conceived Him and them to be. To all persons of a particular sect the words and phrases employed by them in their Confession of Faith, or other doctrinal matters, have a particular or technical meaning which expresses their own particular conceptions and beliefs in spiritual matters; but such language would fail to express the conceptions and belief of any other religious sect, for the reason that their conception of spiritual matters is entirely different from the former; and this is the reason, as before stated, for the existence of so many different religious denominations. This same rule of interpretation is applied in the business affairs of life. The books are full of cases which show that certain words and phrases when used in certain business transactions have a particular meaning, which is understood only by those who are familiar with that particular kind of business; and if applied to some other business, they would convey an entirely different meaning. This condition calls for expert testimony, and no witness is qualified to testify of such matters except when it is first shown that he is familiar with that particular class of business. So it is in religious matters—no one is competent to inter-

pret the words and construe the Confession of Faith of a particular church without it is first shown that he is a believer in that doctrine. His belief in spiritual matters occupies the same relative position to the knowledge of the expert in business affairs, and without that belief the former cannot properly interpret the words of the Confession of Faith of a particular church any more than a witness without such knowledge could testify as to the meaning of technical words used in a particular business transaction. This rule applies equally as well to all, whether judges, saints or sinners.

This being unquestionably true, then we may have the same word spoken in the presence of two or more persons regarding religious matters and each and every one of them may attach a different meaning to them and understand the proposition stated differently. This truth is recognized and acknowledged generally by all well informed religious people, and is taught in the Scriptures. For this reason it would lead to erroneous conclusions were we in the construction of creeds and confessions of faith to give to the words and phrases thereof the plain and ordinary meaning that is attached to them in the ordinary affairs of life, for by so doing they would mean one thing to the member of one church and another thing to a member of a different church; and just so long as people have imperfect conceptions of God and spiritual matters, just that long will this apparent conflict in the Scriptures and creeds of churches exist, for the reason, as before stated, the language used therein does not express or convey the *same idea alike* to all who read or hear it spoken, but is construed by each individual and church according to the correct or incorrect conception he or it has of God and of heavenly matters. If his conception of God is that He is, for instance, a personal God, then the word "God" conveys to his mind the image of some perfect man; and, of course, that conception or

image differs in the minds of all such, for the reason that they do not all have the same conception of what constitutes a perfect man, but each attributes to his own ideal man the most perfect qualities and attributes which his mind is capable of conceiving. That being true, then in all such cases each person's conception of God varies according to his various conceptions of what constitutes a perfect man; and the latter depends largely upon his intelligence, knowledge and moral qualities. But these are all formal matters and have nothing to do with true religion. The fault rests with the individual and not with religion or the Scriptures; and my only object in mentioning them was to show why, in my judgment, the Scriptures and church creeds are misunderstood by so many people.

But when we come to investigate true religion and the teachings of Christ, we find that there is no real conflict either in the Scriptures or between the two Confessions of Faith involved in this case. All teach substantially the same great fundamental truths, and all Christians regardless of the particular church to which they belong believe in those truths, some of which are as follows:

The existence of God, the Trinity, the authenticity of the Bible, Creation, Providence, the Fall of Man, God's universal love for all, that Christ died for the sins of the world, that through the atonement whomsoever will may be saved, that all infants dying in infancy and all others who never possessed reason, and all who have no knowledge of the Scriptures, but have led exemplary lives according to their dim lights, will be saved.

Upon these matters all churches and all Christians agree, and their only differences grow out of their imperfect knowledge of God and His plan of salvation, which has caused confusion in the minds of many, leading them to believe that some formal and immaterial matters are of substance and are essential to salvation;

but, upon the other hand, the Bible is so plain upon the fundamental principles of religion that no church or member thereof has ever been so confused or so misled thereby as to mistake substantial matters taught therein for formal or immaterial matters, and for that reason disregard its mandate.

When we take this broad view of the Scriptures and read the two Confessions of Faith in the light thereof, can there be any possible doubt in the minds of intelligent men about the identity of doctrine stated in the two? If I had the legal right to decide that question, which I deny, I would not hesitate one moment in answering it in the negative. Any other construction would seem to me to be too narrow and technical to meet the broad and useful purposes intended to be accomplished by their promulgation.

On account of the inestimable good which would have been done for the Church, religion and the human family generally, it is, in my judgment, to be deeply regretted that this wise and beneficial union is to be disturbed.

For the reasons hereinbefore stated, I believe the motion for a rehearing should be sustained, in order that this important case, the most important, in my judgment, which has ever been presented to this court, may be argued again.


## DISSENTING OPINION.

LAMM, J.—What I have to say can be said shortly; for in the face of all that has been said pro and con (and well said), the *furor scribendi* is out of place. While the opinions of my learned brothers, GRAVES and VALLIANT, concurred in by a majority of the brethren, do not say in so many words that legal church unions are impossible; yet, as read between the lines, in final effect they seem to announce to the several denominations of the Christian Church in America a doctrine

222 Sup.—50

tantamount to that. I do not agree to that doctrine, by or large, in whole or in part. I do not agree that the road to church unity on the basis of the essentials of Christian faith (allowing flexibility and liberty of belief in non-essentials) is laid with legal pitfalls or bristles with obstacles well-nigh insurmountable. To my mind there are no legal lions in the way to the affirmance of this decree. I am not willing to announce as the solemn and final conclusion of this court, that the longing, abiding and great hopes of Presbyterian Church unity are vain; that the dreams of the wise and good in that behalf may never come true. The new dogma of once split always split is a heresy in logic and in law. The Christian Church, burst asunder centuries ago by cleavages, need not stay apart like inanimate rocks burst in twain by heat or frost. It seems to me the bounden duty of courts is to lend all the art and reason of the law to smooth the way and make the path easy to unity in endeavor, Christian faith and church relation; and any other view is dreary and un-necessary.

With such predilections I have read the briefs of counsel, the opinions of the majority, the record in the cause and the dissenting opinion of my learned brother WOODSON. The proposition of law announced and the authorities cited by him have my approval and, therefore, I dissent from the majority opinions and vote to sustain the motion for a rehearing.